IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| JOHN DOE<br>c/o Nesenoff & Miltenberg, LLP<br>363 Seventh Avenue, 5th Floor<br>New York, NY 10001-3904,<br><br>         Plaintiff,<br><br>vs.<br><br>CASE WESTERN RESERVE<br>UNIVERSITY<br>10900 Euclid Avenue<br>Cleveland, Ohio 44106,<br><br>and<br><br>CASE WESTERN RESERVE<br>UNIVERSITY BOARD OF TRUSTEES<br>10900 Euclid Avenue<br>Cleveland, Ohio 44106,<br><br>and<br><br>BARBARA R. SNYDER<br>c/o Case Western Reserve University<br>10900 Euclid Avenue<br>Cleveland, Ohio 44106,<br><br>and<br><br>LOU STARK<br>c/o Case Western Reserve University<br>10900 Euclid Avenue<br>Cleveland, Ohio 44106,<br><br>and<br><br>G. DEAN PATTERSON, JR.<br>c/o Case Western Reserve University<br>10900 Euclid Avenue<br>Cleveland, Ohio 44106, | CASE NO. 1:17-cv-414<br><br>JUDGE<br><br><br><br><br><br><br><br>**COMPLAINT**<br>**(Jury Trial Demanded)** |

and                                            )
                                               )
GEORGE O'CONNELL                               )
c/o Case Western Reserve University            )
10900 Euclid Avenue                            )
Cleveland, Ohio 44106,                         )
                                               )
and                                            )
                                               )
SHANNON J. GREYBAR MILLIKEN                    )
c/o Case Western Reserve University            )
10900 Euclid Avenue                            )
Cleveland, Ohio 44106,                         )
                                               )
and                                            )
                                               )
LAUREN TOMPKINS                                )
c/o Case Western Reserve University            )
10900 Euclid Avenue                            )
Cleveland, Ohio 44106,                         )
                                               )
            Defendants.                         )

Plaintiff John Doe[1], (hereinafter referred to as "Plaintiff" or "John Doe"), by his attorneys Ziegler Metzger LLP and Nesenoff & Miltenberg, LLP, as and for his Complaint against Defendants Case Western Reserve University, Case Western Reserve University Board of Trustees, Barbara R. Snyder, Lou Stark, G. Dean Patterson Jr., George O'Connell, Shannon J. Greybar Milliken and Lauren Tompkins, respectfully alleges as follows:

## THE NATURE OF THIS ACTION

1.      This case arises out of the actions taken and procedures employed by Defendants Case Western Reserve University ("CWRU" or the "University"), Case Western Reserve University Board of Trustees ("Defendant Board of Trustees"), Barbara R. Snyder ("Defendant Snyder"), Lou Stark ("Defendant Stark"), G. Dean Patterson, Jr. ("Defendant Patterson"),

---

[1] Plaintiff herewith files a motion to proceed pseudonymously.

George O'Connell ("Defendant O'Connell"), Shannon J. Greybar Milliken ("Defendant Milliken") and Lauren Tompkins ("Defendant Tompkins") (hereinafter collectively referred to as the "CWRU Defendants") concerning allegations made against Plaintiff which resulted in his suspension despite a previously unblemished disciplinary record at CWRU as a result of false allegations of nonconsensual sexual activity with fellow CWRU student Jane Doe.

2.      The false allegations of sexual assault involving Jane Doe arose from consensual sexual activity that occurred on the evening of September 13, 2014 (the "Incident").

3.      On November 25, 2014, a student who worked with Deputy Title IX Coordinator and Assistant Director of Student Affairs Defendant Milliken encouraged Jane Doe to contact Defendant Milliken to report the events of the alleged Incident with John Doe. Although Jane Doe had stated that she "was just trying to process her feelings" about what occurred with John Doe, the student convinced Jane Doe to report what had happened.

4.      Jane Doe did not request an investigation.  Yet, without contacting John Doe to determine if a violation of the student code had in fact occurred, Defendant Milliken accepted Jane Doe's allegations as fact and proceeded with the "next steps" to initiate an investigation.

5.      John Doe did not learn of the allegations against him until December 11, 2014. Without being provided a notice of investigation, being informed that he would be discussing possible charges of student conduct violations, or being informed of his right to be accompanied by an advisor to this meeting, John Doe went to the unannounced mandatory meeting with Defendant Milliken who began her inquiry with John Doe about the night of the alleged Incident.

6.      On February 6, 2015 John Doe had his second and final interview with Defendant Milliken.  It was the only time John Doe was asked to fully recount the events of the alleged Incident.

7.     On February 25, 2015 at 3:30 p.m., John Doe appeared before the Administrative Hearing Officer (the "Hearing") and the Title IX Coordinator to respond to allegations that he had violated the Sexual Misconduct Policy: Non-consensual Sexual Intercourse.

8.     Ultimately, on February 27, 2015, Hearing Officer Defendant O'Connell issued a decision letter (the "Decision Letter") finding John Doe responsible for the charge of non-consensual sexual intercourse (the "Decision"). As a result, the CWRU Defendants imposed the following sanctions: (i) suspension from CWRU until May 2017; (ii) disciplinary probation for the remainder of John Doe's time at CWRU; (iii) eviction from University housing; (iv) a no contact order for the duration of his time at CWRU; (v) and entrance into a counseling program for alcohol abuse (collectively, the "Sanction").

9.     John Doe timely submitted an appeal of the Administrative Hearing Officer's Decision to the Appeals Board on March 4, 2015.

10.    On March 17, 2015 Gia M. Adeen, Appeals Board Chair and Deputy Title IX Coordinator, issued a decision upholding the original Decision while the Board egregiously amended and increased the length of the Sanction by imposing suspension for an additional one year, for a total of three years' suspension, until May 2018.

11.    John Doe was immediately evicted from his university housing and banned from the CWRU campus until May 2018, without an opportunity to speak with any of the CWRU administrators before his departure.

12.    Throughout the investigative process, the CWRU Defendants failed to abide by CWRU's own guidelines and regulations and acted in direct violation of federal and/or state law.

13.    A non-exhaustive list of the CWRU Defendants' wrongful actions include the following: (i) Defendants failed to conduct a thorough and impartial investigation; (ii)

4

Defendants improperly advised and advocated on behalf of Jane Doe; (iii) Defendants evidenced a gender bias against John Doe as the male accused throughout the investigative and hearing process; (iv) Defendants made assessments of credibility and evidentiary weight with respect to each party without any logical basis or rationale; (v) Defendants denied John Doe of the opportunity to present and question all relevant witnesses; (vi) Defendants failed to afford John Doe the requisite presumption of innocence required by a preponderance of the evidence standard; and (vii) the unwarranted and unduly severe  Sanction was unilaterally and arbitrarily increased.

14.     When the CWRU Defendants subjected John Doe to disciplinary action, they did so in an arbitrary and capricious way, and with an anti-male discriminatory bias in violation of Title IX. The CWRU Defendants failed to adhere to CWRU's own guidelines and regulations, which resulted in a fatally flawed proceeding. The procedural violations that permeated CWRU's disciplinary process, combined with a discriminatory bias against males and the underlying motive to protect CWRU's reputation and financial wellbeing led to an erroneous finding of sexual misconduct against John Doe.

15.     John Doe has been greatly damaged by the actions of Defendants: his education and career prospects have been severely compromised as he will be unable to gain admission to any institution of similar standing to complete his undergraduate education or to obtain gainful employment with a disciplinary mark on his academic record. Additionally, as a result of Defendants' actions and inactions, John Doe has suffered physical, psychological, emotional and reputational damages, economic injuries and the loss of educational and career opportunities.

16.     John Doe therefore brings this action to obtain relief based on causes of action for, among other things, violation of Title IX of the Education Amendments of 1972, violation of

14th Amendment Procedural Due Process, breach of contract, abuse of process, intentional infliction of emotional distress and other state law causes of action.

**THE PARTIES**

17.     Plaintiff John Doe is a natural person, citizen of the United States and citizen of the state of Texas. During the events described herein, Plaintiff was a student at Case Western Reserve University and resided in university housing in Cleveland, Ohio.

18.     Defendant Case Western Reserve University is a not-for-profit Ohio corporation and private institution renowned for research and graduate programs in law, engineering and management science located in Cleveland, Ohio.

19.     Upon information and belief, the Case Western Reserve University Board of Trustees is the governing body of Case Western Reserve University. It is currently composed of 41 members, of which 32 members are alumni. Upon information and belief, the Board of Trustees is responsible for setting policy to govern the university and approving budgets and expenditures.

20.     Upon information and belief, Barbara J. Snyder is a resident of the State of Ohio and was the President of Case Western Reserve University at all relevant times herein.

21.     Upon information and belief, Lou Stark is a citizen of the State of Ohio and was Vice President for Student Affairs of Case Western Reserve University at all relevant times herein.

22.     Upon information and belief, G. Dean Patterson, Jr. is a citizen of the State of Ohio and was the Associate Vice President for Student Affairs at Case Western Reserve University at all relevant times herein.

23.     Upon information and belief, George O'Connell is a citizen of the State of Ohio and was the Director of Student Conduct and Community Standards of Case Western Reserve University at all relevant times herein.

24.     Upon information and belief, Shannon J. Greybar Milliken is a citizen of the State of Ohio and was Associate Dean of Students and Deputy Title IX Coordinator at Case Western Reserve University at all relevant times herein.

25.     Upon information and belief, Lauren Tompkins is a citizen of the State of Ohio and was an Investigator at Case Western Reserve University at all relevant times herein.

26.     Plaintiff John Doe and Defendants Case Western Reserve University, Case Western Reserve University Board of Trustees, Snyder, Stark, Patterson, O'Connell, Milliken and Tompkins are sometimes hereinafter collectively referred to as the "Parties."

