IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| JOHN DOE, | ) CASE NO.  1:17 CV 414 |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) JUDGE DONALD C. NUGENT |
| | ) |
| CASE WESTERN RESERVE | ) <u>MEMORANDUM OPINION</u> |
| UNIVERSITY, *et al.*, | ) <u>AND ORDER</u> |
| | ) |
| Defendants. | ) |

This matter is before the Court on the Motion of Defendants Case Western Reserve
University ("CWRU"), Barbara R. Snyder, Lou Stark, G. Dean Patterson, Jr., George O'Connell,
and Shannon J. Greybar Milliken to Dismiss the Complaint pursuant to Fed. R. Civ. P. 12(b)(6)[1].
(ECF #11) Defendant Lauren Tompkins filed a separate Motion to Dismiss pursuant to Fed. R.
Civ. P. 12(b)(6) and to join in the Motion to Dismiss of the other Defendants, asserting that the
arguments contained in that Motion apply equally to Ms. Tompkins.(ECF #17)  The motions are
now fully briefed and ready for decision.

**FACTS[2]**

Plaintiff John Doe is a citizen of Texas, but was a student at CWRU and residing in

_____

[1]

Defendants assert that the Complaint improperly names "Case Western Reserve
University Board of Trustees as a defendant because the CWRU Board of Trustees is not
a separate legal entity. The corporate entity subject to suit is CWRU. Plaintiff does not
take issue with this pronouncement and as such, the CWRU Board of Trustees will be
dismissed.

[2]

The factual allegations are taken from the Plaintiff's Complaint and will be accepted as
true for the purposes of this motion.

university housing in Cleveland, Ohio during the events at issue in the Complaint. (Compl. ¶ 17) Plaintiff brings this action against Defendants CWRU, Barbara J. Snyder, president of CWRU, Lou Stark, Vice President for Student Affairs of CWRU, G. Dean Patterson, Jr., Associate Vice President for Student Affairs of CWRU, George O'Connell, Director of Student Conduct and Community Standards of CWRU, Shannon J. Greybar Milliken, Associate Dean of Students and Deputy Title IX Coordinator at CWRU, and Lauren Tompkins, an Investigator at CWRU. (Compl. ¶¶ 18-25) Plaintiff asserts the following causes of action against one or more of the Defendants: Count 1: Violation of Title IX of the Education Amendments of 1972-Erroneous Outcome (against CWRU); Count 2: Violation of the Fourteenth Amendment of the United States Constitution Procedural Due Process (against CWRU); Count 3: Breach of Contract (against the CWRU Defendants)[3]; Count 4: Breach of the Covenant of Good Faith and Fair Dealing (against the CWRU Defendants); Count 5: Negligence (against the CWRU Defendants); Count 6: Promissory Estoppel (against CWRU); and a request for a declaratory judgment pursuant to 28 U.S.C. § 2201 (against unspecified defendants). These claims arise out of the actions taken and procedures employed by the Defendants concerning the investigation of allegedly false allegations of sexual assault made by a student, Jane Doe, against Plaintiff resulting in serious sanctions being imposed on Plaintiff, including a multi-year suspension from CWRU.

The alleged sexual misconduct at issue occurred on the night of September 13-14, 2014. Plaintiff alleges that he met Jane Doe during freshman orientation activities held in August 2014 at CWRU. At that time John Doe was a sophomore orientation team member and Jane Doe was

---

[3]

The Court will assume that the Plaintiff is referring to all of the defendants when he uses the term "CWRU defendants").

an incoming freshman. Plaintiff and Jane Doe became close friends which developed into an intimate, mutually consensual sexual relationship consisting of frequent sexual encounters. (Compl. ¶¶ 67-69) On the afternoon of September 13, 2014, Jane Doe told Plaintiff she was unsure of her feelings for him and suggested they needed time apart, perhaps the forthcoming weekend. At 9:00 that evening, Jane Doe was at a dorm party where she consumed beer and shots. Plaintiff met his friends at the same dorm party before attending the new pledge initiation party for his fraternity. At about 1:00 a.m., while at an off-campus fraternity party, Plaintiff received a text from a friend stating that Jane Doe has asked him to send Plaintiff a text telling him to come out with them. Jane Doe then sent a text to Plaintiff telling him to come find her. Plaintiff went to the location specified by Jane Doe and found Jane Doe with her arms around another guy. Plaintiff turned around and walked away. At that point Jane Doe spotted Plaintiff and ran after him. She asked him if she could spend the night at his fraternity house. Plaintiff walked with Jane Doe back to her dorm so she could change into sweat pants before going to the fraternity house for the night. (Compl. ¶¶ 70-73).

Once at the fraternity house, Plaintiff made something for Jane Doe to eat and they talked and played billiards for some time. Jane Doe told Plaintiff that she wanted to sleep with him so they went to the basement of the fraternity house where they knew that they could be alone. They laid on the couch together in the dark room, where they engaged in kissing and mutual touching. Plaintiff helped Jane Doe remove her pants and digitally penetrated her and performed oral sex on her. This was the usual pattern of their sexual relationship that they had done many times before when engaging in consensual sexual relations. Jane Doe did not provide oral sex to Plaintiff nor did Plaintiff ever attempt to have vaginal intercourse with Jane Doe.  As Plaintiff

and Jane Doe lay facing each other on the sofa, Jane Doe suddenly pushed Plaintiff away, got up from the couch and began to cry. Plaintiff did not know why she was crying but tried to comfort her. Jane Doe told him she wanted to go back to her dorm so Plaintiff drove her back to her building. While in the car Plaintiff apologized to Jane Doe if he had done anything to upset her. Jane Doe told him that she needed time apart to think about their relationship. (Compl. ¶¶ 74-80).

The next day Plaintiff states that he and Jane Doe went for a drive and talked about their relationship. Jane Doe told him that she wanted to take a break. Thereafter, Plaintiff texted Jane Doe, sent her gifts and tried to talk to her whenever he saw her. He states that after trying for weeks to make amends, by the end of October, Plaintiff stopped all efforts to communicate with Jane Doe. (Compl. ¶¶ 81-83).