## JURISDICTION AND VENUE

27.     This Court has federal question, diversity and supplemental jurisdiction pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1332 and 28 U.S.C. § 1367 because: (i) the federal law claims arise under the constitution and statutes of the United States; (ii) Plaintiff and Defendants are citizens of different states; and (iii) the state law claims are so closely related to the federal law claims as to form the same case or controversy under Article III of the United States Constitution.

28.     This Court has personal jurisdiction over Defendant CWRU on the grounds that it is conducting business within the State of Ohio.

29.     This Court has personal jurisdiction over Defendant Board of Trustees on the grounds that it is conducting business within the State of Ohio and is the governing body of Case Western Reserve University.

30.     This Court has personal jurisdiction over Defendant Snyder on the grounds that she was acting as an agent of CWRU at all relevant times herein.

31.     This Court has personal jurisdiction over Defendant Stark on the grounds that he was acting as an agent of CWRU at all relevant times herein.

32.     This Court has personal jurisdiction over Defendant Patterson on the grounds that he was acting as an agent of CWRU at all relevant times herein.

33.     This Court has personal jurisdiction over Defendant O'Connell on the grounds that he was acting as an agent of CWRU at all relevant times herein.

34.     This Court has personal jurisdiction over Defendant Milliken on the grounds that she was acting as an agent of CWRU at all relevant times herein.

35.     This Court has personal jurisdiction over Defendant Tompkins on the grounds that she was acting as an agent of CWRU at all relevant times herein.

36.     Venue for this action properly lies in this district pursuant to 28 U.S.C. § 1391 because CWRU is considered to reside in this judicial district and a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

## FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

### I.     Background: The Department of Education's Office for Civil Rights' April 2011 "Dear Colleague Letter"

37.     On April 4, 2011, the Office for Civil Rights ("OCR") of the U.S. Department of Education ("DOE") sent a "Dear Colleague Letter" to colleges and universities (hereinafter referred to as the "Dear Colleague Letter"). The Dear Colleague Letter provides a necessary set of background facts to this action.

38.     The Dear Colleague Letter advised that, in order to comply with Title IX, colleges and universities must have prompt procedures to investigate and resolve complaints of sexual misconduct. Most notably, the Dear Colleague Letter required schools to adopt a relatively low burden of proof referred to as the preponderance of the evidence standard – "more likely than not" -- in cases involving sexual misconduct, including assault. Several colleges had been using the "clear and convincing" standard and some, like Stanford University, applied the criminal standard, "beyond a reasonable doubt." The Dear Colleague Letter states that schools should "minimize the burden on the complainant," transferring alleged perpetrators, if necessary, away from shared courses or housing. The Dear Colleague Letter, while not completely ignoring due process concerns, suggested that schools should focus more on victim advocacy. The Dear Colleague Letter states that schools should give both parties the right to appeal a decision, which amounts to double jeopardy for an accused student. After the Dear Colleague Letter was published, many schools revised their sexual assault and sexual harassment policies and procedures, to ensure compliance with Title IX, under a threat of rescission of federal funding.

39.     The Obama Administration, through the DOE and OCR, treated the 2011 Dear Colleague Letter as binding on regulated parties for all practical purposes and thus pressured colleges and universities to aggressively pursue investigations of sexual assaults on campuses. Catherine Lhamon, former Assistant Secretary of the Department of Education ("Assistant Secretary Lhamon") delivered what has continued to be treated as marching orders by colleges and universities:

(a)  In February 2014, Assistant Secretary Lhamon told college officials attending a conference at the University of Virginia that schools need to make "radical" change. According to the Chronicle of Higher Education, college presidents said afterward that there were "crisp

marching orders from Washington." "*Colleges Are Reminded of Federal Eye on Handling of Sexual-Assault Cases,*" Chronicle of Higher Education, February 11, 2014.

(b) In June 2014, Assistant Secretary Lhamon testified at a Senate Hearing that "some schools are still failing their students by responding inadequately to sexual assaults on campus. For those schools, my office and this Administration have made it clear that the time for delay is over." Assistant Secretary Lhamon stated at the Senate Hearing in June 2014 that "we do" expect institutions to comply with the 2011 Dear Colleague Letter. Assistant Secretary Lhamon told the Senate Committee, "This Administration is committed to using all its tools to ensure that all schools comply with Title IX . . ." She further told the Committee: If OCR cannot secure voluntary compliance from the recipient, OCR may initiate an administrative action to terminate and/or refuse to grant federal funds or refer the case to the DOJ to file a lawsuit against the school.

(c) In July 2014, Assistant Secretary Lhamon, speaking at a conference on campus sexual assault held at Dartmouth College, stated that she was prepared to cut off federal funding to schools that violate Title IX and that she would strip federal funding from any college found to be non-compliant with the requirements of the Dear Colleague Letter. "Do not think it's an empty threat," Assistant Secretary Lhamon warned. She went on to describe that enforcement mechanism as part of a set of "very, very effective tools," adding "If a school refuses to comply with Title IX in any respect, I will enforce."  Assistant Secretary Lhamon was quoted: "It's not surprising to me that we haven't gone to the last step. . . . It means that so far the process has been working." Meredith Clark, "*Official to colleges: Fix sexual assault or lose funding,*" July 15, 2014 (available at: http://www.msnbc.com/msnbc/campus-sexual-assaultconference-dartmouth-college#51832).

(d)  Assistant Secretary Lhamon was quoted in the *Los Angeles Times* stating, "We don't treat rape and sexual assault as seriously as we should, . . . [There is] a need to push the country forward." Savage and Timothy M. Phelps, "*How a little-known education office has forced far-reaching changes to campus sex assault investigations*," *Los Angeles Times*, August 17, 2015.

40.    To support making the Dear Colleague Letter binding, the OCR has hired hundreds more investigators to ensure Title IX enforcement. The Federal Government is currently investigating approximately 307 schools for possible Title IX violations, including notable schools such as UC Berkeley, Stanford, Harvard, Brown University, Columbia University, Cornell University, Dartmouth College, Johns Hopkins University, the University of Chicago and many top state universities. The Department of Education has also negotiated settlements and voluntary resolutions with many schools.

41.    Colleges and universities, including Defendant CWRU, are fearful of and concerned about being investigated or sanctioned by the DOE and/or of potential Title IX lawsuits by the U.S. Department of Justice ("DOJ"). The White House issued a report entitled "Not Alone" in April 2014, which included a warning that if the OCR finds that a Title IX violation has occurred, the "school risks losing federal funds" and that the DOJ shares authority with OCR for enforcing Title IX, and may initiate an investigation or compliance review of schools; if a voluntary resolution cannot be reached, the DOJ may initiate litigation.

42.    In July 2016, Vice President Biden suggested that schools that do not comply with administration guidelines could be stripped of federal funding. "*Obama, Biden Won't Visit Universities That Fall Short In Addressing Sexual Assault,*" Huffington Post, July 4, 2016 ("The vice president said he'd like to take away federal funding from those universities.")

11

43. To revoke federal funds -- the ultimate penalty -- is a powerful tool because institutions receive billions of dollars a year from the federal government. Anne Neal of the American Council of Trustees and Alumni was quoted as follows: "There is a certain hysteria in the air on this topic, . . . It's really a surreal situation, I think." She explained that "schools are running so scared of violating the civil rights of alleged victims that they end up violating the due process rights of defendants instead." "*How Campus Sexual Assaults Came To Command New Attention,*" NPR, August 12, 2014.

44. The DOE and OCR have created a significant amount of pressure on colleges and universities to treat all those accused of sexual misconduct with a presumption of guilt. The Chronicle of Higher Education noted that "Colleges face increasing pressure from survivors and the federal government to improve the campus climate." "*Presumed Guilty: College men accused of rape say the scales are tipped against them,*" Chronicle of Higher Education, September 1, 2014. In the same article, the Chronicle noted that different standards were applied to men and women: "Under current interpretations of colleges' legal responsibilities, if a female student alleges sexual assault by a male student after heavy drinking, he may be suspended or expelled, even if she appeared to be a willing participant and never said no. That is because in heterosexual cases, colleges typically see the male student as the one physically able to initiate sex, and therefore responsible for gaining the woman's consent." "*Presumed Guilty: College men accused of rape say the scales are tipped against them,*" Chronicle of Higher Education, September 1, 2014. Robert Dana, Dean of Students at the University of Maine, told NPR that some rush to judgment is inevitable. "I expect that that can't help but be true," he says. "Colleges and universities are getting very jittery about it." "*Some Accused Of Sexual Assault On Campus Say System Works Against Them,*" NPR, September 3, 2014.

45.     In response to pressure from OCR, DOJ, and the White House, educational institutions, like Defendant CWRU, have limited procedural protections afforded to male students, like John Doe, in sexual misconduct cases.

**II.     Agreements, Representations, Covenants & Warranties Between Plaintiff and CWRU**

46.     Plaintiff John Doe graduated with high honors from a competitive private high school in Houston, Texas. Ranked amongst the top students of his graduating class, he was selected as a National Merit Scholarship Finalist and received the National AP Scholar Award. John Doe also received the President's Volunteer Service Award and the Senior Award from the high school basketball team.  He was selected as a Finalist in the city's Symphony Concerto Competition. Additionally, John Doe was a devoted member of the ministry for his church, for which he organized international mission trips.

47.     With multiple scholarship offers from many universities, including all of the state universities in Texas, John Doe decided to accept a full scholarship with admittance to Case Western Reserve University.  He matriculated in August 2013 as a member of the class of 2017.

48.     Upon his acceptance, CWRU provided John Doe with copies of its school policies, including the 2013-2014 Student Handbook. As a matriculating freshman, John Doe attended orientation for new students. According to the CWRU 2013 Annual Security Report, there was no formal educational information provided to new students in the fall of 2013 regarding the university's policies on sexual misconduct.

49.     In fact, according to the 2015 CWRU Annual Security Report chart of Sexual Misconduct Prevention/Education Initiatives, at the time of John Doe's matriculation in the fall 2013, sexual misconduct educational awareness for new students consisted of "skits presented to incoming students" and "bathroom posters".