On November 25, 2014, at the insistence of a friend, Jane Doe agreed to speak to Defendant Milliken, the Title IX director for CWRU, to try to "sort out her feelings" for Plaintiff about what happened between them. Prior to initiating an investigation, Ms. Milliken asked Jane Doe if she wanted to request academic accommodations. Plaintiff believes that Jane Doe was failing one of her courses (Anatomy) one week prior to the final exam and that she was permitted to withdraw from that class as an academic accommodation provided by the Title IX Office. The Anatomy course was allegedly required for Jane Doe to continue in the nursing program and by allowing her to withdraw, she would be eligible to repeat the course without having had a failing grade from the first attempt and the failed class would not affect her grade point average. (Id. ¶¶ 84-87) In contrast, Plaintiff states that he informed Ms. Milliken (at their first meeting on December 11, 2014) that due to his recent severe depression he had stopped going to classes for

two weeks, had dropped one course and was having difficulty in Spanish. Although CWRU policy stated that a student accused of sexual misconduct must also be provided with support resources, Plaintiff was not informed of or offered any academic accommodations. (Id. ¶¶ 88, 89)

Ms. Milliken allegedly asked Jane Doe what she would like to see happen with the sexual misconduct investigation and described the next steps, including support resources, no contact directive, police notification, and written statement. (Id. ¶¶ 91-92). On December 10, 2014, Plaintiff received a No Contact Directive with respect to Jane Doe. On December 11, 2014, he received an email directing him to make an appointment with Trina Jones. The email did not state the purpose of the meeting or advise him that he could bring an advisor with him. Plaintiff asserts that he was blind sided when the meeting turned out to be with Ms. Milliken, the Title IX investigator. Plaintiff contends that he had not received a notice of investigation or a discussion of his rights and responsibilities. (Id. ¶¶ 93-94) Further, he informed Ms. Milliken at the start of their meeting that he was having trouble verbalizing things lately because of a depression based aphasia and that he had an impairment in the speaking portion of the brain, so he had been taking pills. (Id. ¶ 95) Ms. Milliken offered no resources or accommodation to Plaintiff upon receiving the  information regarding Plaintiff's mental health and disabilities. (Id. ¶ 96)

In response to Ms. Milliken's request that Plaintiff tell her what happened on the night of the incident with Jane Doe, Plaintiff, who is devoutly religious, began to confess that he "became tempted to do things that were not moral." Plaintiff alleges that Ms. Milliken did not ask him what he meant by "not moral" and asserts that she presumed that his statement was an admission of responsibility for sexual assault. (Id. ¶ 97)

Plaintiff met with Ms. Milliken a second time on January 21, 2015, where she told

Plaintiff that the purpose of the meeting was to confirm his statements made in his December interview and proceed to hearing. Plaintiff alleges that he denied the allegations and requested a formal hearing. (Id. ¶ 100)

Jane Doe was contacted by the CWRU Police on two occasions regarding a report made by the Student Conduct Office that she had been involved in an incident of forcible sexual assault. After meeting with the officers, Jane Doe declined to pursue charges against Plaintiff and informed them that she had no interest in assisting with a criminal prosecution against Plaintiff. (Id. ¶101)

Plaintiff asserts that he did not learn of the allegations against him until February 6, 2015. (Id. ¶ 102) Defendants Milliken and Tompkins interviewed 14 witnesses between February 9 and February 24, 2015. Plaintiff was not permitted to review the witness statements or to provide responses to the statements. Defendant interviewed Jane Doe again and again discussed academic accommodations for Jane Doe. (Id. ¶¶ 104-05)

On February 25. 2017, an Administrative Hearing was held before Defendant O'Connell, CWRU's Director of Student Conduct and Community Standards. The only participants were Ms. Milliken and Plaintiff. Mr. O'Connell notified Plaintiff of his decision letter on February 27, 2015, which sanctioned Plaintiff to two years of suspension, status of persona non grata, no contact order with Jane Doe, and permanent ban from residing in University housing. Plaintiff was given three days to appeal the decision. The Appellate Board affirmed the sanctions in all respects except it increased the suspension from two years to three years, through May 2018.(Id. ¶¶ 106-09)

Plaintiff alleges that the Department of Education's April 2011 "Dear Colleague Letter"

put increased pressure on colleges to have prompt procedures to investigate and resolve complaints of sexual misconduct. The Dear Colleague Letter ("DCL") required schools to adopt a preponderance of the evidence standard in cases involving sexual misconduct, and urged schools to minimize the burden on the complainant. (Id. ¶¶ 37-38). The Complaint details the Obama Administration's efforts to make the DCL binding on schools, including the hiring of hundreds more investigators by the Department of Education Office of Civil Rights to ensure Title IX enforcement and notes that the Federal Government is investigating approximately 307 schools for possible Title IX violations. In July 2016, Vice President Biden warned that schools that do not comply with administration guidelines could be stripped of federal funding. (Id. at ¶¶ 39-43) Plaintiff cites numerous 2014 media reports that "schools are running so scared of violating the civil rights of alleged victims that the end up violating the due process rights of defendants instead." (Id. at ¶¶ 43-44) Plaintiff alleges that in response to all of the pressure from the Office of Civil Rights, the Department of Justice and the White House, educational institutions like CWRU, have limited the procedural protections afforded to male students like Plaintiff in sexual misconduct cases.(Id. ¶ 45)

## STANDARD OF REVIEW

In evaluating a motion to dismiss, the court must construe the complaint in the light most favorable to the plaintiff, accept its factual allegations as true, and draw reasonable inferences in favor of the plaintiff.  *See Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007).  The complaint need not contain detailed factual allegations, but it must include more than labels, conclusions, and formulaic recitations of the elements of a cause of action. *Id.* "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not

suffice." *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (citing *Twombly,* 550 U.S. at 555).

To survive a motion to dismiss under Rule 12(b)(6), a complaint must allege facts that "state a claim to relief that is plausible on its face," and that, if accepted as true, are sufficient to "raise a right to relief above the speculative level." *Twombly,* 550 U.S. at 555, 570. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal,* 556 U.S. 678. "A claim is plausible on its face if the 'plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.' " *Ctr. for Bio–Ethical Reform, Inc. v. Napolitano,* 648 F.3d 365, 369 (6th Cir.2011), *cert. denied,* 132 S.Ct. 1583, (2012) (quoting *Iqbal,* 556 U.S. at 677).

On a motion brought under Rule 12(b)(6), the court's inquiry is limited to the content of the complaint, although matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint may also be taken into account. *See Bassett v. Nat'l Collegiate Athletic Ass'n,* 528 F.3d 426, 430 (6th Cir. 2008)*; Amini v. Oberlin College*, 259 F.3d 493, 502 (6th Cir. 2001).

Thus, for the purposes of this Motion to Dismiss, the Court accepts the Plaintiff's factual allegations as true and construes the Complaint in the light most favorable to Plaintiff. However, the Court will not credit the Complaint's mere conclusory statements without reference to its factual content. *Iqbal,* 566 U.S. at 686.