50.     In August 2014, John Doe returned to CWRU as a sophomore. The 2014-2015 CWRU Student Handbook which included the CWRU Student Code of Conduct ("Code of Conduct") was made available on the university website, along with the CWRU Sexual Misconduct Policy (collectively, the "Policies"), a new Sexual Misconduct Policy effective as of July 2014.

51.     New students entering CWRU in fall 2014, including first year student Jane Doe, were required to complete the CWRU online sexual misconduct education module. This module was "part of the checklist for incoming students" during fall 2014 who were provided sexual misconduct prevention and education under the new policy.

52.     In contrast, as a returning sophomore in fall 2014, John Doe was not provided with the new sexual misconduct prevention and education initiatives required for first year students like Jane Doe. Upon information and belief, there was no specific forum to educate returning students about the new Sexual Misconduct Policy when they returned in the fall 2014.

53.     The new 2014-2015 Sexual Misconduct Policy contained more definitions of the types of sexual misconduct that would fall under the policy, including new expanded definitions for consent and incapacitation.

54.     The new 2014-2015 Sexual Misconduct Policy also noted  a time table of 60 days to resolve complaints of sexual misconduct, specified the university's responsibility to support a fair process, and outlined the rights afforded to both the complainant and the respondent including: the right to confidentiality; the right to have an advisor present at meetings, during the initial inquiry and during the Informal Process and/or Administrative/Formal Hearing process; the right to not be questioned or have information presented about past sexual conduct or history with anyone other than with the complainant or respondent, unless related to a pattern of prior

14

violations or behavior by the respondent that was substantially similar to the present complaint; to have allegations investigated in a thorough and timely manner; the right to refrain from making statements; to be informed of the outcome of the sexual misconduct process in a timely manner; and to have access to support resources.

55.    The Designated Reporting Representative/Title IX Coordinator conducted interviews with the complainant and respondent and reviewed relevant documents to determine whether the information gathered during this initial inquiry indicated that the complaint falls within the University's policies.

56.    If it was determined that the complaint fell within the policy, the Designated Reporting Representative would either proceed with the Informal Process or refer the matter to the Sexual Misconduct Investigator/Title IX Coordinator.

57.    The Designated Reporting Representative/Title IX Coordinator and/or Title IX Investigator was responsible for conducting a prompt and thorough investigation of the complaint, which included identifying and interviewing witnesses, and gathering relevant documentation.

58.    The Designated Reporting Representative/ Investigator was required to provide a report of the findings of the investigation for review by the Title IX Coordinator or his/her designee in consultation with the Office of General Counsel. A decision was then made as to the appropriate steps for resolution of the complaint, which could include a formal Administrative Hearing or Board Hearing, an informal process, another university process, or the process would not proceed further.

59.    An Administrative Hearing was used when the complainant requested it, the respondent admitted to the alleged sexual misconduct, or the Investigator decided in consultation

with the Title IX Coordinator and the Office of General Counsel that it was appropriate. No option was provided for a respondent who claimed he or she was *not* responsible for the alleged violations.

60.     The Title IX Coordinator determined that the administrative hearing would be conducted by either a representative from the Office of Student Affairs or by three members of the Sexual Misconduct Panel.

61.     The hearing would include the respondent, the Title IX Investigator/ Title IX Coordinator who conducted the investigation, and the administrative hearing representative(s). The complainant had option of whether or not to attend the hearing. Jane Doe did not attend the hearing on her complaint against John Doe.

62.     The Administrative Hearing representative(s) could ask questions of the respondent. However, the policy did not allow the respondent to submit questions to be asked of the complainant or the witnesses, who were excluded from attending the hearing.

63.     Moreover, the respondent was not allowed to ask or submit any questions to the hearing representative(s) or the Investigator who were in attendance at the hearing.  In fact, John Doe was denied his fundamental right to cross-examine his accuser Jane Doe, question the witnesses against him, or even question those in attendance such as the Investigator.

64.     The complainant was permitted to submit a written statement addressing the effects of the alleged sexual misconduct and recommend sanctions for the respondent. The respondent in contrast was only permitted to submit a written statement "about the sexual misconduct" and address the possible sanctions for the misconduct.

65.     The Administrative Hearing representative(s) was required to consult with the Vice President for Student Affairs prior to reaching a determination. If necessary, a sanction

16

would also be determined at that time. Notification of the Decision would be sent to the complainant and respondent within two business days after the hearing was held.

66.     Appeals were to be submitted to the Title IX Coordinator within three business days of receipt of the written decision and had to specify the grounds for the appeal. The Title IX Coordinator or his/her designee determined whether the appeal submitted met any of the three grounds for appeal of a decision. The appeal statement would be provided to the other party. The other party was then entitled to file an opposing statement responding to the appeal. In addition, the hearing representative was entitled to submit a responsive statement. The decision by the Appeals Board was final.

### III.      The Night of September 13-14, 2014 (the "Incident")

67.     John Doe and Jane Doe met during freshman orientation activities held in August 2014 at CWRU. John Doe was a sophomore orientation team member.  Jane Doe was an incoming first year student. During the weeks following orientation, John Doe helped Jane Doe adapt to life at CWRU and they became close friends.

68.     John Doe advised Jane Doe on her courses and with how to study for tests. He introduced her to his friends in his fraternity and invited her to his Bible study group which John Doe attended on most Friday nights, although she declined to join him.  John Doe also drove Jane Doe to the stores to go shopping whenever she asked him.

69.     Their relationship quickly developed from a close friendship to an intimate, mutually consensual sexual relationship consisting of frequent sexual encounters.

70.     On the afternoon of September 13, 2014, John Doe drove Jane Doe to a nearby mall to go shopping. While in the car, Jane Doe told John Doe that she was unsure about her feelings for him and suggested they might need some time apart, perhaps the forthcoming

weekend for two days.  John Doe was disappointed, but he accepted and agreed to Jane Doe's request for time apart.

71.    At approximately 9:00 p.m. that evening, Jane Doe was at a dorm party where she later reported she consumed beer and shots of hard alcohol. John Doe arrived at the same dorm to meet his friends before attending the new pledge initiation party for his fraternity.

72.    John Doe left with his friends to attend an off-campus new member fraternity party. While there, at approximately 1:00 a.m., John Doe received a text message from a friend stating the friend had seen Jane Doe and Jane Doe asked him to send a text message to John Doe, telling him to come out with them. John Doe was confused by this request as he was trying to keep his promise to Jane Doe to stay away from her for two days while she sorted out her feelings for him.

73.     However, Jane Doe then sent a text message to John Doe telling him to come find her. John Doe went to the location she gave, which was near the FIJI fraternity house where John Doe lived. When John Doe arrived, he saw Jane Doe with her arms around another guy. Disappointed, John Doe turned and began to walk away, at which point Jane Doe spotted him and ran after John Doe. She then asked if she could spend the night at the FIJI house. John Doe walked with Jane Doe  back to her dorm because she wanted to change into sweatpants before going to the FIJI house for the night.

74.    After changing into sweatpants, Jane Doe walked with John Doe from her dorm back to the FIJI fraternity house. Once there, John Doe made something for Jane Doe to eat and then they talked and played billiards for some time.

75.    A mutual friend, N.P., had followed along from the time Jane Doe had left her dorm to accompany John Doe to the fraternity house. N.P. witnessed the entire time that Jane

Doe and John Doe were together at the fraternity house, including when John Doe walked with Jane Doe back to her building.

76.  Jane Doe told John Doe that she wanted to sleep with him. Together they went to the basement of the fraternity house where they knew they could be alone. John Doe and Jane Doe laid on the couch together in the dark room, where they began to engage in mutual kissing.

77.  The kissing progressed to mutual touching and John Doe helped Jane Doe to remove her pants. John Doe digitally penetrated Jane Doe and performed oral sex on her. This was the usual pattern of their sexual relationship, and something they had done many times before when engaging in consensual sexual relations.

78.  Jane Doe did not provide oral sex to John Doe, nor did John Doe ever attempt to have vaginal intercourse with Jane Doe.

79.  As John Doe and Jane Doe lay facing each other on the sofa, Jane Doe suddenly pushed John Doe away, with her hands against his chest. She got up from the couch and began to cry. John Doe did not know why she was starting to cry and so he tried to comfort her. Jane Doe said she wanted to return to her dorm, so John Doe drove her back to her building.

80.  During the car ride, John Doe apologized profusely if he had done anything to upset Jane Doe. Once again, Jane Doe said she needed time apart to think about their relationship.

81.  John Doe was distraught in not knowing how to comfort Jane Doe.  He was concerned that he had let her down by breaking his promise to stay apart from her for two days. The next day, John Doe and Jane Doe went for a drive to a nearby lake. They talked about their relationship and Jane Doe said she wanted to take a break from being together so often.

82.     John Doe sent Jane Doe texts, gifts and tried to talk with her whenever he saw her. When John Doe sent her a card, Jane Doe's friend remarked that "he wanted to sound all 'romantic' and Jane Doe was laughing at the card."

83.     After trying for weeks to make amends, by the end of October 2014 John Doe stopped all efforts at attempting to communicate with Jane Doe.

**IV.    The Investigation**

84.     On November 25, 2014 at the insistence of a friend, Jane Doe agreed to speak with Defendant Milliken to try to "sort out her feelings" for John Doe and what had happened between them.

85.     Jane Doe told Defendant Milliken that on the night of the alleged incident she was under the influence of alcohol, but could not say how much. She stated that she had invited John Doe to go out with her that night to cheer him up, but he declined. However, John Doe was concerned about her and he went to find Jane Doe when he received a text message that she wanted to see him.

86.     Prior to initiating an investigation, Defendant Milliken asked Jane Doe if she needed support resources and if she wanted to request academic accommodations.

87.     Notably, Jane Doe stated one week before her courses concluded with final exams that she had been failing one of her courses. Jane Doe was ultimately allowed to withdraw from the course due to the academic accommodations provided by the Title IX Office. Upon information and belief, the course Jane Doe was failing was Anatomy. Successful completion of Anatomy was required for Jane Doe to continue in the nursing program. By allowing Jane Doe to withdraw, she would be eligible to repeat the course without having had a failing grade from the first attempt and the failed class would no longer affect her Grade Point Average.