## DISCUSSION

### I. Federal Claims

Moving first to the federal claims asserted in the Complaint, Defendants argue that Plaintiff's Title IX claim (Count 1) fails because it lacks any non-conclusory factual allegations that any of the alleged procedural flaws were motivated by gender bias. Defendants argue that Plaintiff's Fourteenth Amendment claim (Count 2) must be dismissed because the Fourteenth Amendment due process requirements do not apply to a private educational institution's disciplinary proceedings. The Court will consider these arguments in order.

### A.  Title IX Claim against (CWRU)

Title IX provides: "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any educational program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). The Department of Education and the Department of Justice have also adopted regulations that require schools to "adopt and publish grievance procedures providing for the prompt and equitable resolution of student [...] complaints alleging any action that would be prohibited by" Title IX regulations, including sexual assault. See 34 C.F.R. § 106.8(b); 28 C.F.R. § 54.135(b).The Sixth Circuit, citing *Yusuf v. Vassar College*, 35 F.3d 709, 715 (2d Cir. 1994), has recognized a private right of action under Title IX where a plaintiff alleges that an educational institution implemented disciplinary actions that discriminated against the plaintiff based on sex. *Mallory v. Ohio Univ.*, 76 F. App'x 634, 638-39 (6th Cir. 2003); *Doe v. Case Western Reserve Univ.*, No. 1:14 CV 2044, 2015 WL 5522001 at *4 (N.D. Ohio Sept. 16, 2015).  "Title IX bars the imposition of university discipline where gender is a motivating factor in the decision to discipline. *Yusuf*, 35 F.3d at 715.

Courts have analyzed Title IX claims arising from disciplinary hearings under four

standards: the "erroneous outcome" standard, the "selective enforcement" standard, the "deliberate indifference" standard, and the "archaic assumptions" standard. *Doe v. Univ. of the South*, 687 F. Supp. 2d 744, 756 (E.D. Tenn. 2009); *Doe v. Case Western Reserve Univ.*, 2015 WL 5522001 at \*4. In this case, Plaintiff's first cause of action alleges a Title IX violation against CWRU based on the erroneous outcome theory[4]. (ECF #21 at 13) The gravamen of an erroneous outcome claim is that an innocent person was wrongly found to have committed an offense because of his or her gender. *Marshall v. Ohio Univ.*, No. 2:15 CV 775, 2015 WL 7254213, at \*5 (S.D. Ohio Nov. 17, 2015).

In order to state an erroneous-outcome claim, a plaintiff must plead:

> (1) facts sufficient to cast some articulable doubt on the accuracy of the outcome of the disciplinary proceeding" and
>
> (2) a particularized ... causal connection between the flawed outcome and gender bias.

*Doe v. Cummins*, 662 F. App'x 437, 452 (6th Cir. 2016), citing Yusuf , *supra*, 35 F.3d 709, 715. In order to satisfy the first element of the test, Plaintiff must

> allege particular facts sufficient to cast some articulable doubt on the accuracy of the outcome of the disciplinary proceeding....However, the pleading burden in this regard is not heavy. For example, a complaint may allege particular evidentiary weaknesses behind the finding of an offense such as a motive to lie on the part of a complainant or witnesses, particularized strengths of the defense, or other reason to doubt the veracity of the charge. A complaint may also allege particular procedural flaws affecting

---

[4] Defendants move to dismiss Plaintiff's Title IX claim against the individual defendants. The Complaint in Count One alleges a Title IX claim against CWRU. Plaintiff emphasizes in his opposition to Defendants' motion to dismiss that Plaintiff does not assert a Title IX claim against the individual defendants. (ECF #21 p.2- III F)

the proof.

*Yusef*, 35 F.3d at 715. Here, Plaintiff alleges that Jane Doe had a reason to lie–she allegedly needed the Title IX accommodation to withdraw from a class that she was failing without having the F applied to her gpa; Defendants found Jane Doe to be more credible despite her inconsistent and varying account of the events; Defendants lured Plaintiff into a false sense of security when they falsely assured him it would be in his best interests to cooperate and tell them everything; overlooked all exculpatory evidence; Defendants ignored evidence regarding Plaintiff's mental health and disabilities and the fact that he was taking medication affecting his ability to communicate and instead pressed forward with the interview without suggesting contacting disability or support services; Plaintiff was never permitted to review or respond to any of the 14 witness statements prior to the hearing; Plaintiff was not provided with the Investigation Report prior to his hearing and was only allowed 20 minutes to review the report on the day after his hearing to prepare his appeal. The Court finds that Plaintiff alleges facts sufficient to cast some doubt on the accuracy of the outcome of the disciplinary proceedings[5].

---

[5]

      In their initial Memorandum in Support of the Motion to Dismiss, Defendants moved directly to the second element of the test–arguing that Plaintiff has failed to make any factual, non-conclusory allegations showing that the flawed outcome of the disciplinary proceeding was caused or motivated by gender bias. The Court assumed Defendants conceded that the Complaint satisfied the first element of the test. However, in their reply brief, Defendants attach a copy of CWRU's Sexual Misconduct Policy, and filed a copy of the no contact directive emailed to Plaintiff, Ms. Milliken's DRR Initial Inquiry Notes from December 11, 2014 and Ms. Milliken's Sexual Misconduct Interview Memorandum Notes from February 6, 2015, under seal. Defendants refer to these documents to show that CWRU complied with its Sexual Misconduct Policy and that some of the allegations asserted in the Complaint are untrue or incomplete. Thereafter, Plaintiff moved to covert the Motion to Dismiss to a Motion for Summary Judgment (ECF # 36) which Defendants opposed. Upon review, it appears that the documents submitted under seal to refute some of Plaintiff's factual allegations are some, but not all of the documents prepared during the course of the investigation at issue. Moreover, the documents are

-11-

To satisfy the second element of the test, Plaintiff must allege facts sufficient to show "a particularized ... causal connection between the flawed outcome and gender bias." *Cummins*, 662 F. App'x at 452. Causation sufficient to state a Title IX discrimination claim can be shown in a number of ways including via "statements by members of the disciplinary tribunal, statements by pertinent university officials, or patterns of decision-making that also tend to show the influence of gender." *Yusuf*, 35 F.3d at 715. "However, allegations of a procedurally or otherwise flawed proceeding that has led to an adverse and erroneous outcome combined with a conclusory allegation of gender discrimination is not sufficient to survive a motion to dismiss." *Id.*

Plaintiff makes the following allegations in support of his claim of gender bias:

--Upon information and belief there are no reported incidents of male complaints against female students for sexual assault and/or no reports of female accused students being disciplined for sexual misconduct by males;

---Upon information and belief CWRU defendants are knowledgeable of the fact that complaints of sexual misconduct are disproportionately lodged by females against males;

---Upon information and belief CWRU recognized the increased pressure, both internally, and from the United States government to aggressively discipline male students accused of sexual misconduct, under threat of rescission of federal funds.