88.     While CWRU Policy stated that a student accused of sexual misconduct must also be provided with support resources, John Doe was not informed by Defendant Milliken about academic accommodations until December 11, 2014, which was in the middle of final exams week.

89.     John Doe further explained that due to his recent severe depression, he had stopped going to classes for two weeks, had dropped one course and was having difficulty in Spanish. Defendant Milliken made no response to John Doe; she had not offered specific referrals for counseling or academic accommodations in response to John Doe's admissions of physical and mental health issues and academic difficulties.

90.     Defendant Milliken had separately asked Jane Doe and John Doe if they each felt safe. Jane Doe had replied yes. John Doe had replied, "I don't" and Defendant Milliken made no reply and did nothing to follow up on John Doe's fears and concerns.

91.     At her first meeting with Jane Doe on November 25, 2014, Defendant Milliken presumptively asked Jane Doe, "So what would you like to see happen with the sexual misconduct investigation?" Significantly, Defendant Milliken posed this question to Jane Doe prior to having met or spoken with John Doe to determine whether an investigation would be required. Jane Doe responded that she had tried to seek counseling and that she "[didn't] know what [she] wanted to see happen, [she didn't] know what could happen."

92.     According to her report, Defendant Milliken evidenced a presumption of guilt against John Doe when she responded by informing Jane Doe of "Next Steps:  Review: support resources, NCD, police notification, written statement, next steps."

93.     More than two weeks later, on December 10, 2014 John Doe received a No Contact Directive ("NCD") with respect to Jane Doe. The following day, he received an email

requiring him to make an appointment with Trina Jones. The email did not state the purpose of the meeting, did not state that the meeting was in fact with Defendant Milliken and not Trina Jones, and did not state that John Doe could bring an advisor to the meeting.

94. Without receiving a notice of investigation, a discussion of his rights and responsibilities or the CWRU policies and procedures, and without an advisor or support person to accompany him, John Doe was blindsided when he arrived to attend a mandatory meeting with the CWRU Title IX investigator.

95. The first statement John Doe made upon meeting Defendant Milliken was that he was "having troubling verbalizing things lately. I was told I have a depression based aphasia. I have an impairment in the speaking portion of the brain. It is induced, so I have been taking pills."

96. Though provided with this critical information regarding John Doe's mental health and current disabilities, and the fact that he was taking medication which affected his ability to communicate, Defendant Milliken did not stop the interview, nor did she suggest contacting disability services or support services to provide accommodations for John Doe before resuming the interview.

97. Defendant Milliken asked John Doe to tell her what happened on the night of the alleged Incident with Jane Doe. John Doe, who is devoutly religious, began to confess that he "became tempted to do things that were not moral." Defendant Milliken neglected to ask John Doe to define what he had meant by "not moral", presuming that his statement was an admission of responsibility for sexual assault, rather than a product of his religious beliefs.

98. On December 23, 2014 John Doe sent a text message to Jane Doe to again apologize for whatever he might have done to upset her and to wish her peace for the holidays.

Though it was the only time he contacted Jane Doe since November 9, 2014, because it was sent after the NCD had been issued, Jane Doe reported the text to Defendant Milliken.

99.     After returning to CWRU from the holiday break, John Doe met with Defendant Milliken for a second time. At their first meeting on December 11, 2014, Defendant Milliken had shown John Doe a chart which outlined the process for how the University responded to a complaint. Without explanation, Defendant Milliken advised John Doe that they would be "skipping" most of the chart, as all steps were not necessary in this case.

100.   At their second meeting on January 21, 2015, Defendant Milliken stated the purpose of the meeting was to have John Doe confirm the statements made in his interview and proceed to a hearing. John Doe denied the allegations and requested a formal investigation.

101.   When Jane Doe returned from the winter break, she was contacted by the CWRU Police on January 22, 2015 and again on February 6, 2015 regarding a report made by the Student Conduct Office that she had been involved in an incident of forcible sexual assault.  Jane Doe spoke with the campus police officers both times but declined to pursue charges against John Doe. She informed the officers that she had no interest in assisting with a criminal prosecution against John Doe.

**V.     The Formal Investigation**

102.   On February 6, 2015, nearly two months after his first meeting with Defendant Milliken, John Doe learned of the allegations against him for the first time. In her report of this meeting, Defendant Milliken listed as the agenda for their meeting a "Review of SMC Policy" and noted "Consent can apply to some actions and not others, so we are investigating just the non-consensual activity for the purpose of the investigation."

103. CWRU's Policy defined consent as follows: "Consent is the equal approval, given freely, willingly, and knowingly, of each participant to desired sexual involvement. Consent is an affirmative, conscious decision – indicated clearly by words or actions – to engage in mutually accepted sexual contact."

104. During the time period of February 9 to February 24, 2015 Defendants Milliken and Tompkins interviewed 14 witnesses. John Doe was not permitted to review the witness statements or to provide responses thereto at any point prior to the hearing.

105. On February 10, 2015 Defendant Milliken interviewed Jane Doe and again discussed academic accommodations for Jane Doe.

106. On February 25, 2015 at 3:30 p.m. an Administrative Hearing was held. The only participants in attendance were Defendants O'Connell and Milliken, and John Doe.

107. On Friday, February 27, 2015 John Doe was notified by Defendant O'Connell of the outcome. Defendant O'Connell's Decision Letter sanctioned John Doe to two years of suspension, status of persona non grata, no contact order with the complainant, and permanent ban from residing in university housing.

108. John Doe was given three days to appeal the Decision. The written appeal was due on Wednesday, March 4, 2015, however he was not informed who the appeal should be submitted to. Nonetheless, John Doe submitted his appeal by the deadline.

109. On March 16, 2015, the Appeals Board met to review John Doe's appeal. The following day, John Doe received a letter informing him that the sanctions, including suspension, had been increased from two years to three years, through May 2018.

## VI.    Failure to Conduct a Thorough and Impartial Investigation and Adjudication

110.    Defendants performed a one sided and biased investigation in favor of Jane Doe's allegations of sexual misconduct.

111.    To ensure a fair and impartial proceeding, "[e]ach case must be decided on its own merits, according to its own facts. If a college student is to be marked for life as a sexual predator, it is reasonable to require that he be provided a fair opportunity to *defend himself and an impartial arbiter to make that decision." Doe* v. *Brandeis Univ.*, 177 F. Supp. 3d 561 (D. Mass. 2016)

112.    The lack of training and experience on the parts of Defendants Milliken and Tompkins resulted in a procedurally flawed and superficial investigation process conducted by individuals who were neither independent nor impartial. Upon information and belief, neither of these two university employees had professional experience as a trained investigator, nor the requisite level of experience to ensure a fair, thorough and impartial investigation of the allegations against John Doe.

113.    Under the direction of Defendant Milliken, and in response to both internal institutional pressure and external pressure from the United States Department of Education, the Investigators pursued an investigation calculated to lead to the foregone conclusion that John Doe was guilty of the misconduct alleged.

114.    The lack of training and experience on the part of Defendant Milliken was apparent throughout the investigation. For instance, the CWRU "Sexual Misconduct Check List" kept by Defendant Milliken falsely stated that she had referred the case to a formal process due to the "seriousness of accusation" and not, as it had happened, at the request of the respondent John Doe.

25

115.    Further, Defendant Milliken indicated that the investigation team assigned to this matter were external investigators "Citrano and Tompkins." The name Citrano does not appear on any documents related to this matter.

116.    Defendant Milliken's Check List also falsely confirmed that a written statement had been received from the respondent John Doe. In fact, at no time during the investigation process did John Doe submit a written statement.

117.    Defendants Milliken and Tompkins interviewed a total of 14 witnesses between February 9 and February 24, 2015. Their last interview with John Doe took place on February 6, 2015, prior to meeting with any of these witnesses. Thereafter, the Investigators never permitted John Doe to review or respond to any of the 14 witness statements prior to his hearing. Moreover, the Investigators never scheduled an interview with John Doe after the interviews with all 14 witnesses in order to verify or question John Doe about the testimony provided by the witnesses.

118.    Because witnesses contacted by CWRU are not obligated to appear for an interview, a respondent is left without any authority to compel the appearance of a witness he deems necessary, should they fail to comply.

119.    Incredibly, there were witnesses interviewed on the day of the hearing, February 25, 2015, and one was interviewed the day after the hearing. These interviews were included in the Investigation Report for the Hearing Administrator and the Appeals Board to consider when making their determinations, even though John Doe never had an opportunity to review or challenge these witness statements.

120.    Indeed, John Doe was not provided with the Investigation Report prior to his hearing with Defendant O'Connell, depriving him of the opportunity to fully and adequately

26

defend himself. Defendant Milliken allowed John Doe only twenty minutes to review the lengthy report on the day *after* his hearing, to prepare for his appeal.

121.    It was only when John Doe received the final determination from the Appeals Board that he learned Gia M. Adeen was the Appeals Board Chair/ Deputy Title IX Coordinator. John Doe was never informed of the individuals who were on the Appeals Board and had made the decision to increase his sanctions.

### VII.    Failure to Avoid Conflicts of Interest

122.    The U.S. Department of Education's 2011 Dear Colleague Letter outlines the responsibilities of the Title IX Coordinator.

123.    Among these responsibilities, the Dear Colleague Letter advises that the Title IX coordinator should not have other job responsibilities that may create a conflict of interest.

124.    The coordinator's responsibilities include overseeing all Title IX complaints and identifying and addressing any patterns or systemic problems that arise during the review of such complaints and reviewing the recipient's disciplinary procedures to ensure that the procedures comply with the prompt and equitable requirements of Title IX.