--CWRU's response to this pressure, and attempts to avoid rescission of federal funding, is evident from CWRU's Clery Reports which reveal that the number of forcible sex offenses

---

submitted to prove the truth (or untruth) of Plaintiff's allegations or Defendants' defense. As such, the Court will not consider those documents in ruling on the instant motion to dismiss. The Court will consider the Sexual Misconduct Policy attached to the reply brief. Plaintiff's Motion to Convert is denied.

reported on CWRU's campus during 2014 increased considerably, from 9 reported instances in 2013 to 19 in 2014, with only 6 reported incidents in 2015.

–Significantly, it was just prior to calendar year 2014 that Defendant Milliken assumed the role of Title IX Sexual Misconduct Investigator and Deputy Title IX Coordinator. After more than doubling the number of reported forcible sex offenses to 19 at CWRU during her tenure, upon Defendant Milliken's departure from CWRU in 2015, the number of alleged incidents decreased to 6 for 2015.

In 2013 Defendant Milliken wrote her doctoral dissertation on "The Dangerous Reality: Sexual Risk Taking Among College Women" which focused on the detrimental effects to women of engaging in casual sex in college. She concluded that "we have an epidemic in higher education regarding the sexual risk taking of college students, in particular women."

–The foregoing demonstrates Defendant Milliken's inherent belief that males accused of sexual misconduct on college campuses are always responsible, a theory she perpetuated while at CWRU.

–CWRU demonstrated a gender bias against Plaintiff because while both parties were admittedly intoxicated at the time of the sexual encounter, the CWRU Defendants failed to consider the effect of Plaintiff's intoxication on his ability to affirmatively consent to physical contact initiated by Jane Doe.

–CWRU demonstrated bias by affording academic accommodations to Jane Doe but Defendant Milliken failed to offer any aid or accommodation to Plaintiff despite Plaintiff's admissions of physical and mental health issues and academic difficulties.

–CWRU's gender bias against Plaintiff resulted in a decision that did not afford Plaintiff

the requisite preponderance of the evidence standard, instead he was assumed guilty unless proven innocent. CWRU's interpretation of the evidence failed to recognize or address Jane Doe's potential motive of reporting a false allegation against Plaintiff in order to obtain a Title IX academic accommodation to permit her to withdraw at the end of the semester from a class she was failing.

–Defendant Milliken's report adds acts not in the record, accuses Plaintiff of objectifying Jane Doe, wanting to control Jane Doe–evidencing a presumption that Plaintiff was the sexual aggressor.

–CWRU accepted at face value Jane Doe's allegations, notwithstanding her inconsistent statements and contradictory evidence.

–Investigators intentionally overlooked any evidence tending to diminish Jane Doe's credibility and/or exculpate Plaintiff.

–Only an anti-male bias to find for the female complainant and against the male respondent can explain CWRU's findings concerning the preponderance of the evidence.

These allegations, accepted as true with all inferences taken in favor of the Plaintiff for the purposes of this Motion to Dismiss, are sufficient to support an allegation of gender bias at this stage of the proceedings. It is not Plaintiff's responsibility at this time to demonstrate facts that prove that the outcome of the disciplinary procedure was erroneous as a result of gender bias. Rather, to survive a motion to dismiss, Plaintiff need plead only enough facts to show that his allegation that the flawed outcome of his disciplinary proceeding was motivated by gender bias is "plausible."  Here Plaintiff has alleged that the Deputy Title IX Coordinator Ms. Milliken, who was the person to investigate the complaint, prepare the evidentiary report, and testified at the

hearing was biased against men and or considered them the sexual aggressor based upon statements made in her recent doctoral dissertation. He also alleged that sexual misconduct complaints more than doubled during Ms. Milliken's tenure as Deputy Title IX Coordinator. Making all inferences in Plaintiff's favor, these allegations at least give rise to the possibility that Ms. Milliken had a bias against men in these types of situations, and while she was not the decision maker in this instance, she exercised enormous influence over the record and evidence presented to the decision maker.

Moreover, Plaintiff alleges that both parties to the incident were intoxicated, but that only Plaintiff was punished for the consensual sexual acts initiated by Jane Doe. If only the male participant is disciplined for participating in the same acts–the implication of gender bias is clear. If these facts are taken as true and all inferences are credited to Plaintiff, then Plaintiff' claim that his discipline was motivated by gender bias is plausible.[6] Accordingly, Defendants' Motion to

---

[6] There has been an explosion of Title IX lawsuits alleging reverse gender backlash from the 2011 DCL and the Department of Education's enforcement of it. Lower courts are divided on what Plaintiffs must allege in order to make their claims of gender bias plausible enough to survive a motion to dismiss. In *Yusuf*, decided before *Twombly* and *Iqbal*, the court found that the plaintiff's alleged deficiencies in his disciplinary proceeding coupled with his allegation "that males accused of sexual harassment at Vassar are 'historically and systematically' found guilty regardless of the evidence, or lack thereof, to be sufficient. *Yusuf*, 35 F.3d at 716. Post *Iqbal* and *Twombly*, courts have split on whether allegations along these lines, that schools are concerned about appearing too lenient on male students accused of sexual assault, and therefore those students are systematically found guilty regardless of the evidence, a factual allegation–which must be credited–or a conclusory legal allegation–which does not get the presumption of truth. See *Doe v. Brown University*, 166 F. Supp. 177, 186-190 (D. RI 2016) (collecting cases) In this case and others where courts denied motions to dismiss a plaintiff's Title IX erroneous outcome claim, the courts found additional factual allegations that supported the Plaintiff's claim of gender bias. See *Doe v. Ohio State University*, 2017 WL 951464 (S.D. Ohio March 10, 2017); *Doe v. Columbia University*, 831 F.3d 46 (2d Cir. 2016); *Wells v. Xavier*, 7 F.Supp.3d 746, 751 (S.D. Ohio 2014); *Doe v. Washington and Lee Univ.*, No.6:14-CV-00052, 2015 WL 4647996 (W.D. Va. Aug. 5, 2015).

Dismiss Count 1 is denied.