125.    Upon information and belief, Darnell Parker was hired as CWRU's Title IX Coordinator beginning in July 2015. Prior to this time, Defendant Milliken was the Designated Reporting Representative and Investigator responsible for the matter of Jane Doe's complaint.

126.    Defendant Milliken, Title IX Investigator and Deputy Title IX Coordinator for CWRU, singularly conducted the initial assessment interviews with the complainant and respondent and the formal investigation interviews with the complainant and respondent; she interviewed most all of the witnesses; and she wrote the final investigation report, which included a determination of responsibility.

127.  Notwithstanding all her previous involvement in the matter, Defendant Milliken next arranged for the Administrative Hearing for John Doe.

128.  CWRU Procedures state that the Title IX Investigator/Title IX Coordinator will submit the following documents to the Sexual Misconduct Panel or administrative hearing representative(s) for their consideration at a formal hearing: (1) The written account from the complainant of the sexual misconduct complaint. When possible, the account should include dates, times, locations, a description of the alleged behavior/incident, and the name(s) of the respondent. (2) The written account from the respondent of the sexual misconduct complaint. When possible, the account should include dates, times, locations, a description of the alleged behavior/incident. Notably, in what can only be a presumption of guilt by the accused, the respondent was expected to write a description of the alleged behavior/incident, and further, was not to identify the complainant in his statement. (3) Additional written accounts from witnesses collected during the investigation.

129.  Defendant Milliken, in clear violation of CWRU procedures, did not provide to the Administrative Hearing Representative the written accounts from the complainant, respondent or any of the 14 witnesses interviewed, as required by the 2014 Sexual Misconduct Policy. Significantly, in the Investigative Report, Defendant Milliken stated that the complainant and respondent elected not to submit statements; hence, Defendant Milliken's interview summaries were the only testimony considered in the hearing. There was only one version of the account involving the allegations of sexual misconduct provided to the hearing administrator, and that was Defendant Milliken's rendering included within her Investigation Report.

130.  Within three days prior to the hearing, the Policy procedures stated that, "In addition, the complainant and the respondent may submit their own written statement about the

28

facts of the alleged behavior/incident for consideration by the panel." Nonetheless, there were no statements submitted by either the complainant or the respondent. John Doe was not informed prior to the hearing that he could submit a statement. Once again, Defendant Milliken controlled the evidence provided to the hearing administrator, limiting the scope so that only her version of the events would be considered and ultimately, predetermining the outcome.

131.    Furthermore, Defendant Milliken was in charge of scheduling the hearing and informing the witnesses. Yet, Defendant Milliken attended the hearing and was the only witness present.

132.    Defendant Milliken also arranged for the hearing outcome meeting, less than 48 hours after the hearing.

133.    Significantly, neither John Doe nor Jane Doe had an advisor throughout the investigation, hearing, or the appeal proceedings. CWRU did not offer John Doe a procedural advisor. John Doe was not asked before his meetings with Defendant Milliken if he wished to have an advisor with him.

134.    Upon information and belief, with her sights set on building her resume, Defendant Milliken pursued a biased and unchallenged proceeding to find John Doe guilty of the misconduct alleged. Defendant Milliken left CWRU in August 2015 to assume a new position at a state university.

**VIII.**    **Gender Bias Against Plaintiff as the Male Accused**

135.    Pursuant to the U.S. Department of Education Office for Civil Rights' Guidelines, CWRU was required to conduct an impartial and unbiased investigation process.

136.    Upon information and belief, there are no reported incidents of male complainants against female students for sexual assault and/or there are no reports of female accused students being disciplined for sexual misconduct by male complainants at CWRU.

137.    Upon information and belief, the CWRU Defendants are knowledgeable of the fact that complaints of sexual misconduct are disproportionately lodged by females against males.

138.    Upon information and belief, the CWRU Defendants have recognized the increased pressure, both internally, and from the United States government to aggressively discipline male students accused of sexual misconduct, under threat of rescission of federal funds.

139.    According to Forbes, CWRU's student body received approximately $$26,884 per student in federal aid in 2016, with 86% of its student population receiving some form of financial aid. *See* http://www.forbes.com/colleges/case-western-reserve-university/.

140.    The CWRU Defendants' response to this pressure, and attempts to avoid rescission of federal funding, is evident from a review of CWRU's recent Annual Fire Safety & Security Reports (the "Clery Reports"). Indeed, CWRU's Clery Reports reveal that the number of forcible sex offenses reported on CWRU's campus during 2014 increased considerably, from 9 reported instances in 2013, to 19 reports in 2014, with only 6 reported incidents in 2015.

141.    Significantly, it was just prior to calendar year 2014 that Defendant Milliken assumed the role of Title IX Sexual Misconduct Investigator and Deputy Title IX Coordinator. After more than doubling the number of reported forcible sex offenses to 19 at CWRU during her tenure, upon Defendant Milliken's departure from CWRU in 2015, the number of alleged incidents decreased to 6 for 2015.

142.    In fact, in 2013 Defendant Milliken wrote her doctoral dissertation on "The Dangerous Reality: Sexual Risk Taking Among College Women" which focused on the detrimental effects to women of engaging in casual sex in college, including depression and eating disorders. Defendant Milliken concluded that "we have an epidemic in higher education regarding the sexual risk taking of college students, in particular women."

143.    The foregoing demonstrates Defendant Milliken's inherent belief that males accused of sexual misconduct on college campuses are always responsible, a theory she perpetuated while at CWRU.

144.    In 2013, CWRU revamped its policies involving sexual assault and harassment in response to guidance from federal education officials. The university subsequently updated its policy in 2015 once again, after receiving additional feedback and federal clarification on certain topics.

145.    In July of 2015, subsequent to the subject investigation, CWRU appointed its first full time associate vice president for student affairs/Title IX coordinator, Darnell T. Parker.

146.    The agenda to increase the number of reported incidents of forcible sexual offenses has continued with the 2016 partnership of CWRU with the Cleveland Rape Crisis Center ("CRCC").  CWRU student advocate Danielle Sabo stated in the September 30, 2016 edition of "The Observer" that this addition will provide more advocates and "when we have advocates on campus, reporting goes up by 60 percent."

147.    Moreover, CWRU's Flora Stone Mather Center for Women presents the following statements, which further perpetuate a bias against male students:

   a.    20%-25% of women in college reported having experienced an attempted or completed rape while in college.[1]

    b.  On Average 24 people per minute are victims of rape, physical violence, or stalking by an intimate partner in the U.S. In a year, that's more than 12 million women and men.[2]

    c.  90% of college women who are victims of rape or attempted rape know their assailant. The perpetrator is usually a classmate, friend, boyfriend, or ex partner.[3]

148.   Susan Freimark, acting director and associate director of faculty leadership programs at the Flora Stone Mather Center for Women has used the term victim interchangeably with female pronouns, when offering the following advice: "Be there for your friend on her terms…[e]specially remember that a few months after the experience when everyone has lessened their attention and care of the victim, she may be at her loneliest with her memories."

149.   Throughout the investigation and hearing process, the CWRU Defendants discriminated against John Doe as the male accused of misconduct.

150.   For instance, although both parties were admittedly intoxicated at the time of the sexual encounter, the CWRU Defendants failed to consider the effect of John Doe's intoxication on his ability to affirmatively consent to the physical contact initiated by Jane Doe.

151.   The CWRU Defendants also demonstrated a gender bias against John Doe as the male student accused of sexual misconduct when they found Jane Doe to be more credible despite her inconsistent and varying account of the events.

152.   Further, while affording academic accommodations to Jane Doe, Defendant Milliken failed to offer any specific referrals for counseling or academic accommodations in response to John Doe's admissions of physical and mental health issues and academic difficulties.

153.   Moreover, notwithstanding that Defendant Milliken's first meeting with Jane Doe took place on November 25, 2014, she failed to advise John Doe of the exact nature of the allegations against him until February 6, 2015, nearly two months later.

154.   CWRU's Policies are inherently discriminatory against respondents, who are invariably male in that they disproportionately affect the male student population as a result of the higher incidence of female complainants of sexual misconduct against male complainants of sexual misconduct.

**IX.  Failure to utilize the requisite preponderance of the evidence standard.**

155.   The U.S. Department of Education Office for Civil Rights and CWRU's Policies require that a preponderance of the evidence standard be used to evaluate allegations of sexual misconduct. The Code of Conduct defines preponderance of the evidence as: "whether it is more likely than not that the referred student violated the Student Code of Conduct."

156.   The preponderance of the evidence standard does not equate to judging the accused as guilty until proven innocent. In fact, nowhere in the Department of Education's guidelines or CWRU's policies is such a standard referenced. However, CWRU's investigation process was motivated by gender bias against John Doe as the male accused, which resulted in a Decision that did not afford Plaintiff the requisite presumption of innocence.

157.   A reasonable review of the evidence would have revealed the following:

a.   Jane Doe waited to report her false allegations against John Doe until her final exams week. When asked if there were any academic accommodations she would like to request, Jane Doe replied, "I think I did before but it's kind of okay now. I did fail a class but I am withdrawing from it." Yet, the only way she could have withdrawn from a class after failing it and at the end of the semester would have been through receiving a Title IX academic accommodation. However, there is nothing in the investigation report or outcome letter to suggest that complainant's potential motivation for filing the complaint against John Doe was ever considered.

b.   Defendant Milliken did not ask John Doe to clarify the statements he made in his first interview, such as: "The vacancy of the basement gave me a sense of privacy and I became tempted to do things there (sic) were not moral." John Doe was devoutly religious. Yet, Defendant Milliken failed to take this factor into

consideration, instead presuming that John Doe was admitting responsibility for the alleged misconduct.

c.  In Jane Doe's formal complaint, she stated she "did not give consent for the oral or vaginal sex performed by [John Doe] in the basement of the FIJI House on September 12-13, 2014." Notwithstanding that John Doe consistently maintained they never engaged in vaginal intercourse, the determination of responsibility was based upon "acts that included kissing, penetration of [Jane Doe's] vagina with [John Doe's] fingers" and that he allegedly forced her to perform oral sex on him. These acts were not part of the complaint and should not have been cited as evidence in support of a finding of responsibility.

d.  Defendant Milliken accused John Doe of "objectifying" Jane Doe. Further, she noted in her investigation report that "[John Doe], during his meeting with Dr. Greybar Milliken on February 6, 2015, made several statements that Greybar Milliken believes demonstrate wanting to control [Jane Doe] while [John Doe] believes [they] are demonstrating his affection for [Jane Doe]." Evidencing a presumption that John Doe was the sexual aggressor, while Defendant Milliken viewed John Doe's statements as an attempt to control Jane Doe, she failed to consider that his statements instead suggested he was simply a young man in love.

e.  In Jane Doe's interview, she stated "I would assume [John Doe] was feeling my breasts…"  She was uncertain about this, yet claimed to be certain that penetration occurred. As the interview progressed, her position changed from not knowing whether any penetration occurred, to assertively stating: "I know for sure he penetrated me with his penis."

f.  On the day of the alleged Incident, Jane Doe told John Doe that she did not want to see him for two days. Yet, later that evening, Jane Doe admitted she wanted to be with John Doe. At no point did Defendant Milliken ask why Jane Doe had suddenly changed her mind and decided she wanted to spend the night with John Doe.