**B. Fourteenth Amendment Due Process Claim (Count 2)**

Plaintiff's second claim is titled, "Violation of the Fourteenth Amendment of the United States Constitution Procedural Due Process (against CWRU)". The Fourteenth Amendment, "which prohibits the states from denying federal constitutional rights and which guarantees due process, applies to acts of the state, not to acts of private persons or entities." *Rendell Baker v. Kohn*, 457 U.S. 830, 837-38 (1982). The Fourteenth Amendment is "is not self-enforcing. Rather, § 5 of the Fourteenth Amendment grants Congress the power to enact legislation with the purpose of enforcing the Fourteenth Amendment." *Johnson v. Sutter Delta Medical Center*, No. C 11-03628 SI, 2011 WL 5444319, at *2 (N.D. CA Nov. 9, 2011) (*citing City of Boerne v. Flores*, 521 U.S. 507, 518-19 (1997). 42 U.S.C. § 1983 was enacted by pursuant to the authority of Congress to enforce the Fourteenth Amendment. *Kohn*, 457 U.S. 837-38. Here, Plaintiff failed to assert his Fourteenth Amendment claim through § 1983.

Even if this claim is not dismissed for that failure, Plaintiff must make factual, non-conclusory allegations to demonstrate that CWRU, a private university, was acting as a state actor when it investigated Jane Doe's complaint and adjudicated the charges. The ultimate issue in determining whether a person or entity is subject to suit under § 1983 is the same as 'state action' required under the Fourteenth Amendment, that is—"is the alleged infringement of federal rights 'fairly attributable to the State?'"*Kohn*, 457 U.S. at 838 *quoting Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982); *Lansing v. City of Memphis*, 202 F.3d 821, 828 (6th Cir. 2000). The Sixth Circuit applies three tests to determine whether a private party has acted under color of state law, for the purposes of § 1983: (1) the "public function test"; (2) the "state compulsion test"; and (3) the "nexus" test. *Wolotsky v. Huhn*, 960 F.3d 1331, 1335 (6th Cir. 1992); *Lansing*,

202 F.3d at 828. Under the "public function" test, the actions of a private individual are fairly attributable to the state if the private party "exercises powers which are traditionally exclusively reserved to the state, such as holding elections or eminent domain." *Wolotsky*, 960 F.2d 1331, 1335. Under the "state compulsion" test, the state must "exercise such coercive power or provide such significant encouragement, either overt or covert, that in law the choice of the private actor is deemed to be that of the state." *Id*. Finally, the "symbiotic or nexus" test requires a sufficiently close relationship (*i.e*., through state regulation or contract) between the state and the private actor so that the action taken may be attributed to the state. *Id*. State regulation and the receipt of public funds will not convert private conduct into state action. *Lansing*, 202 F.3d at 830.

Plaintiff argues that there is a nexus between CWRU and the Department of Education and its enforcement of the directives contained in the DCL such that CWRU's actions relative to Plaintiff were coerced by the Government under the threat of withdrawal of federal funds. Specifically, Plaintiff alleges that the DCL threatened colleges with large de-funding penalties if they did not immediately begin investigating and adjudicating allegations of campus sexual assault under procedures and terms dictated by the federal government including the requirements that colleges:

-- investigate and adjudicate sexual assault allegations regardless of whether the complainant reported the allegations to the police;

–establish a coordinated and centralized investigative and adjudicative procedure according to federal guidelines;

–protect the anonymity of complainants if the complainant so requests;

–apply a preponderance of the evidence standard;

–not permit cross examination by the accused student;

–strongly encouraged to expel students that the college finds to have engaged in

unconsented-to sexual intercourse with another student. (Compl ¶¶ 205-06).

Thus, Plaintiff contends that CWRU became a state actor, subject to the requirements of

Fourteenth Amendment due process, when it was coerced to investigate and adjudicate the

allegations against Plaintiff in compliance with the mandates of the 2011 Dear Colleague Letter.

This argument was rejected by the Court in *Doe v. Washington and Lee University*, No. 6:14 CV

00052, 2015 WL 4647996 (W.D. Va Aug. 15, 2015). Noting that for Fifth Amendment [or

Fourteenth Amendment] protections to apply "the government must have compelled the act of

which [Plaintiff] complains," the Court in *Washington and Lee* determined that the actions taken

by Washington and Lee in response to the DCL and pressure from the Department of Education

Office of Civil Rights did not rise to government coercion:

> Responding to the OCR's guidance, W & L made changes that one could
> infer were designed to secure more convictions. W & L removed
> protections that had previously been afforded to the accused, such as the
> right to counsel, and adopted a low burden of proof, preponderance of the
> evidence, rather that the beyond reasonable doubt standard used for honor
> code violations. Plaintiff does not, however, ...contend that the
> government participated in the decision-making process at any stage of the
> proceedings, [a] factor crucial to the determination of whether a school's
> actions are attributable to the government." See *Logan v. Benning Coll.
> Corp.*, 72 F.3d 1017, 1028 (2d Cir. 1995)(finding no state action where the
> state "neither drafted the disciplinary code, nor participated in determining
> what sentence was to be handed out under it."); accord *Stefanowicz v.
> Bucknell Univ.*, No. 10-CV-2040, 2010 WL 3938243, at *3 (M.D. Pa. Oct.
> 5, 2010)(determining that university was not a state actor when the
> "hearing at issue appear[ed] to be strictly an internal investigation,
> conducted freely from state intervention.) On these allegations, W & L
> cannot be considered a governmental actor subject to the due process
> requirements of the Fifth Amendment[7].

---

[7] The standards used to find federal action for purposes of the Fifth Amendment are
identical to those employed to detect state action subject to the strictures of the Fourteenth

Id. at *9. There is no allegation here that the federal government participated in the proceedings against Plaintiff, or dictated the specific finding of responsibility in this case. Federal regulation and receipt of federal funds alone, does not convert private conduct to government or state action. See *Lansing*, 202 F.3d at 830.