158.  The CWRU Defendants failed to apply a burden of proof, which requires a reasoned consideration of the evidence to reach a conclusion, and actually revealed the absence of a preponderance of evidence supporting the finding of a violation by John Doe.

159.  The CWRU Defendants improperly placed the burden of proof on John Doe, as the respondent, to establish that Jane Doe had consented to the sexual activity, when it accepted

at face value Jane Doe's allegations, notwithstanding her inconsistent statements and contradictory evidence.

160.   Further, the Investigators intentionally overlooked any evidence tending to diminish Jane Doe's credibility and/or exculpate John Doe.

161.   From the outset, John Doe was presumed guilty, while Jane Doe was characterized as the "victim".

162.   Only an anti-male bias to find for the female complainant and against the male respondent can explain CWRU's purported findings concerning the preponderance of the evidence.

163.   Accordingly, Defendants failed to utilize the requisite preponderance of the evidence standard when they found third-party witnesses to be more credible than John Doe despite the lack of any corroborating evidence, wholly discounted all exculpatory evidence, and presumed John Doe guilty from the outset. Defendants conducted an investigation designed to reach a predetermined result.

**AS AND FOR A FIRST CAUSE OF ACTION**
**Violation of Title IX of the Education Amendments of 1972-**
**Erroneous Outcome (Against Case Western Reserve University)**

164.   Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

165.   Title IX of the Education Amendments of 1972 provides, in relevant part, that: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."

35

166.    Title IX of the Education Amendments of 1972 applies to all public and private educational institutions that receive federal funding.

167.    Upon information and belief, Defendant CWRU receives federal funding for research and development.

168.    Both the Department of Education and the Department of Justice have promulgated regulations under Title IX that require a school to "adopt and publish grievance procedures providing for the *prompt and equitable resolution* of student... complaints alleging any action which would be prohibited by" Title IX or regulations thereunder. 34 C.F.R. § 106.8(b) (Dep't of Education); 28 C.F.R. § 54.135(b) (Dep't of Justice) (*emphasis added*). Such prohibited actions include all forms of sexual harassment, including sexual intercourse, sexual assault, and rape.[2]

169.    In 2001, the Office for Civil Rights issued the "Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties (the "2001 Guidance") pursuant to the Administrative Procedure Act's notice and comment rulemaking.

170.    According to the 2001 Guidance, the procedures adopted by a school covered by Title IX must not only "ensure the Title IX rights of the complainant," but must also *"[accord] due process to both parties involved..."[3]*

171.    The "prompt and equitable" procedures that a school must implement to "accord due process to both parties involved" must include, at a minimum:

---

[2] *See generally* U.S. Dep't of Education, Office for Civil Rights, *Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties -- Title IX* (2001) at 19-20, 21 & nn.98-101.
[3] *Id.* at 22 (emphasis added).

- "Notice . . . of the procedure, including where complaints may be filed";

- "Application of the procedure to complaints alleging [sexual] harassment...";

- "Adequate, reliable, and impartial investigation of complaints, including the opportunity to present witnesses and other evidence";

- "Designated and reasonably prompt timeframes for the major stages of the complaint process"; and

- "Notice to the parties of the outcome of the complaint......"[4]

172.    A school also has an obligation under Title IX to make sure that all employees involved in the conduct of the procedures have "adequate training as to what conduct constitutes sexual harassment, which includes "alleged sexual assaults." [5]

173.    The Sixth Circuit recognizes a private cause of action under Title IX "where a plaintiff alleges that an educational institution implemented disciplinary actions that discriminated against the plaintiff based on sex." *Mallory v. Ohio Univ.,* 76 F. App'x 634, 638–39 (6th Cir.2003), citing *Yusuf v. Vassar College,* 35 F.3d 709 (2d Cir.1994).

174.    Title IX claims arising from university disciplinary hearings are analyzed under one or more of the following four standards: erroneous outcome, selective enforcement, deliberate indifference, or archaic assumptions. *Doe v. Univ. of the S.,* 687 F.Supp.2d 744, 756 (E.D.Tenn.2009).

175.    Under the erroneous outcome theory, a Plaintiff demonstrates that he was erroneously found responsible for an alleged offense, and that the educational institution's

---

[4] *Id.* at 20.

[5] *Id.* at 21.

challenged misconduct was motivated by sex-based discrimination. *Doe v. Case W. Reserve Univ.*, No. 1:14CV2044, 2015 WL 5522001, at *4 (N.D. Ohio Sept. 16, 2015).

176.     Based on the foregoing, *supra,* at ¶¶ 110-163, Defendant CWRU deprived Plaintiff, on the basis of his sex, of his rights to due process and equal protection through the improper administration of and/or the existence, in its current state, of Defendant CWRU's guidelines and regulations.

177.     Based on the foregoing, *supra,* at ¶¶ 110-163, Defendant CWRU failed to conduct an adequate, reliable, and impartial investigation when it conducted its investigation of the Incident and subsequent adjudication in a manner that was biased against Plaintiff.

178.     CWRU's one-sided process deprived John Doe, as a male student, of educational opportunities at CWRU on the basis of his sex.

179.     CWRU erroneously found John Doe responsible for sexual misconduct despite the absence of any reliable or credible evidence.

180.     CWRU applied its stated policies and procedures and gender-biased practices in a manner that discriminated against Plaintiff on the basis of his sex and led to an erroneous and adverse outcome. Specifically:

- Defendants found Jane Doe to be more credible despite her inconsistent and varying account of the events, as presented within the Investigation Report.

- Defendants violated John Doe's right against self-incrimination when they coerced him into providing a statement.

- Defendants lured John Doe into a false sense of security when they falsely assured him it would be in his best interests to cooperate and tell them everything.

- Defendants forced John Doe to sign an agreement to accept the suspension if he wanted to retain his scholarship upon his return to CWRU.

- Defendants failed to afford John Doe a presumption of innocence when they overlooked all potentially exculpatory evidence and presumed John Doe guilty from the outset.

181.   Upon information and belief, CWRU possesses communications evidencing Defendants' inclination to favor female students alleging sexual misconduct over male students who are accused of sexual misconduct.

182.   For instance, though charged with the responsibility of acting as an impartial factfinder, Defendant Milliken's view of males as the aggressors in sexual encounters was apparent in her doctoral dissertation on "The Dangerous Reality: Sexual Risk Taking Among College Women" which focused on the detrimental effects to women of engaging in casual sex in college, including depression and eating disorders. Defendant Milliken concluded that "we have an epidemic in higher education regarding the sexual risk taking of college students, in particular women."

183.   Upon information and belief, CWRU has demonstrated a pattern of inherent and systematic gender bias and discrimination against male students accused of misconduct.

184.   Upon information and belief, all students that have been suspended from CWRU for sexual misconduct have been male.

185.   Upon information and belief, CWRU's mishandling of Plaintiff's investigation was informed by internal institutional pressure as well as external pressure from the United States Department of Education, under a threat of rescission of federal funds.

186.   In the fall of 2015, CWRU released its results from a sexual assault climate survey conducted by the American Association of Universities. The Daily, CWRU's internal communications outlet, reported that "nearly two thirds of the university's undergraduate women reported experiencing sexual harassment during their time on campus, a figure slightly higher

than the overall average." Further, the national survey of 150,000 at 27 universities found that nearly one in four female undergraduates have been a victim of sexual assaults or sexual misconduct within the past year.

187.   However, this statistic misstates the survey results, which only account for students who chose to respond, rather than the entire student population at CWRU. The overall response rate of CWRU students was approximately 30%. The response rate among undergraduate women was 43%.

188.   In response to these results, Vice President for Student Affairs Lou Stark stated "While any misconduct that our students suffer is regrettable, we do feel that the data show we have raised awareness of the issue and the university's commitment to address it."

189.   CWRU's policies and procedures further perpetrate gender bias by referring to complainants as "victims" throughout their sexual misconduct policies.

190.   However, "whether someone is a "victim" is a conclusion to be reached at the end of a fair process, not an assumption to be made at the beginning." *Doe v. Brandeis* Univ., 177 F. Supp. 3d 561 (D. Mass. 2016).

191.   The institutionalized gender bias against males accused of sexual misconduct results in part from archaic assumptions and opinions about male and female roles in sexual encounters.

192.   On September 23, 2016, an event entitled SEXPO debuted at CWRU, attracting an attendance of over 300 students. The event was scheduled to raise awareness for the Red Zone, the period of time from the beginning of the year until Thanksgiving break where female students are most likely to be sexually assaulted.

193.    Upon information and belief, information concerning the outcome of disciplinary proceedings involving males and/or minorities as compared to female students, is in the exclusive control and possession of the CWRU Defendants. However, upon information and belief, such statistics will demonstrate a pattern of intentional discriminatory conduct and disproportionate findings of responsibility imposed on male students.