The Court has reviewed dozens of cases filed by students like Plaintiff from around the country who have been expelled or otherwise disciplined by a college or university in Title IX investigations and disciplinary proceedings. Despite extensive research, the Court has not found a single case in which a court has determined that a private school's compliance with Title IX's regulations make that entity a state actor for purposes of a Fourteenth Amendment due process claim, nor has Plaintiff cited any such decision.  Rather, the courts that have considered this issue agree that private colleges are not state actors by virtue of their adoption of Title IX grievance procedures. See, e.g., *Tsuruta v. Augustana Univ.*, No. 4:15 CV 04150 KES, 2015 WL 5838602, at *2-3 (D.S.D. Oct. 7, 2015)(college's compliance with Title IX requirements and receipt of contingent federal funds did not make the private college a state actor); *Xiaolu Peter Yu v. Vasser College,* 97 F.Supp.3d 448, 462 (S.D.N.Y. 2015)("to extent Yu is claiming that Vassar's disciplinary proceedings denied him constitutional due process, this argument is without merit" since Vassar is not a state actor); *Doe v. Columbia University,* 2015 WL 1840402 at *9 n. 5 (S.D.N.Y. Apr. 21, 2015) (same) overruled by *Doe v. Columbia University*, 831 F.3d 46 (2d Cir. 2016) ; *see also Curto v. Smith,* 248 F.Supp.2d 132, 139 (N.D.N.Y.2003) (noting "no direct

_____

Amendment. *Doe v. Washington and Lee Univ*., 2015 WL 4647996 at *8. Moreover, the tests utilized by the Fourth Circuit to determine whether a private party's conduct can be considered governmental or state action are the same as those utilized by the Sixth Circuit. *Id*.

oversight or involvement by state officials" in matters such as creating and enforcing disciplinary policies in a private institution weigh against state action determination).

Accordingly the Court finds that Plaintiff has failed to allege facts sufficient to plausibly establish that CWRU is a state actor for purposes of the Fourteenth Amendment due process analysis under any of the three accepted tests. As such, Count 2 of the Complaint is dismissed.

## II. State Law Claims

Plaintiff asserts state law claims of Breach of Contract (Count 3) against CWRU defendants, Breach of Covenant of Good Faith and Fair Dealing (Count 4) against the CWRU defendants and Promissory Estoppel (Count 6) against CWRU.

### A. Breach of Contract against CWRU Defendants (Count 3)

In order to state a claim for breach of contract under Ohio law a plaintiff must allege "the existence of a contract, performance by the plaintiff, breach by the defendant and damage or loss to the plaintiff." *Savedoff v. Access Group, Inc.*, 524 F.3d 754, 762 (6th Cir. 2008) citing *Jarupan v. Hanna*, 173 Ohio App.3d 284, 878 N.E.2d 66, 73 (2007)(further citations omitted).

The Complaint alleges that a contractual relationship existed between CWRU and John Doe through CWRU's policies and procedures governing the student discipline system. (Compl. ¶ 227) There is no allegation in the Complaint of a contract between Plaintiff and any of the individual defendants. As such, the Complaint fails to state a breach of contract claim against any of the individual Defendants. Dismissal is warranted if the complaint lacks an allegation as to a necessary element of the claim raised. *Craighead v. E.F. Hutton & Co.*, 899 F.2d 485 (6th Cir. 1990). As such, Plaintiff's breach of contract claim is dismissed against the individual Defendants.

As to Defendant CWRU the Complaint alleges that there was a contractual relationship

between Plaintiff and CWRU through CWRU's policies and procedures governing the student disciplinary system. (Compl. ¶ 227). The Complaint also alleges performance by Plaintiff when he accepted an offer of admission from CWRU and paid the required tuition and fees to CWRU. (Id. ¶ 229). Plaintiff alleges that CWRU materially breached the contract by failing to provide a "fair process for the handling of sexual misconduct matters," failing to give adequate notice, failing to perform a fair, thorough and non-discriminatory investigation, and failing to comply with its policies and procedures. (Id. ¶ 232) These alleged breaches are detailed in paragraphs 234-251 of the Complaint. Finally, Plaintiff alleges that he sustained damage as a direct and proximate result of CWRU's breaches including emotional distress, loss of educational and career opportunities, reputational damages, and economic injuries. On its face, the Complaint states a claim for breach of contract against CWRU that satisfies the *Twombley/Iqbal* standard.

CWRU contends that the breach of contract claim should be dismissed because courts must defer to the decisions of a school unless there is a substantial departure from accepted academic norms as to demonstrate a lack of professional judgment. (ECF #11 at 12) CWRU further contends that it has made a reasonable effort to comply with its policies, procedures and Title IX procedures and thus has fulfilled its obligations to Plaintiff. (Id. at 12-13.) While CWRU may be entirely correct that it is not in breach, the Court is unable at this juncture in the proceedings to determine whether CWRU breached its contract with Plaintiff. Accordingly, the motion to dismiss Count 3 is denied as to CWRU.

**B. Breach of the Covenant of Good Faith and Fair Dealing against All Defendants (Count 4)**

CWRU asserts that Plaintiff's Claim for Breach of the Covenant of Good Faith and Fair

Dealing should be dismissed because Ohio courts decline to recognize such a claim in situations involving universities and students. See *Valente v. Univ. of Dayton*, 438 Fed. Appx. 381, 385-386 (6th Cir. 2011). In *Valente*, a law school student brought an action against the University of Dayton asserting breach of contract and various tort claims including breach of the covenant of good faith and fair dealing. Holding that the student's claim that the University's actions violated its duty of good faith and fair dealing failed, the Sixth Circuit explained:

> This contention has no merit because, excepting insurance contracts, *see, e.g., Suver v. Pers. Serv. Ins. Co.,* 11 Ohio St.3d 6, 462 N.E.2d 415, 417 (1984), "Ohio courts have been circumspect in allowing tort remedies for breaches of such duties," *In re Commercial Money  *386 Ctr., Inc., Equip. Lease Litig.,* 603 F.Supp.2d 1095, 1122 (N.D.Ohio 2009). In fact, when addressing a contractual dispute between a school and its former employees and students, the Ohio Court of Appeals held that "[t]here is no separate tort cause of action for breach of good faith that is separate from a breach of contract claim." <u>Ne. Ohio Coll. of Massotherapy v. Burek,</u> 144 Ohio App.3d 196, 759 N.E.2d 869, 875 (2001).

*Valente*, 438 F. App'x at 385–86.  Accord *Lakota Local School Dist. v.  Brickner*, 108 Ohio App. 3d 637, 646, 671 N.E.2d 578, 584 (Ohio Ct. App. 1996)(Dismissed breach of covenant of good faith and fair dealing claim because there is no separate tort cause of action for breach of good faith and fair dealing that is separate from a breach of contract claim. Rather, "good faith is part of a contract claim and does not stand alone."); *Buescher v. Baldwin Wallace University*, No. 1:13 CV 2821, 2014 WL 1910907 (N.D. Ohio May 12, 2014)(dismisses students' breach of duty of good faith and fair dealing claim based upon *Valente*.)  Based upon this precedent, Plaintiff's claim for Breach of the Covenant of Good Faith and Fair Dealing is dismissed.