194.    As outlined above, the outcome was predetermined and simply a motion into a biased, prejudiced and implicitly unfair process, calculated to reach the conclusion that Plaintiff was responsible for the misconduct alleged.

195.    Based on the foregoing, Defendant CWRU imposed an unwarranted and excessive sanction on Plaintiff as a result of an erroneous outcome reached by a flawed investigation.

196.    Based on the foregoing, male respondents accused of sexual misconduct at CWRU are discriminated against solely on the basis of sex.  They are invariably found guilty, regardless of the evidence, or lack thereof.

197.    Based on the foregoing, Plaintiff was subjected to a biased, prejudiced and explicitly unfair process in violation of Title IX.

198.    As a direct and proximate result of the above conduct, Plaintiff sustained tremendous damages, including, without limitation, emotional distress, loss of educational and career opportunities, reputational damages, economic injuries and other direct and consequential damages.

199.    As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

**AS AND FOR A SECOND CAUSE OF ACTION**
**Violation of the Fourteenth Amendment of the United States Constitution**
**Procedural Due Process (Against Case Western Reserve University)**

200. Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

201. The Fourteenth Amendment to the United States Constitution provides that no state shall "deprive any person of life, liberty, or property, without due process of law."

202. A person has a protected liberty interest in his good name, reputation, honor, and integrity, of which he cannot be deprived without due process.

203. A person has a protected property interest in pursuing his education, as well as in future educational and employment opportunities and occupational liberty, of which he cannot be deprived without due process.

204. On April 4, 2011, the United States, by and through its agent the United States Department of Education, sent a 19-page "Dear Colleague" letter to colleges and universities all over the country, stating that "sexual violence" on campus was a form of "sexual harassment prohibited by Title IX" ("Dear Colleague Letter").

205. Reversing previous federal policy, the Dear Colleague Letter threatened colleges with hundreds of millions of dollars in de-funding penalties if they did not immediately begin investigating and adjudicating allegations of campus sexual assault under detailed procedures and terms dictated by the federal government.

206. For example, and without limitation, as a result of the Dear Colleague Letter and later statements, actions, and directives issued by the United States, colleges were as of 2016:

> (i) Required to investigate and adjudicate campus sexual assault allegations regardless of whether the complainant reported his or her allegations to the police (whereas previous federal policy had permitted colleges to allow law enforcement to handle allegations of sexual assault);

42

(ii)     Required to establish a coordinated and centralized investigative and adjudicative procedure according to detailed rules mandated by the federal government and headed by a Title IX coordinator;

(iii)    Required to protect the anonymity of students accusing another student of sexual assault if the student making the allegations so requests;

(iv)    Required to apply a preponderance of the evidence standard when adjudicating such allegations (whereas previously colleges frequently applied higher evidentiary standards, such as the clear and convincing evidence standard);

(v)     Required not to allow cross-examination by the accused student;

(vi)    Required or strongly encouraged to expel students that the college finds to have engaged in unconsented-to sexual intercourse with another student.

207.   Since 2011, the United States has consistently reaffirmed and adhered to the threat of substantial monetary penalties made in the Dear Colleague Letter.  For example, in July 2014, former DOE Assistant Secretary for Civil Rights Catherine Lhamon stated that she would strip federal funding from any college found to be non-compliant with the requirements of the Dear Colleague Letter. "Do not think it's an empty threat," Lhamon warned.

208.   Upon information and belief, since 2011 CWRU has revised its policies in response to the federal government's threat that colleges refusing to comply would be found in violation of Title IX and be subject to extremely substantial, and in fact crippling, monetary penalties.

209.   Indeed, demonstrating its attempted compliance with the 2011 Dear Colleague Letter, CWRU's Clery Reports reveal that the number of forcible sex offenses reported on CWRU's campus during Defendant Milliken's tenure in 2014 increased considerably from 9 reported instances in 2013, to 19 reports in 2014, with only 6 reported incidents in 2015.

210.    The Dear Colleague Letter has resulted in significant action and legal consequences; former Assistant Secretary for the Office of Civil Rights Catherine Lhamon recognized that: "Our release of the 2011 DCL is widely credited with having sparked significant changes at colleges and universities as they worked to meet Title IX's requirements consistent with the 2011 DCL."

211.    Speaking at a conference on campus sexual assault held at Dartmouth College in July 2014, Defendant Lhamon also stated that despite the fact it had never been done before, she was prepared to cut off federal funding to schools that violate Title IX. She went on to describe that enforcement mechanism as part of a set of "very, very effective tools;" Lhamon said, "If a school refuses to comply with Title IX in any respect, I will enforce."

212.    In fact, Secretary Lhamon admitted: "It's nice when you carry the big stick of the federal government," Concerning why there is a higher volume of complaints being made to the Office for Civil Rights, Secretary Lhamon stated: "I think there is more public awareness about the issue and also more confidence from survivors that we will be there for them." http://www.si.com/college-football/2016/10/20/title-ix-sexual-assault-explained

213.    Accordingly, CWRU was coerced by the United States into complying with the Title IX investigative and adjudicatory process mandated by the Dear Colleague Letter and by subsequent federal actions, statements, and directives.

214.    CWRU applied the investigative and adjudicatory process dictated to it by the federal government when it investigated and adjudicated Jane Doe's sexual assault complaint against John Doe.

215.    Under clear and controlling federal constitutional case law, a private actor becomes a state actor when his or its actions are coerced by the United States government.

216.   Under clear and controlling federal constitutional case law, a private actor required by the United States to investigate and adjudicate alleged violations of a federal statute under terms and procedures dictated by the federal government is a state actor when engaging in such investigation and adjudication.

217.   Accordingly, when CWRU investigated and adjudicated Jane Doe's complaint against John Doe, and imposed a sanction of suspension on John Doe upon reaching its conclusions, CWRU was a state actor and was therefore required to honor the rights and guarantees set forth in the United States Constitution.

218.   In the course of such investigation and adjudication, CWRU flagrantly violated Plaintiff's clearly established rights under the Due Process Clause of the Fourteenth Amendment through its repeated acts of gender bias and of deprivation of the minimal requirements of procedural fairness.

219.   Defendants deprived Plaintiff of his liberty and property interests without affording him basic due process, including, but not limited to: his right to a fair adjudication, his right to be informed of the exact charges against him, his right to be heard by an impartial factfinder, to question his accuser, to review all witness statements and evidence against him prior to the hearing, to challenge the credibility of other adverse witnesses and present evidence and witnesses in support of his defense. Rather than investigate what occurred on September 13, 2014, Defendants conducted a superficial investigation biased against Plaintiff as a male accused of sexual misconduct.

220.   As a result, Defendants failed to provide Plaintiff with the basic due process protections that they are required to provide students accused of sexual misconduct, in violation of the 14th Amendment.

45

221.    Based on the foregoing, CWRU was a state actor when it violated the rights and guarantees set forth in the Fourteenth Amendment of the United States Constitution during the investigation and adjudication of Jane Doe's complaint against John Doe.

222.    As a result of these due process violations, Plaintiff continues to suffer ongoing harm, including damages to his reputation and other non-economic and economic damages.

223.    Accordingly, Defendants are liable to Plaintiff for violations of the Due Process Clause of the Fourteenth Amendment, and for all damages arising therefrom.

224.    As a direct and proximate result of the above conduct, Plaintiff sustained tremendous damages, including, without limitation, emotional distress, loss of educational and career opportunities, reputational damages, economic injuries and other direct and consequential damages.

225.    As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

### AS AND FOR A THIRD CAUSE OF ACTION
### Breach of Contract (Against the CWRU Defendants)

226.    Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

227.    At all times relevant hereto, a contractual relationship existed between CWRU and John Doe through CWRU's policies and procedures governing the student disciplinary system, including but not limited to the Sexual Misconduct Policy.

228.    Through the documents it publishes and provides to students, CWRU makes express contractual commitments to students involved in a disciplinary process.

46

229.    CWRU promises students "[t]he university does not discriminate on the basis of sex in its educational program and in other activities operated by the university and is required by Title IX, and specifically 34 C.F.R. Part 106.9, as well as Title VII, not to discriminate in such a manner." The Policy further guarantees "[t]he University is responsible for assuring that the rights of the complainant and the respondent are maintained by supporting a fair process for the handling of sexual misconduct matters and making determinations regarding the Policy." Moreover, CWRU promises to "respect the rights of all involved by following the stated university sexual misconduct process" and "have the allegations investigated in a thorough and timely manner." John Doe performed his obligations under the contract when he accepted an offer of admission from CWRU and paid the required tuition and fees to CWRU.

230.    Based on the foregoing, CWRU created express and implied contracts with Plaintiff.

231.    Based on the aforementioned facts and circumstances, Defendant CWRU breached express and/or implied agreement(s) with Plaintiff.

232.    Based on the foregoing, *supra,* at ¶¶ 110-163, CWRU materially breached its contracts with John Doe by, *inter alia*, failing to provide a "fair process for the handling of sexual misconduct matters", failing to give adequate notice, failing to perform a fair, thorough and non-discriminatory investigation, and failing to comply with its policies and procedures.

233.    Defendant CWRU committed several breaches of its agreements with Plaintiff during the investigation and hearing process, including for instance:

**Failure to complete the investigation within 60 days.**

234.  CWRU's Policies and federal guidance provides that sexual misconduct investigations should be completed within 60 days. Further, the allegations must be "investigated in a thorough and timely manner."

235.  Notwithstanding, Defendant CWRU took nearly twice that amount of time to complete the investigation, from the date Jane Doe first contacted Defendant Milliken's office to file a complaint in November 2014, to the time John Doe's appeal was denied and the sanction arbitrarily increased in March of 2015.