### C. Negligence against All Defendants (Count 5)

Plaintiff alleges that Defendants owed him a duty of care arising from the obligations delineated in CWRU's Policies and federal Title IX directives. Plaintiff asserts that such duties

-22-

included a duties of reasonable care to allow Plaintiff an equal opportunity to present information and witnesses in support of his defense; to conduct an impartial and thorough investigation and to utilize the preponderance of the evidence standard in reaching a determination. (Compl. ¶263) Plaintiff further asserts that Defendants breached their duties and as a result Plaintiff suffered damages. The elements of a negligence claim are "(1) the existence of a legal duty, (2) the defendant's breach of that duty, and (3) injury that is the proximate cause of the defendant's breach."*Schmitz v. Natl. Collegiate Athletic Assn.*, 2016 Ohio 8041, ¶ 46, 67 N.E.3d 852, 865–66, citing *Wallace v. Ohio DOC,* 96 Ohio St.3d 266, 2002-Ohio-4210, 773 N.E.2d 1018, ¶ 22, citing *Mussivand v. David,* 45 Ohio St.3d 314, 318, 544 N.E.2d 265 (1989).

Defendants argue that Plaintiff's negligence claim fails as a matter of law because in Ohio, a claim for negligence within the university-student context "is essentially one of educational malpractice...[and such] a claim is not recognized in the state of Ohio." *Lemmon v. Univ. of Cincinnati*, 112 Ohio Misc.2d 23, 29, 750 N.E.2d 668 (Ohio Ct. Claims 2001). In *Lemmon*, students enrolled in a university's computerized court reporting program brought a negligence claim against the school asserting that the university represented to the students that they were achieving certain levels of speed when, in fact, they were not close to achieving those speeds. The Court determined that the claim was essentially a claim for educational malpractice which is not recognized in Ohio. "Educational malpractice" has been loosely defined as any allegation directed to the adequacy or quality of education received. *Malone v. Academy of Court Reporting*, 64 Ohio App.3d 588, 593, 582 N.E.2d 54 (Ohio Ct. App. 1990). See also, *Denson v. Steubenville Bd. Of Educ.*, No. 85-J-31, 1986 WL 8239 (Ohio Ct. App. 7th Dist. 1986)(Complaint dismissed where student-athlete alleged educational malpractice because Defendants passed him from grade one

through grade 12 without teaching him how to read or write.); *Baker v. Oregon City Schools*, No. L-11-1109, 2012 WL 762482 (Ohio App. 6th Dist. Mar. 9, 2012) (Plaintiffs, students in the Green Energy, Electrical, & Environmental Specialist Program, asserted that the school made representations in brochures and the student handbook that were known to be false; program did not live up to brochures because of poor facilities, incompetency of instructors, lack of instruction on promised curriculum and hands on training, failure of program directors to make changes after student complaints, and the lack of promised job shadowing. The trial court dismissed plaintiffs' negligence claim because it was "in fact a claim of educational malpractice which is not cognizable under Ohio law.")

The defendant college in *Buescher v. Baldwin Wallace University*, No., 1:13 CV 2821, 2014 WL 1910907 (N.D. Ohio May 12, 2014) argued successfully that Plaintiffs' negligence claim should be dismissed as an educational malpractice claim. The plaintiffs were students in an Accelerated Bachelor of Science Degree in Nursing Program (ABSN) who were discharged from the program for different reasons. Plaintiffs argued that their claim for negligent hiring and supervision of ABSN administrative staff and faculty was distinguishable from educational malpractice because they did not allege a substandard education. Judge Gaughan, comparing Plaintiffs' claim to the claim in *Baker v. Oregon City Schools*, determined that plaintiffs' allegations that defendants' failure to provide them with a quality nursing education through the ABSN program despite the representations made in defendants' marketing of the program and statements made in the handbook, do amount to [an educational malpractice claim] even though plaintiffs' did not use the term "substandard education" that had been used by the plaintiffs in *Baker*. Id. at *4

-24-

In this case Plaintiff attempts to distinguish *Lemmon* and its progeny, arguing that "Defendants conflate a claim that a university has violated a duty of care with a claim that an institution failed to provide a certain quality of education, which has been deemed educational malpractice." (ECF #21 at 28). Plaintiff's distinction was not really addressed by Defendants in their reply brief. Rather, Defendants assert, without analysis or factual comparisons, that any negligence claim asserted in the university-student context is "essentially one of educational malpractice...a claim not recognized in the state of Ohio." Defendants position overstates the holdings of *Lemmon* and the following cases.

It is clear that all of the cases dismissing plaintiffs' negligence claims as educational malpractice claims involved claims that the education received by the plaintiffs was in some way lacking. Here Plaintiff's Complaint focuses on CWRU's investigation and disciplinary proceedings and the School's policies regarding the same and not on the education he received. As such, Plaintiff's negligence claim is not a claim for educational malpractice. Rather, Plaintiff's negligence claim is mostly a re-statement of his breach of contract claim. Plaintiff asserts that Defendants owed him a duty "arising from the obligations delineated in CWRU's Policies, and directives issued by the U.S. Department of Education's Office for Civil Rights." (Compl. ¶ 263). Defendant Tompkins raises the point that in Ohio, a breach of contract does not create a tort claim. *Textron Financial Corp. v. Nationwide Mutual Ins.*, 115 Ohio App.3d 137, 151 (8th Dist. 1996)(citing *Wolfe v. Continental Cas. Co.*, 647 F.2d 705, 710 (6th Cir. 1981).

> Generally, the existence of a contract action * * * excludes the opportunity to present the same case as a tort claim. A tort claim based upon the same actions as those upon which a claim of contract breach is based will exist independently of the contract action only if the breaching party also breached a duty owed separately from that created by the contract, that is, a duty owed even if no contract existed.

*Id*. See also, *Wright v. Bank of Am. N.A.*, 517 Fed. Appx. 304, 307 (6th Cir. 2013). Thus, Plaintiff's

negligence claim based upon a duty arising from "obligations delineated in CWRU's policies" is

barred because the alleged duties are contractual duties, not separate and independent duties

created by common law that would exist even if no contract existed. However, the negligence

claim based upon a duty allegedly owed by the CWRU defendants arising from the directives

issued by the U.S. Department of Education's Office for Civil Rights is not necessarily duplicative

of Plaintiff's breach of contract claim and may, for the moment, proceed.