236.  Yet, at no time did Defendant CWRU provide any explanation of good cause for the delay.

237.  Thus, CWRU violated its contract with John Doe when it failed to timely complete the investigation.

**Failure to afford John Doe a fair process.**

238.  CWRU's Policies provide that the Univesrity is responsible for "assuring that the rights of the complainant and the respondent are maintained by supporting a fair process…"

239.  Defendant CWRU violated its contract with John Doe when it conducted a biased, prejudiced and implicitly unfair process, calculated to reach the conclusion that Plaintiff was responsible for the misconduct alleged, employed investigators with inadequate training and experience to ensure a thorough and impartial investigation was conducted, and deprived John Doe of his procedural rights throughout the investigation and adjudication process.

240.  Accordingly, Defendant CWRU violated its contract with John Doe when it conducted a procedurally flawed, biased and subjective investigation on the allegations against him.

**Failure to notify John Doe of his right to an advisor.**

241.    Defendant CWRU further violated its contract with John Doe when it failed to provide John Doe with appropriate support resources.

242.    CWRU's Policies provide that a respondent is entitled to "the presence of a support person…at meetings during the initial inquiry and during the Informal process and/or Administrative/Formal Hearing…"

243.    However, on December 11, 2014, John Doe received an email requiring him to make an appointment with Trina Jones. The email did not state the purpose of the meeting, did not state that the meeting was in fact with Defendant Milliken and not Trina Jones, and did not inform John Doe of his right to be accompanied by an advisor to this meeting. Thus, John Doe appeared for the unannounced mandatory meeting with Defendant Milliken, who began to interrogate John Doe about the alleged Incident, blindsiding John Doe.

244.    John Doe did not have an advisor throughout the investigation, hearing, or the appeal proceedings. CWRU did not offer John Doe a procedural advisor. John Doe was not asked before his meetings with Defendant Milliken if he wished to have an advisor with him.

245.    Thus, Defendant CWRU breached its contract with John Doe when it failed to notify him of his right to an advisor.

**Failure to provide support resources.**

246.    CWRU's Policies provide that the respondent is guaranteed "access to support resources listed in this Policy."

247.    Yet, John Doe was not informed by Defendant Milliken about academic accommodations until December 11, 2014, which was in the middle of final exams week.

49

248.    Moreover, during his first meeting with Defendant Milliken, John Doe advised that he was "having troubling verbalizing things lately. I was told I have a depression based aphasia. I have an impairment in the speaking portion of the brain. It is induced, so I have been taking pills."

249.    Though provided with this critical information regarding John Doe's mental health and current disabilities, and the fact that he was taking medication which affected his ability to communicate, Defendant Milliken did not stop the interview, nor did she suggest contacting disability services or support services to provide accommodations for John Doe before resuming the interview.

250.    Therefore, Defendant CWRU further violated its contract with John Doe when it failed to afford him proper support resources and accommodations.

**Improper Application of the Preponderance of the Evidence Standard.**

251.    The U.S. Department of Education Office for Civil Rights requires that the excessively low preponderance of the evidence burden of proof be used to evaluate allegations of sexual misconduct. Though an inadequate standard to protect the procedural rights of accused students, Defendant CWRU utilized this standard of review, in accordance with its policies. Defendant CWRU violated this provision when it improperly placed the burden of proof on John Doe to prove that Jane Doe's accusations were not true and when it failed to utilize the preponderance of the evidence standard in fact in reaching its determination of responsibility. Defendant CWRU therefore breached its contract with John Doe when it failed to utilize the requisite preponderance of the evidence standard.

252.    Based on the foregoing, Plaintiff is entitled to recover damages for Defendant CWRU's breach of the express and/or implied contractual obligations described above.

253.   As a direct and proximate result of the above conduct, Plaintiff sustained tremendous damages, including, without limitation, emotional distress, loss of educational and career opportunities, reputational damages, economic injuries and other direct and consequential damages.

254.   As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

### AS AND FOR A FOURTH CAUSE OF ACTION
### Breach of the Covenant of Good Faith and Fair Dealing
### (Against the CWRU Defendants)

255.   Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

256.   Based on the aforementioned facts and circumstances, Defendant CWRU acted in bad faith when it meted out an erroneous Decision and disproportionate Sanction notwithstanding the flawed investigative process and lack of evidence in support of Jane Doe's allegations of sexual misconduct.

257.   Based on the aforementioned facts and circumstances, Defendant CWRU breached and violated a covenant of good faith and fair dealing implied in the agreement(s) with Plaintiff.

258.   As a direct and foreseeable consequence of these breaches, Plaintiff sustained tremendous damages, including, without limitation, emotional distress, loss of educational and career opportunities, reputational damages, economic injuries and other direct and consequential damages.

259.   Plaintiff is entitled to recover damages for Defendant CWRU's breach of the express and/or implied contractual obligations described above.

260.   As a direct and proximate result of the above conduct, Plaintiff sustained tremendous damages, including, without limitation, emotional distress, loss of educational and career opportunities, reputational damages, economic injuries and other direct and consequential damages.

261.   As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## AS AND FOR A FIFTH CAUSE OF ACTION
### Negligence (Against the CWRU Defendants)

262.   Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

263.   Defendants owed a duty of care to Plaintiff, arising from the obligations delineated in CWRU's Policies, and directives issued by the U.S. Department of Education's Office for Civil Rights. Such duties included, without limitation, a duty of reasonable care to allow Plaintiff an equal opportunity to present information and witnesses in support of his defense; a duty of care to conduct an impartial and thorough investigation of the allegations of sexual misconduct against him; and a duty of care to utilize the preponderance of the evidence standard in reaching a determination.

264.   Based on the foregoing, Defendants breached their duties owed to Plaintiff.

265.   As a direct and proximate result of the above conduct, Plaintiff sustained tremendous damages, including, without limitation, emotional distress, loss of educational and career opportunities, reputational damages, economic injuries and other direct and consequential damages.

266.   As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## AS AND FOR A SIXTH CAUSE OF ACTION
## Promissory Estoppel (Against Case Western Reserve University)

267.  Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

268.  CWRU's Policies constitute unambiguous representations and promises that CWRU should have reasonably expected to induce action or forbearance on the part of Plaintiff.

269.  CWRU expected or should have expected Plaintiff to accept its offer of admission and choose not to attend other colleges based on its express and implied promises including, but not limited to: CWRU would not deny Plaintiff his procedural rights should he be accused of a violation of CWRU's policies; CWRU was committed to providing support to anyone involved in an incident of sexual misconduct; the University would ensure the rights of the complainant and the respondent are maintained by supporting a fair process for the handling of sexual misconduct matters and making determinations regarding the Policy; and the University would respect the rights of all involved by following the stated university sexual misconduct process.

270.  Plaintiff reasonably and foreseeably relied to his detriment on these express and implied promises and representations made by CWRU, by choosing to attend CWRU rather than other schools of equal caliber and which offered full scholarships and academic advantages.

271.  These express and implied promises and representations made by CWRU must be enforced to prevent substantial injustice to Plaintiff.

272.  Based on the foregoing, CWRU is liable to Plaintiff based on Promissory Estoppel.

273.  As a direct and proximate result of the above conduct, Plaintiff sustained tremendous damages, including, without limitation, emotional distress, loss of educational and

career opportunities, reputational damages, economic injuries and other direct and consequential damages.

274.   As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

### Declaratory Judgment

275.   Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

276.  CWRU has committed numerous violations of the Parties' contracts and of federal and state law.

277.   Plaintiff's future educational and career prospects have been severely damaged. Without appropriate redress, the unfair outcome will continue to cause irreversible damages to Plaintiff's future educational and employment prospects, with no end in sight.

278.   As a result of the foregoing, there exists a justiciable controversy between the Parties with respect to the outcome, permanency, and future handling of Plaintiff's formal student record at CWRU.

279.   By reason of the foregoing, Plaintiff requests, pursuant to 28 U.S.C. § 2201, a declaration that: (i) the outcome and findings made by CWRU be reversed; (ii) Plaintiff's reputation be restored; (iii) Plaintiff's disciplinary record be expunged; (iv) the record of Plaintiff's suspension from CWRU be removed from his education file; (v) any record of the complaint against Plaintiff be permanently destroyed; (vi) Plaintiff be readmitted to CWRU for the Spring 2017 semester; and (vii) CWRU's rules, regulations and guidelines are unconstitutional as applied.

## PRAYER FOR RELIEF

**WHEREFORE,** for the foregoing reasons, Plaintiff John Doe demands judgment against Defendants as follows:

(i)       on the first cause of action for violation of Title IX of the Education Amendments of 1972, a judgment awarding John Doe damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and career opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(ii)      on the second cause of action for violation of the Fourteenth Amendment of the United States Constitution Procedural Due Process, a judgment awarding John Doe damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and career opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursement;

(iii)     on the third cause of action for breach of contract, a judgment awarding John Doe damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and career opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(iv)     on the fourth cause of action for breach of the covenant of good faith and fair dealing, a judgment awarding John Doe damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological

damages, damages to reputation, past and future economic losses, loss of educational and career opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(v)     on the fifth cause of action for negligence, a judgment awarding John Doe damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and career opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(vi)     on the sixth cause of action for promissory estoppel, a judgment awarding John Doe damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and career opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements; and

(vii)     awarding Plaintiff such other and further relief as the Court deems just, equitable and proper.

## JURY DEMAND

John Doe herein demands a trial by jury of all triable issues in the present matter.

Respectfully submitted,


*/s/ Stephen M. Bales*
Stephen M. Bales (0003380)
Ziegler Metzger LLP
1111 Superior Avenue, Suite 1000
Cleveland, OH 04114
(216) 781-5470; Fax: (216) 781-0714
Email: sbales@zieglermetzger.com

*Awaiting pro hac vice admission*
Andrew T. Miltenberg, Esq.
Tara J. Davis, Esq.
Nesenoff & Miltenberg, LLP
363 Seventh Avenue, Fifth Floor
New York, NY 10001
212-736-4500
Email: amiltenberg@nmllplaw.com
        tdavis@nmllplaw.com

*Attorneys for Plaintiff John Doe*