      In her separate Motion to Dismiss, Defendant Tomkins asserts that neither CWRU policy

nor the directives from the OCR impose a duty on her, as an individual. The Complaint refers to

the DCL which outlines the responsibilities of the Title IX coordinator of the university, which

Ms. Tompkins is not. (Compl. ¶¶ 122-24) The Complaint details the duties the Department of

Education's Office of Civil Rights directives imposed upon schools, colleges and universities. *(Id.*

¶¶ 39, 41, 122-24, 135, 170-72.) The Complaint does not allege that the directives imposed a duty

upon an individual such as Ms. Tompkins. Moreover, the fact that Title IX does not impose

personal liability on individuals, only on recipients of federal funds, *i.e*., the educational

institutions, bolsters the argument that the directives issued under Title IX do not impose a duty of

care for litigation purposes on an individual. See generally *Davis v. Monroe County Bd. Of Educ*.,

526 U.S. 629, 640 (1999); *Campbell v. Dundee Cmty. Sch.*, 661 Fed. Appx. 884, 887-888 (6th Cir.

2016)(upholding dismissal of individual defendants because "Title IX does not permit individual

liablity"); *Fitzgerald v. Barnstable Sch.Comm*., 555 U.S. 246, 257 (2009)(Title IX "has been

consistently interpreted as not authorizing suits against school officials, teachers and

individuals.")

Accordingly, the Court finds that the Complaint fails to assert the first element required for a negligence claim–the existence of a legal duty– as to Defendant Tomkins. As such the negligence claim is dismissed as to Ms. Tomkins. The negligence claim against the remaining Defendants is limited to any duty arising from the OCR directives.

### D. Promissory Estoppel against CWRU (Count 6)[8]

Plaintiff asserts a claim of promissory estoppel as his sixth claim for relief. In order to establish a claim for promissory estoppel under Ohio law a plaintiff must establish the following elements: (1) a clear and unambiguous promise; (2) reliance upon the promise by the person to whom the promise is made; (3) the reliance is reasonable and forseeable; and (4) the person claiming reliance was injured as a result of the reliance on the promise. *Stewart v. Everyware Global, Inc.*, 68 F.Supp.3d 759, 766 (S.D. Ohio 2014); *Weiper v. W.A. Hill & Associates*, 104 Ohio App.3d 250, 260, 661 N.E.2d 796 (1st Dist. Ohio Ap. 1995).

Plaintiff has pled all of these elements. Plaintiff alleges that CWRU's policies constitute unambiguous representations and promises that CWRU should reasonably expected to induce action or forbearance on the part of Plaintiff. (Compl. ¶ 268) Specifically, Plaintiff asserts the promises include that "CWRU would not deny Plaintiff his procedural rights should he be accused of a violation of CWRU's policies; that CWRU was committed to providing support to anyone involved in an incident of sexual misconduct; the University would ensure the rights of the complainant and the respondent are maintained by supporting a fair process for the handling of

---

[8] Defendants move to dismiss this claim against the individual defendants, however the Complaint states that the claim is against CWRU. Plaintiff confirms that fact in its opposition. (ECF #21 at 26-27.)

sexual misconduct matters and making determinations regarding the Policy; and the University would respect the rights of all involved by following the stated university sexual misconduct process."(Id. ¶ 269) Further, Plaintiff alleges that he reasonably and foreseeably relied to his detriment on these promises and representations made by CWRU by choosing to attend CWRU rather than other schools of equal caliber which offered full scholarships and academic advantages. Finally, Plaintiff alleges that he was injured as a direct and proximate result of CWRU's conduct, sustaining emotional distress, loss of educational and career opportunities, reputational damages and economic injury.

CWRU argues that Plaintiff's promissory estoppel claim should be dismissed because the policies on which its based also form the basis of Plaintiff's breach of contract claim. Specifically, CWRU contends that the presence of a valid and enforceable contract between CWRU and the Plaintiff generally precludes a claim of promissory estoppel arising from claims related to the contract. *O'Neill v. Kemper Ins. Cos*., 497 F.3d 578, 583 (6th Cir. 2007) In *O'Neill* the Court determined that where neither party disputes the fact that an enforceable contract exists and governs the substance of the lawsuit, the plaintiff may not mount a claim for promissory estoppel that directly contradicts the language of the contract. *Id.* While a party is not permitted to recover for the same wrong under both claims, Ohio courts permit promissory estoppel claims to be argued alternatively to breach of contract claims. *Bonner Farms, Ltd. v. Power Gas Mktg. & Transmission,* No. 5:04–2188, 2007 WL 2463247 at *7 (N.D.Ohio Aug. 28, 2007)(Promissory estoppel and unjust enrichment are quasi-contractual or equitable claims that may be pled in the alternative to a breach of contract claim. *See* Fed.R.Civ.P. 8(e)(2) ("A party may set forth two or more statements of a claim ... alternately or hypothetically, either in one count ... or in separate

counts. * * * A party may also state as many separate claims ... as the party has regardless of consistency and whether based on legal [or] equitable ... grounds.").

Plaintiff here has sufficiently pleaded the elements of promissory estoppel in the alternative.

### III. Declaratory Judgment

Plaintiff seeks declaratory relief pursuant to 28 U.S.C. § 2201. Defendants move to dismiss this claim because Plaintiff's substantive claims have failed and thus he is not entitled to declaratory relief. *United States Wrestling Fed'n v. Wrestling Div. Of the AAU, Inc.*, 711 F.2d 1060, 1060 (6th Cir. 1983) However, since the Court has declined to dismiss all of Plaintiff's substantive claims, his request for declaratory relief will not be dismissed at this time.

### Conclusion

For the reasons set forth above, the Motion of Defendant Tomkins (ECF # 17) is granted. All claims against Ms. Tomkins are dismissed.[9] The Motion of Defendants CWRU, Barbara R. Snyder, Lou Stark, G. Dean Patterson, Jr., George O'Connell and Shannon J. Greybar Milliken to Dismiss (ECF #11) is granted in part and denied in part as follows:

Count1: Violation of Title IX against CWRU-denied;

Count 2: Violation of the Fourteenth Amendment against CWRU– granted**;**

Count 3: Breach of Contract against Individual Defendants–granted; as to CWRU-denied;

Count 4: Breach of Covenant of Good Faith and Fair Dealing against all

Defendants–granted;

---

[9]

Plaintiff's alternative request to amend his complaint is denied because the claims against Defendant Tompkins lack merit and any amendment would be futile. *See e.g. Riverview Health Institute LLC v. Medical Mutual of Ohio*, 601 F.3d 505, 523 (6th Cir. 2010).

Count 5: Negligence –denied, but limited to duties arising from Title IX directives;

Count 6: Promissory Estoppel against CWRU–denied.

As explained above, Plaintiff's motion for leave to submit supplemental authority (ECF #34) is granted and Plaintiff's Motion to Convert (ECF #36) is denied.

IT IS SO ORDERED.


                                           */s/Donald C. Nugent*
                                           DONALD C. NUGENT
                                           United States District Judge

DATED: September 1, 2017