IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

JOHN DOE,                                    )
                                             )
          Plaintiff,                         )
                                             )   Case No. 1:17-cv-00414
v.                                           )
                                             )   THE HONORABLE JUDGE
CASE WESTERN RESERVE UNIVERSITY;             )   DONALD C. NUGENT
CASE WESTERN RESERVE UNIVERSITY              )
BOARD OF TRUSTEES; BARBARA R.                )
SNYDER; LOU STARK; G. DEAN                   )   **DEFENDANTS' MOTION FOR**
PATTERSON, JR.; GEORGE O'CONNELL;            )   **SUMMARY JUDGMENT**
SHANNON J. GREYBAR MILLIKEN; and             )
LAUREN TOMPKINS,                             )
                                             )
          Defendants.                        )
                                             )

        Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Defendants Case Western

Reserve University ("CWRU" or the "University"), Barbara R. Snyder ("Snyder"), Lou Stark

("Stark"), G. Dean Patterson, Jr. ("Patterson"), George O'Connell ("O'Connell"), and Shannon J.

Greybar Milliken ("Milliken") (collectively, "Defendants") move this Court for summary judgment

on Plaintiff John Doe's remaining claims, *i.e.* Title IX violation – erroneous outcome theory against

CWRU (Count I), breach of contract against CWRU (Count III), negligence (limited to any duties

imposed by the directives of the U.S. Department of Education Office of Civil Rights) against all

remaining Defendants (Count V), and promissory estoppel against CWRU (Count VI) (collectively,

the "Remaining Claims") because there are no issues of material fact, and Defendants are entitled to

judgment in their favor as a matter of law. The reasons supporting this Motion are set forth in detail

in the attached Memorandum in Support.

Respectfully submitted,


/s/ Amanda T. Quan
John Gerak, OH #0075431
Rebecca J. Bennett, OH #0069566
Amanda T. Quan, OH #0086623
Ogletree, Deakins, Nash, Smoak & Stewart, P.C.
Key Tower
127 Public Square, Suite 4100
Cleveland, OH 44114
216.241.6100
216.357.4733 (FAX)
Email:  john.gerak@ogletreedeakins.com
        rebecca.bennett@ogletreedeakins.com
        amanda.quan@ogletreedeakins.com

*Attorneys for Defendants Case Western Reserve University, Barbara R. Snyder, Lou Stark, G. Dean Patterson, Jr., George O'Connell, and Shannon J. Greybar Milliken*

## <u>TABLE OF CONTENTS</u>

**MEMORANDUM IN SUPPORT** ....................................................................................1

**I.**      **INTRODUCTION** ....................................................................................1

**II.**     **FACTUAL BACKGROUND** .................................................................2

      **A.**    CWRU's Sexual Misconduct Policy......................................................2

      **B.**    Jane Doe's Complaint Of Sexual Misconduct Against Plaintiff. ...................6

      **C.**    CWRU's Investigation Into Jane Doe's Complaint Of Sexual Misconduct Against Plaintiff..................................................................8

      **D.**    CWRU's Title IX Administrative Hearing On Jane Doe's Complaint Of Sexual Misconduct Against Plaintiff. .................................................9

      **E.**    CWRU's Findings On Jane Doe's Complaint Of Sexual Misconduct Against Plaintiff.................................................................. 10

      **F.**    Plaintiff's Appeal Of The Sanctions Imposed Against Plaintiff. ..................11

**III.**   **STANDARD OF REVIEW** ...................................................................11

**IV.**   **LAW AND ARGUMENT** .....................................................................12

      **A.**    Count III (Breach Of Contract) Fails As A Matter Of Law Because CWRU Reasonably Complied With Its Policies And Procedures.............................12

      **B.**    Count VI (Promissory Estoppel) Fails As A Matter Of Law Because CWRU Substantially Complied With Its Policies And Procedures Outlined In The Policy. ...............................................................................13

      **C.**    Count I (Title IX Violation – Erroneous Outcome) Fails As A Matter Of Law Because (1) The Outcome Of Plaintiff's Title IX Proceedings Was Not Erroneous And/Or (2) Even If The Outcome Were Erroneous, Which It Was Not, There Is No Causal Connection Between The Outcome And Any Purported Sex Bias..................................................................14

      **D.**    Count V (Negligence) Fails As A Matter Of Law.............................................18

**V.**      **CONCLUSION** ....................................................................................20

# <u>TABLE OF AUTHORITIES</u>

**Cases**

*Buescher v. Baldwin Wallace University*, 86 F.Supp.3d 789 (N.D. Ohio 2015) ......................... 13

*Corso v. Creighton Univ.*, 731 F.2d 529 (8th Cir. 1984) ................................................ 12

*Doe v. Brown Univ.,* 166 F. Supp. 3d 177, 196–97 (D.R.I. 2016) ................................. 20

*Doe v. Case Western Reserve University*, No. 1:14CV2044, 2015 WL 5522001,
at *4 (N.D. Ohio Sept. 16, 2015) .......................................................................... 14

*Doe v. Colgate University,* No. 5:15-cv-1069, 2017 WL 4990629 (N.D.N.Y.
Oct. 31, 2017)....................................................................................................... 17

*Doe v. College of Wooster*, 243 F.Supp.3d 875, 888 (N.D. Ohio 2017)....................... 14

*Doe v. Cummins,* 662 F. App'x 437, 452 (6th Cir. 2016) ................................. 15, 16, 18

*Doe v. Trustees of Boston College,* 892 F. 3d 67, 91 (1st Cir. 2018).......................... 17

*Doe v. Univ. of South,* No. 4:09-CV-62, 2011 WL 1258104, at *14
(E.D. Tenn. Mar. 31, 2011) ................................................................................... 19

*Doe v. Univ. of the South*, 687 F.Supp.2d 755, 755 (E.D. Tenn. 2009) ....................... 12

*Faparusi v. Case Western Reserve University*, No. 1:16CV1586, 2017 WL 759024, at *2
(N.D. Ohio Feb. 28, 2017) .............................................................................. 12, 13

*Gebser v. Lago Vista Independent School District,* 524 U.S. 274, 118 S.Ct. 1989,
141 L.Ed.2d 277 (1998) ........................................................................................ 19

*Haley v. Va. Commonwealth Univ.,*948 F. Supp. 573 (E.D. Va. 1996) .................. 17, 18

*Jones v. Pi Kappa Alpha Int'l Fraternity, Inc., No.* 2:16-CV-7720-KM-MAH,
2017 WL 4074547, at *11 (D.N.J. Sept. 13, 2017)......................................................... 19

*Lemmon v. Univ. of Cincinnati*, 112 Ohio Misc.2d 23, 26-27, 750 N.E.2d 668
(Ohio Ct. Claims 2001) ......................................................................................... 12

*Mallory v. Ohio Univ.*, 76 F. App'x 634, 638-39 (6th Cir. 2003)........................... 14, 15

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) ........... 11

*O'Neill v. Kemper Ins. Cos.*, 497 F.3d 578, 583 (6th Cir. 2007) ................................. 14

*Ross v. Univ. of Tulsa,* No. 14-CV-484-TCK-PJC, 2015 WL 4064754, at *2–4 (N.D. Okla. July 2, 2015) ........................................................................................ 19

*Valente v. University of Dayton,* 438 Fed. Appx. 381 (6th Cir. 2011) .......................................... 13

*Williams v. Howard Univ.*, 528 F.2d 658 (D.C. Cir. 1976) ........................................................ 12

*Yu v. Vassar College,* 97 F. Supp. 3d 448, 462 (S.D.N.Y. 2015) ..................................... 15, 16, 18

*Yusuf v. Vassar College,* 35 F.3d 709, 715 (2d Cir. 1994) ..................................................... 15, 16

**Statutes**

20 U.S.C. § 1671, *et seq.* ................................................................................................. 2

Fed. R. Civ. P. 56(c) ..................................................................................................... 11

<u>**MEMORANDUM IN SUPPORT**</u>

**I.      <u>INTRODUCTION</u>**

Jane Doe reported that, after a night of drinking, Plaintiff digitally penetrated her, vaginally penetrated her without her consent and, after she told him to stop, engaged in non-consensual oral sex. Pursuant to its Sexual Misconduct Policy (the "Policy"), CWRU conducted an investigation, including an interview with Plaintiff. Plaintiff admitted that, the night of the incident between Plaintiff and Jane Doe: (1) Plaintiff knew Jane Doe was intoxicated; (2) Plaintiff knew Jane Doe did not want to have oral sex or sex of any kind; (3) Plaintiff did not remember everything he did that night, but distinctly remembers Jane Doe pushed him off of her and started crying; (4) at least initially, Plaintiff did not deny vaginally penetrating Jane Doe (and further stated he believed what Jane Doe said happened, which was that Plaintiff digitally and vaginally penetrated Jane Doe); and (5) Plaintiff performed oral sex on Jane Doe. (Plaintiff's Depo. 62:12-63:25, 95:5-98:14, 137:8-138:10, Exs. 8, 11.[1]) The Policy provides two formal hearing mechanisms. CWRU provided Plaintiff the hearing mechanism he selected. Following the administrative hearing, CWRU found Plaintiff violated the Policy and separated Plaintiff from the University. Throughout the entire process, CWRU reasonably complied with the Policy. The record is devoid of any evidence to suggest that CWRU did not follow the Policy or any directives of the U.S. Department of Education's Office of Civil Rights, or that the outcome of the Title IX proceedings was erroneous and based on Plaintiff's sex. Accordingly, Defendants are entitled to summary judgment on Plaintiff's Remaining Claims.

---

[1] Relevant portions of the transcript of Plaintiff John Doe's deposition are attached as <u>Exhibit A</u>.

## II.     FACTUAL BACKGROUND

### A.     CWRU's Sexual Misconduct Policy.

CWRU is required to adopt and publish grievance procedures providing for the prompt and equitable resolution of student and employee complaints under Title IX, including complaints alleging sexual misconduct. 20 U.S.C. § 1671, *et seq*. CWRU established and follows its Title IX policy, which strongly encourages persons who experience sexual misconduct to report the misconduct to the university within two years of the alleged incident. (Policy, p. 8.[2]) Under the Policy, sexual misconduct includes non-consensual sexual contact or activity and non-consensual sexual intercourse. (Policy, pp. 4-6.) Non-consensual sexual intercourse is defined as any sexual intercourse (anal, oral, or vaginal) with any object or body part by a person upon a person without consent. (Policy, p. 5.) The Policy provides that "[c]onsent is an affirmative, conscious decision – indicated clearly by words or actions – to engage in mutually accepted sexual contact." (Policy, p. 6.) Consent to past sexual activity does not imply consent to future sexual activity, and consent can be withdrawn at any time. (*Id*.) "Consent CANNOT be given if a person's ability to resist or consent is incapacitated" and the Policy defines incapacitation as including incapacitation "because of voluntary intoxication due to use of drugs or alcohol." (*Id*.)

When a complaint of alleged sexual misconduct is received, an initial inquiry is conducted by a Designated Reporting Representative, who is a neutral administrator in the process. (Policy, pp. 14-15; Milliken Depo. 77:4-79:24, 85:6-86:15.[3]) The initial inquiry will generally include interviews with the complainant and the respondent and a review of relevant documents, if any. (Policy, p. 15.) In addition to conducting an initial inquiry, the Designated Reporting Representative/Title IX Coordinator may need to take interim actions to protect the

---

[2] A copy of CWRU's Sexual Misconduct Policy, in effect in 2014-2015, is attached to Plaintiff's deposition transcript as Exhibit 17. *See* Exhibit A.
[3] Relevant portions of the transcript of Shannon Milliken's deposition are attached as Exhibit B.

safety and well-being of the individuals involved in a complaint of sexual misconduct. (*Id.*) Such interim actions may include, but are not limited to, notifying the respondent that a complaint has been made against him or her and/or directing the parties not to initiate contact with each other until further notice by the University. (Policy, pp. 15-16.)

Following the initial inquiry, the Designated Reporting Representative will determine whether the information gathered during the initial inquiry indicates that the complaint falls within the Policy. (Policy, p. 15.) If it is determined that the complaint falls within the Policy, the Designated Reporting Representative will either: (1) proceed with the informal process; or (2) refer the matter to the Sexual Misconduct Investigator/Title IX Coordinator for a determination as to whether to proceed with the informal process, formal process, or another University process. (*Id.*) The Designated Reporting Representative will make this determination by considering, among other things, the wishes of the complainant and the respondent. (*Id.*)

The Policy provides for two separate and distinct formal processes for the resolution of Title IX complaints: (1) a streamlined administrative hearing process; or (2) a more involved and lengthier board hearing process. (Policy, pp. 17-23.) An administrative hearing may be used when the complainant and respondent want to use the administrative hearing process. (O'Connell Depo. 101:13-102:13; Policy, p. 17.[4]) An administrative hearing involves only the respondent, the investigator, the administrative hearing officer, and the complainant, if the complainant wishes to attend. (Policy, p. 19.) No witnesses are presented at the administrative hearing. (Policy, p. 19.) The administrative hearing officer may ask questions of the respondent at the hearing, then reviews and considers statements and other relevant information received during the investigation in order to make a finding and impose sanctions, if appropriate. (Policy, pp. 18-19.) On the other hand, board hearings involve three voting members of the board panel and one

---

[4] Relevant portions of the transcript of George O'Connell's deposition are attached as <u>Exhibit C</u>.

non-voting chairperson. (Policy, p. 20.) At board hearings, the complainant, respondent, and witnesses are all invited to make statements to the board panel, and the complainant, respondent, and panel members are permitted to ask questions of each individual making a statement. (Policy, p. 21.) Board hearings are audio recorded. (*Id*.) After board hearings, the panel members convene to discuss and make a determination regarding a finding and sanction(s), if appropriate. (Policy, pp. 21-22.) The Policy outlines certain rights of the complainant and respondent through the formal process:

1. To confidentiality as provided in the Policy.
2. To options outlined in the Policy in the informal process or formal process if applicable.
3. To the presence of a support person as described in the Policy at meetings during the initial inquiry and during the informal process and/or administrative/formal hearing.
4. To not be questioned or have information presented about past sexual conduct or history with anyone other than with the complainant or respondent, unless related to a pattern of prior violations or behavior by the respondent that was substantially similar to the present complaint.
5. To have the allegations investigated in a thorough and timely manner.
6. To refrain from making statements. However, the University will make a determination of whether a violation of the Policy occurred based on the information presented.
7. To be informed of the outcome of the sexual misconduct process in a timely manner.
8. To access to support resources listed in the Policy.

(Policy, p. 12.) The Policy also outlines the process and procedure for administrative hearings:

1. The complainant and respondent will be notified of the date, time and location of the hearing.
2. The hearing is closed and generally includes the respondent, the Sexual Misconduct Investigator/Deputy Title IX Coordinator who conducted the investigation, and the administrative hearing representative(s). The complainant will be notified of the option to attend the hearing if the complainant wishes to do so.
3. The complainant may submit an additional written statement concerning the effect of the sexual misconduct and the desired sanction for the respondent. The written statement must be submitted no later than three (3) business days prior to the scheduled hearing.

4

4.      The respondent may make a statement about the sexual misconduct and the possible sanction(s) for the misconduct. The written statement must be submitted no later than three (3) business days prior to the scheduled hearing.

5.      The administrative hearing representative(s) may ask questions of the respondent and will consider the statements and any relevant information received during the investigation.

6.      Prior to determining whether the Sexual Misconduct Policy was violated and/or a sanction, as applicable to the matter, the administrative hearing representative(s) will normally consult with the following individuals depending on the constituency of the respondent: When a student is the respondent: Vice President for Student Affairs or his/her designee.

(Policy, p. 19.) After the administrative hearing, the administrative hearing representative(s) will make a decision promptly whether the Policy was violated and/or on the appropriate sanction and communicate that decision in writing to the respondent, complainant, and to any University administrators, faculty, or staff who require the information to carry out the sanction. (*Id.*)

Either the respondent or the complainant may appeal the outcome of the administrative hearing. (*Id.*) Appeals must be submitted within three (3) business days of receipt of the written decision. (*Id.*) The Appeals Board will not rehear or make a redetermination of the facts of the matter, but rather will only review whether the decision erred in one of three limited grounds for appeal:

1.      New information not available to the panel which, if available at the time of the hearing, would have significantly affected the decision;

2.      Evidence that established procedures were not followed in a manner that would have significantly affected the decision, and/or;

3.      The sanction(s) are substantially disproportionate to the severity of the violation.

(Policy, p. 23.) With respect to appeals of the sanction(s), the Appeals Board may, in its discretion, increase or decrease the original sanction(s) imposed. (Adeen Aff., ¶ 4.[5]) The Appeals Board's decision is final. (Policy, p. 23.)

---

[5] A copy of the affidavit of Gia Adeen is attached as <u>Exhibit D</u>.

**B.**     **Jane Doe's Complaint Of Sexual Misconduct Against Plaintiff.**

Plaintiff and Jane Doe met in the fall of 2014, when they were both enrolled as students at CWRU during the 2014-2015 academic year. On November 23, 2014, Jane Doe sent an email to Milliken to "make an appointment regarding a sexual assault incident." (Milliken Aff., ¶ 4, Ex. 1.[6]) On November 25, 2014, Milliken met with Jane Doe, and Jane Doe reported to Milliken that, during the evening of September 13-14, 2014, after Jane Doe had consumed alcohol, and after Jane Doe and Plaintiff engaged in consensual kissing while alone in the basement of Plaintiff's fraternity house, Plaintiff digitally penetrated Jane Doe, vaginally penetrated her without her consent and, after Jane Doe told him to stop, Plaintiff engaged in non-consensual oral sex. (Milliken Aff., ¶ 5, Ex. 2.) Jane Doe told Plaintiff that she did not want to perform oral sex on him. (*Id.*) Upset by the encounter, Jane Doe left the fraternity house. (*Id.*)

The following day, on November 26, 2014, Milliken's assistant, Trina Jones, sent an email to Plaintiff requesting to schedule a meeting between Plaintiff and Milliken, who Ms. Jones identified in the email as "Title IX Sexual Misconduct Investigator." (Plaintiff's Depo. Ex. 4.) Upon receiving the November 26, 2014 email from Ms. Jones, Plaintiff Googled Milliken's name, and confirmed Milliken's Title IX role. (Plaintiff's Depo. 48:19-49:3, 49:15-51:10.) Ms. Jones scheduled a meeting between Milliken and Plaintiff for December 11, 2014, and on December 9, 2014 at 1:09 p.m., Plaintiff accepted the calendar appointment confirming the meeting. (Milliken Aff., ¶ 6, Ex. 4.) Later that night, on December 9, 2014 at 7:18 p.m., Jane Doe sent an email to Milliken asking about the status and notifying Milliken that Plaintiff visited Jane Doe at her dorm earlier that day to discuss what was going on. (Milliken Aff., ¶ 7, Ex. 5.) Jane Doe reported that Plaintiff texted her and, after ignoring Plaintiff's text messages for a couple of hours, Plaintiff showed up at her dorm to tell Jane Doe how important the fraternity

---

[6] A copy of the affidavit of Shannon Milliken is attached as <u>Exhibit E</u>.

6

was to him and "how he didn't want the incident to be affiliated with his fraternity." (*Id.*) Milliken responded letting Jane Doe know that she was unable to meet with Plaintiff over the past week, but had just scheduled a meeting for December 11, 2014. (*Id.*) Milliken also indicated that she would immediately institute a no contact directive between Plaintiff and Jane Doe to avoid further communication between the parties. (*Id.*) On December 10, 2014, Milliken sent an email to Plaintiff stating that, although they were scheduled to meet the next day, "based on information [she] received," Milliken needed to institute the no contact directive between the parties "effective immediately." (Plaintiff's Depo. Exs. 6, 7; Milliken Aff., ¶ 8, Ex. 6.) The no contact directive informed Plaintiff that CWRU was "in the process of investigating allegations made regarding the sexual misconduct policy" and instructed Plaintiff "to have no contact with [Jane Doe] for the duration of this investigation." (*Id.*)

On December 11, 2014, Milliken met with Plaintiff to notify him of Jane Doe's allegations and conduct an initial interview, in accordance with the Policy. (Milliken Aff., ¶ 9, Ex. 7; Plaintiff's Depo. 101:10-102:9, Ex. 11.) During that meeting, Plaintiff described the night of the incident as follows:

> I became tempted to do things that were not moral… What scares me about what happened, **I don't quite remember everything I was doing**. What sobered me up was when **she pushed me off and started crying**… **Quite frankly, I don't remember… I believe whatever she says happened, did happen.** When she pushed me off, I was not wearing any clothes because I had taken my clothes off the same time I undressed her… I asked her for forgiveness… A couple of days before that night, she [told me]… [t]he reason she felt uncomfortable was because I would kiss her and also finger her… she told me that it was too soon, and she didn't want to move that quickly. What happened in the basement [the night of the incident], I know that I didn't physical force her or abuse her, but **it was without her consent**… we were both under the influence of alcohol… I don't remember it because it was one gigantic blur, I was literally thinking to myself 'don't do it. Don't do it' and then next thing was she started crying… **I understood that she did not want to have oral sex or sex of any kind… She was not okay with having my genitals entering any orifice of her body… I performed oral sex on her. I don't remember if I penetrated her vaginally…**

(Plaintiff's Depo. 95:5-98:14, 137:8-138:10, Ex. 11, emphasis added.) During this meeting, Milliken asked Plaintiff if he felt safe and if he wanted academic accommodations and she reviewed CWRU's support services. (Plaintiff's Depo. 98:19-99:3, 80:15-25, 102:16-103:13, Ex. 11.) During that same meeting, Milliken reiterated her instruction to Plaintiff not to make contact with Jane Doe. (Plaintiff's Depo. 60:1-8, 98:15-18, 102:6-9; Milliken Depo. 85:6-86:15.) Immediately after his meeting with Milliken, however, Plaintiff violated the no contact directive by texting Jane Doe and by going to her dorm to speak with her in person. (Plaintiff's Depo. 102:10-12, 115:14-22, 117:25-120:24, 146:10-16, Ex. 12.)

### C. CWRU's Investigation Into Jane Doe's Complaint Of Sexual Misconduct Against Plaintiff.

Milliken interviewed the complainant and the respondent. (Milliken Aff., ¶ 10.) On February 6, 2015, Milliken met with Plaintiff. (Plaintiff's Depo. 138:20-143:4, Ex. 13.) During this meeting, Milliken reviewed the Policy with Plaintiff, discussed the hearing options (board v. administrative), and Plaintiff informed Milliken that he wanted to select the sole administrator hearing without any witnesses. (Plaintiff's Depo. 141:11-142:20, 166:19-167:14, Ex. 13.) Plaintiff again confirmed his recollection of the events from the night of the incident:

> **I think [Jane Doe] was tipsy… She seemed pretty intoxicated…** I did remove clothes, but I can't tell you exactly what. It is a big blur. You don't know what you are doing, it was like a primal surge of some sort… **I know when she pushed me off, I was on top and she was laying down.** We were probably face to face since there was kissing involved. It was really dark, there were no lights or anything. I have no idea where my hands were, I couldn't say… There was no one living in the basement at the time, which is why I brought her down there… **It ended because she told me to stop, and pushed me.**

(Plaintiff's Depo. Ex. 13, emphasis added.) Although at Milliken's first meeting with Plaintiff, Plaintiff stated, "I don't remember if I penetrated her vaginally with my penis," (Plaintiff's Depo. Ex. 11), at this second meeting, Plaintiff changed his story and told Milliken that he did not vaginally penetrate Jane Doe (Plaintiff's Depo Ex. 13, ¶ 3.9). Milliken once again asked

Plaintiff if he felt safe on campus, and she reviewed Plaintiff's options for providing a written and/or impact statement. (Plaintiff's Depo. Ex. 13.) Plaintiff provided a written statement during the investigation. (Plaintiff's Depo. 115:24-117:10, 117:20-118:5, Ex. 12.)

CWRU retained an outside law firm to assist with its Title IX investigation into Jane Doe's complaint. (O'Connell Depo. 79:24-80:7; Milliken Depo. 179:18-181:2.) Lauren Tompkins (acting as an investigator and not an attorney) assisted Milliken with the investigation by interviewing fourteen witnesses. (Tompkins Depo. 16:5-12, 19:12-23, 37:15-38:1, 38:22-39:7, 41:13-14, 63:9-17, 64:9-65:13, 108:8-18, Exs. 1, 2; O'Connell Depo. 79:24-80:7; Milliken Depo. 197:13-23, 202:24-203:11.[7])

> **D.     CWRU's Title IX Administrative Hearing On Jane Doe's Complaint Of Sexual Misconduct Against Plaintiff.**

Following the investigation, CWRU scheduled a Title IX sexual misconduct administrative hearing in accordance with its Policy. On February 18, 2015, CWRU notified both Plaintiff and Jane Doe that (1) an administrative hearing was scheduled for February 25, 2015 at 3:30 p.m., (2) George O'Connell, Director of Student Conduct and Community Standards, would conduct the hearing, (3) per the Policy, a copy of which was attached to the notification email, the parties had the right to submit an optional written and/or impact statement, and (4) the hearing file could be reviewed by the parties from February 23, 2015 at noon until February 24, 2015 at 5 p.m., but in order to review the file, the interested party must schedule a time to review it by February 20, 2015 at 5 p.m. in order to avoid violation of the no contact directive. (Plaintiff's Depo. 147:15-148:5, 152:3-18, Ex. 17; Milliken Aff., ¶ 11, Exs. 10, 11.)

Because Plaintiff did not contact Milliken to schedule a time to review the file within the initial timeframe provided, on February 23, 2015 at 12:29 p.m., Milliken followed up with

---

[7] Relevant portions of the transcript of Lauren Tompkins' deposition are attached as Exhibit F.

Plaintiff by email to see if he planned to review the file before the hearing. (Plaintiff's Depo. 154:25-163:11, Ex. 18.) On February 23, 2015 at 12:38 p.m., Plaintiff responded to Milliken stating he was out of town and "didn't really check [his] email," and requested to review the file at 2:30 p.m. on February 24, 2015. On February 24, 2015 at 1:34 p.m., however, Plaintiff sent an email to Milliken stating he "forgot" he had a meeting from 2:30-4 p.m. and requested to reschedule for 4:15 p.m. that same day, knowing the office would close at 5 p.m. and providing himself, at best, 45 minutes to review the file. (Plaintiff's Depo. 154:25-163:11, Ex. 19.) When Plaintiff arrived at Milliken's office, she was in a meeting, and Plaintiff left. (Plaintiff's Depo. Ex. 19.) Because Plaintiff arrived when Milliken was still in a meeting, later that night, Milliken offered to extend the period for reviewing the file and provided Plaintiff two separate times when he could come into the office to review the file on February 25, 2015 – at 8:30 a.m. or from 12 p.m. to 1:45 p.m. (Plaintiff's Depo. 154:25-163:11, Ex. 19.) Despite these larger windows, on February 25, 2015, Plaintiff went to the office and spent 20 minutes reviewing the file prior to the administrative hearing. (Plaintiff's Depo. 154:25-163:11.)

On February 25, 2015, O'Connell met with Plaintiff and conducted the administrative hearing. (Plaintiff's Depo. 166:19-167:14.) During the hearing, Plaintiff pointed to alleged inconsistencies that Plaintiff perceived in Jane Doe's statements. (*Id*. at 167:16-172:10.)

### E.     CWRU's Findings On Jane Doe's Complaint Of Sexual Misconduct Against Plaintiff.

Following the administrative hearing, O'Connell reviewed the investigation documents and made a determination regarding a finding and appropriate sanction. CWRU found Plaintiff "responsible for non-consensual sexual intercourse" and imposed a disciplinary separation through May 15, 2017, persona non grata status, a continued no-contact order through Jane Doe's graduation, and exclusion from CWRU's university housing. (Plaintiff's Depo. 179:19-

10

180:25, Ex. 21.) On February 27, 2015, O'Connell met with Plaintiff to review the outcome of

the administrative hearing and to notify him of his appeal rights under the Policy. (Plaintiff's

Depo. 172:11-23, 174:2-178:5, 179:19-180:25, Exs. 20, 21.)

      **F.**        **Plaintiff's Appeal Of The Sanctions Imposed Against Plaintiff.**

      Plaintiff submitted an appeal of the sanction imposed:

> If the goal of the sentence was to allow [Jane Doe] time to become a successful
> nurse without me on campus, why was I not sentenced 3 years, until she
> graduates? … I would like to appeal to reduce the disciplinary separation from 2
> years to the end of the May 2015 term or the end of the May 2016 term. **I would
> rather have the sentence increased to the May 2018 term than live with the
> current sentence**, for increasing the sentence gives me a clearer vision on how to
> proceed with my life.

(Plaintiff's Depo. 181:1-17, 182:13-187:7, Ex. 22, emphasis added.) On March 17, 2015, the

chair of the Appeals Board notified Plaintiff that the Appeals Board found the sanctions imposed

were disproportionate to the severity of the violation, and thus, the disciplinary separation was

extended through May 21, 2018, when Jane Doe was scheduled to graduate from CWRU.

(Plaintiff's Depo. 199:3-204:20, Exs. 23, 24.)

## III.    STANDARD OF REVIEW

      Summary judgment is appropriate where "the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavit, if any, show that there is no

genuine issue of material fact and that the moving party is entitled to judgment as a matter of

law." Fed. R. Civ. P. 56(c). Summary judgment must be entered "against a party who fails to

make a showing sufficient to establish the existence of an element essential to that party's case,

and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S.

317, 322 (1986). The party opposing summary judgment cannot rest on its pleadings or merely

reassert its previous allegations. It is insufficient "simply to show that there is some metaphysical

doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574,

586 (1986). Rather, Rule 56(e) "requires the nonmoving party to go beyond the pleadings" and "present some type of evidentiary material in support of its position." *Celotex*, 477 U.S. at 324.

## IV.   LAW AND ARGUMENT

### A.   Count III (Breach Of Contract) Fails As A Matter Of Law Because CWRU Reasonably Complied With Its Policies And Procedures.

Students who are being disciplined "are **entitled to only those procedural safeguards which the school specifically provides**." *Corso v. Creighton Univ*., 731 F.2d 529 (8th Cir. 1984) (emphasis added); *see also Williams v. Howard Univ*., 528 F.2d 658 (D.C. Cir. 1976). The standard of review by the courts for breach of contract claims in the university or educational setting is narrow. *Doe v. Univ. of the South*, 687 F.Supp.2d 755, 755 (E.D. Tenn. 2009). When assessing a breach of contract claim by a student against an educational institution, a court must "defer to the decisions of the school" unless there is such a **substantial departure from accepted academic norms as to demonstrate a lack of professional judgment**. *Tate v. Owens State Community College*, No. 10AP-1201, 2011-Ohio-3452, ¶ 21 (Ohio App. 10 Dist.). Where a university makes reasonable efforts to comply with provisions in a handbook, breach of contract claims in the education context fail as a matter of law. *See e.g., Lemmon v. Univ. of Cincinnati*, 112 Ohio Misc.2d 23, 26-27, 750 N.E.2d 668 (Ohio Ct. Claims 2001). As the Sixth Circuit recently articulated, the law "does not require strict adherence to administrative procedures, rather, courts must consider whether the university abused its discretion in applying the disciplinary grievance procedure." *Faparusi v. Case Western Reserve University*, No. 1:16CV1586, 2017 WL 759024, at *2 (N.D. Ohio Feb. 28, 2017).

Here, CWRU made reasonable efforts to comply with its Policy. At his deposition, Plaintiff testified that CWRU provided him the disciplinary procedure that he selected, *i.e.* the sole administrator hearing process. (Plaintiff's Depo. 141:11-142:20, 166:19-167:14, Ex. 13.)

12

CWRU: (1) provided Plaintiff with notice of Jane Doe's allegations in the initial inquiry process; (2) interviewed Plaintiff twice during the Title IX investigation process; (3) discussed with and provided a copy of the Policy to Plaintiff; asked if Plaintiff needed academic accommodations; (4) reviewed CWRU's support services with Plaintiff; (5) interviewed fourteen witnesses, including all individuals with firsthand knowledge; (6) provided Plaintiff an opportunity to review the investigation file prior to the administrative hearing; (7) provided Plaintiff an opportunity to provide a written and/or impact statement; (8) conducted an administrative hearing; (9) provided Plaintiff with an opportunity to appeal the hearing outcome; and (10) convened an Appeals Board to consider Plaintiff's appeal. It is undeniable that CWRU made – at the very least – reasonable efforts to comply with the Policy. Accordingly, Count III (breach of contract) must be dismissed. *See, e.g., Buescher v. Baldwin Wallace University*, 86 F.Supp.3d 789 (N.D. Ohio 2015) (granting summary judgment in favor of defendant university on breach of contract claim where the university had and followed its grievance and appeal policy); *Faparusi*, supra, at *6 (dismissing breach of contract claim "because nothing alleged by Plaintiff supports a finding of a breach, the entire process was fundamentally fair and Case Western's actions did not involve an abuse of discretion").

### B. Count VI (Promissory Estoppel) Fails As A Matter Of Law Because CWRU Substantially Complied With Its Policies And Procedures Outlined In The Policy.

"Under Ohio's promissory estoppel doctrine, a promise that the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and ... [that] does induce such action or forbearance is binding if one can avoid injustice only by enforcing the promise." *Valente v. University of Dayton,* 438 Fed. Appx. 381, 386 (6th Cir. 2011). It is well-settled that the presence of a valid and enforceable contract generally precludes

a claim of promissory estoppel arising from claims related to the contract. *See O'Neill v. Kemper Ins. Cos.*, 497 F.3d 578, 583 (6th Cir. 2007) ("In Ohio, [w]here the parties have an enforceable contract and merely dispute its terms, scope, or effect, one party cannot recover for promissory estoppel"). "Ohio treats the relationship between a university and its students as contractual in nature." *Doe v. College of Wooster*, 243 F.Supp.3d 875, 888 (N.D. Ohio 2017) (dismissing promissory estoppel claim where said claim "rest[s] on 'promises' set forth in the Student Handbook and the disciplinary process set forth therein, and relies on the same allegations as [a] contract claim"). And thus, where Plaintiff's promissory estoppel claim relies on the same allegations as his breach of contract claim, Count VI must be dismissed.[8] *Id.*

### C. Count I (Title IX Violation – Erroneous Outcome) Fails As A Matter Of Law Because (1) The Outcome Of Plaintiff's Title IX Proceedings Was Not Erroneous And/Or (2) Even If The Outcome Were Erroneous, Which It Was Not, There Is No Causal Connection Between The Outcome And Any Purported Sex Bias.

The Sixth Circuit only recognizes a private right of action for Title IX violations where "the plaintiff alleges that an educational institution implemented disciplinary actions that discriminated against the plaintiff **based on sex**." *Doe v. Case Western Reserve University*, No. 1:14CV2044, 2015 WL 5522001, at *4 (N.D. Ohio Sept. 16, 2015) (citing *Mallory v. Ohio Univ.*, 76 F. App'x 634, 638-39 (6th Cir. 2003)). (Emphasis added.) Although courts analyze Title IX claims under four different standards, in this case, Count I is premised solely on the "erroneous outcome" standard. (*See* Comp. ¶ 175; Order, p. 10 [ECF 41].) An "erroneous outcome" claim requires the plaintiff to show that the "outcome of [the] University's disciplinary

---

[8] Even if this Court were to find Plaintiff could maintain a promissory estoppel claim based on the same allegations as his breach of contract claim, Count VI still fails as a matter of law. Under Ohio law, in order to establish a promissory estoppel claim, the plaintiff must prove: (1) a clear and unambiguous promise; (2) reliance upon the promise by the person to whom the promise is made; (3) the reliance is reasonable and foreseeable; and (4) the person claiming reliance was injured as a result of the reliance on the promise. (Order, ECF # 41.) As set forth above in Section IV-A, CWRU substantially complied with the Policy and the record is devoid of any evidence to suggest that CWRU failed to fulfill any "promise" made to Plaintiff or that Plaintiff was injured by his reliance on an alleged "promise."

proceeding was erroneous **because of sex bias**." *Mallory,* 76 F. App'x at 639; *see also Doe v. Cummins,* 662 F. App'x 437, 452 (6th Cir. 2016) (emphasis added). A plaintiff must establish:

1. Sufficient facts "'to cast some articulable doubt on the accuracy of the outcome of the disciplinary proceeding'"; and
2. A "'particularized . . . causal connection between the flawed outcome and gender bias.'"

*Cummins,* 662 F. App'x at 452 (quoting *Yusuf v. Vassar College,* 35 F.3d 709, 715 (2d Cir. 1994)). To the extent Plaintiff simply disagrees with CWRU's decision, "the Court cannot now – absent flawed process and gender discrimination – second-guess [CWRU's] credibility determinations and factual conclusions." *Yu v. Vassar College,* 97 F. Supp. 3d 448, 462 (S.D.N.Y. 2015) (emphasis original).

### a) CWRU Reasonably Complied With Its Title IX Policies And Procedures And The Outcome Of Plaintiff's Title IX Proceedings Was Not Erroneous.

As set forth above in Section IV-A, CWRU reasonably complied with its policies and procedures, and provided Plaintiff with all the rights and safeguards afforded to him under the Policy. When asked about procedural defects or issues with the disciplinary process, Plaintiff testified at his deposition that he was only afforded 20 minutes to review the entire case file, Milliken allegedly only asked him leading questions, and O'Connell did not assign the same weight to the alleged inconsistencies Plaintiff identified in Jane Doe and other witnesses' statements as Plaintiff. (Plaintiff's Depo. 187:8-199:1, 236:9-240:6.) As outlined above, with respect to Plaintiff's ability to review the investigation file prior to the hearing, CWRU provided Plaintiff with ample time and opportunity to thoroughly review the file – initially, CWRU afforded Plaintiff one and a half days, to be exact, but then extended the time frame to more than two days in order to accommodate Plaintiff – but Plaintiff only spent 20 minutes reviewing the file prior to the hearing. Further, Plaintiff admitted that every person with firsthand knowledge or

information regarding the incident was interviewed as part of CWRU's Title IX investigation, and those interview summaries were in the file. (Plaintiff's Depo. 193:6-16.) With respect to Milliken's interview style, Milliken interviewed both Plaintiff and Jane Doe. (Plaintiff's Depo. Ex. 11; Milliken Aff., ¶¶ 5, 9, 10, Exs. 2, 7, 8, 9.) Milliken used similar witness interview outlines for both interviews, she typed the witness responses contemporaneously during the interviews, and both Plaintiff and Jane Doe had an opportunity to review and make changes to the interview notes before signing, verifying the accuracy of the interview notes. (*Id.*) As is evident from the witness outlines/signed notes, Milliken asked Plaintiff and Jane Doe similar, if not the same, questions and reviewed the same information. (*Id.*) Last but not least, with respect to the administrative hearing officer's weighing of credibility and evidence, this Court is not permitted to second-guess such determinations. *See, e.g., Yu*, supra. The record is devoid of evidence that the outcome of Plaintiff's Title IX proceedings was erroneous in any way, and thus, Count I (Title IX violation – erroneous outcome) must be dismissed.[9]

### b) Even If The Outcome Of Plaintiff's Title IX Proceedings Were Erroneous (Which It Was Not), There Is No Causal Connection Between The Outcome And Any Gender Bias.

A causal connection sufficient to support an erroneous outcome claim may be established through "'statements by members of the disciplinary tribunal, statements by pertinent university officials, or patterns of decision-making that also tend to show the influence of gender.'" *Cummins,* 662 Fed. App'x at 452 (quoting *Yusuf,* 35 F.3d at 715). Plaintiff "cannot merely rest

---

[9] Plaintiff testified that the night of the incident, prior to Plaintiff meeting up with Jane Doe, Plaintiff's closest friend sent him a text message about Jane Doe: "you should check on her dude she's f***ed up." (Plaintiff's Depo. 60:17-64:8, 67:2-6, Ex. 8.) Upon receiving this text message, Plaintiff called his friend, and his friend told him that he encountered Jane Doe and that she was "intoxicated." (Plaintiff's Depo. 62:12-63:25.) In addition, Plaintiff admitted that, the night of the incident, Jane Doe communicated to him that she was drinking. (Plaintiff's Depo. 64:15-20.) During the investigation, Plaintiff admitted he did not remember everything he did that night, but distinctly remembers Jane Doe pushed him off of her and started crying; he admitted to knowing Jane Doe did not want to have oral sex or sex of any kind; at least initially, Plaintiff did not deny penetrating Jane Doe vaginally; Plaintiff admitted to performing oral sex on her; and Plaintiff indicated that, because he could not remember the events of the evening, he believed what Jane Doe said happened. (Plaintiff's Depo. 95:5-98:14, 137:8-138:10, Ex. 11.)

on superficial assertions of discrimination, but must establish that 'particular circumstances suggest[] that gender bias was a motivating factor.'" *Doe v. Trustees of Boston College,* 892 F. 3d 67, 91 (1st Cir. 2018). Moreover, "evidence of bias against the accused in sexual misconduct hearings does not equate to bias against men." *Doe v. Colgate University,* No. 5:15-cv-1069, 2017 WL 4990629, at *11 (N.D.N.Y. Oct. 31, 2017); *Haley v. Va. Commonwealth Univ.,* 948 F. Supp. 573, 579 (E.D. Va. 1996) ("[B]ias against people accused of sexual harassment and in favor of victims . . . indicate[s] nothing about gender discrimination.").

At best, Plaintiff alleged that Milliken views "males as the aggressors in sexual encounters" because she concluded in her doctoral dissertation that "we have an epidemic in higher education regarding the sexual risk taking of college students, in particular women." (Compl., ¶ 182.) While such an allegation may have been sufficient to raise a plausible inference of bias at the pleading stage, throughout discovery, Plaintiff failed to link Milliken's dissertation concerning sexual risk taking to aggression by males in sexual encounters or any other gender-based assumptions, or otherwise provide any evidence that would suggest comments about sexual risk taking on the part of college students infected Plaintiff's disciplinary process with gender bias. *See Doe v. Colgate Univ.,* 2017 WL 4990629, at *13 (rejecting plaintiff's contention that article written by former university president that touted a "Yes Means Yes" seminar focused on 'female sexual power' and a 'world without rape" served as evidence of gender-biased pressure because plaintiff failed to explain the seminar's content, whether it was critical of the university's hearing process, and whether the seminar impacted the university to a degree that it could support an inference that it pressured administrators). This is particularly true given that Milliken was not the decision-maker. It is undisputed that O'Connell made the findings determination and issued the original sanction to Plaintiff. (O'Connell Depo. 140:22-142-22.)

17

And, there is no evidence to suggest Milliken played any role in the decision-making process. (O'Connell Depo. 21:10-18, 30:17-19, 45:13-19, 66:22-67:4, 113:10-114:4, 117:2-25, 130:2-7, 135:12-136:10, 140:22-142-22; Milliken Depo. 131:1-20, 134:18-135:13, 154:23-156:18.) Plaintiff's strained inferences regarding a non-decision maker are insufficient to support his Title IX claim.

In addition, there is no evidence to suggest "patterns of decision-making" on the part of CWRU (or Milliken) that tend to show the influence of gender. *Cummins,* 662 Fed. App'x at 452. As a matter of fact, around the time of Plaintiff's Title IX proceedings, CWRU imposed a harsher sanction on a female respondent involving similar allegations. In 2014-2015, Milliken investigated a complaint of non-consensual oral sex lodged by a male complainant against a female respondent, and the hearing board found the female respondent responsible and expelled her from the University, which decision was upheld on appeal. (Parker Aff., ¶ 4.[10]) Because a female respondent was accused of the same violation as Plaintiff, but a harsher sanction was imposed, Plaintiff cannot in good faith assert his outcome was based on his sex.

Because the record is devoid of any evidence to suggest that the outcome of Plaintiff's Title IX proceedings was erroneous, or that there was a causal connection between the outcome and gender bias, Plaintiff's Title IX claim cannot survive Defendants' Motion for Summary Judgment. *Yu,* 97 F. Supp. 3d 448 (granting summary judgment on Title IX claim where plaintiff failed to tie outcome of disciplinary proceedings to gender bias); *Haley v. Va. Commonwealth Univ.*, 948 F. Supp. 573, 576-81 (E.D. Va. 1996) (same).

### D.      Count V (Negligence) Fails As A Matter Of Law.

This Court dismissed Plaintiff's negligence claim against Defendants to the extent it was based upon a duty arising from "obligations delineated in CWRU's policies," but permitted

---

[10] A copy of the affidavit of Darnell Parker is attached as Exhibit G.

Plaintiff's negligence claim to proceed "limited to any duty arising from the OCR directives." (Order, [ECF 41].) In light of the Supreme Court's ruling in *Gebser v. Lago Vista Independent School District,* 524 U.S. 274, 118 S.Ct. 1989, 141 L.Ed.2d 277 (1998), however, any negligence claim premised upon a duty arising from the OCR directives fails as a matter of law.

In *Gebser,* the Supreme Court clarified that, except for a case involving the official policy of the recipient entity, "a damages remedy will not lie under Title IX unless an official who at a minimum has authority to address the alleged discrimination and to institute corrective measures on the recipient's behalf has actual knowledge of discrimination in the recipient's programs and fails adequately to respond." 524 U.S. 274. A claim that a violation of Title IX, or regulations thereunder, constitutes negligence per se would vitiate Title IX's knowledge requirement and would effectively undermine the *Gebser* rule by excusing the policy/knowledge requirement. *See Jones v. Pi Kappa Alpha Int'l Fraternity, Inc., No.* 2:16-CV-7720-KM-MAH, 2017 WL 4074547, at *11 (D.N.J. Sept. 13, 2017). As a result, district courts across the country have consistently held that Title IX and its implementing regulations cannot serve as the basis for a negligence per se claim. *See Jones,* 2017 WL 4074547, at *11 ("Negligence *per se* would be an end-run around the requirements of Title IX. I agree, therefore, that a claim of negligence *per se* cannot be founded on a violation of Title IX."); *Doe v. Univ. of South,* No. 4:09-CV-62, 2011 WL 1258104, at *14 (E.D. Tenn. Mar. 31, 2011)("If the Court were to allow a regulation used in administering a federally-created right to create a state negligence per se claim, it would effectively eviscerate the *Gebser* rule."); *Ross v. Univ. of Tulsa,* No. 14-CV-484-TCK-PJC, 2015 WL 4064754, at *2–4 (N.D. Okla. July 2, 2015) ("Allowing a Title IX regulatory violation to establish a negligence per se claim is inconsistent with the Supreme Court's holding in *Gebser* that a defendant must act with "deliberate indifference" in order to subject itself to money

damages… Therefore, Title IX's implementing regulations may not provide the basis of a negligence per se claim, and Plaintiff's claim fails as a matter of law."); *Doe v. Brown Univ.,* 166 F. Supp. 3d 177, 196–97 (D.R.I. 2016)( rejecting Title IX as a source of duty for a negligence claim).

Therefore, Plaintiff's negligence claim premised upon a purported duty arising from the OCR's directives fails as a matter of law, and must be dismissed. Even if such a claim did not fail as a matter of law, Plaintiff failed to establish how any of the Defendants violated the directives of the U.S. Department of Education Office of Civil Rights, and thus, Count V must be dismissed.

## V.     <u>CONCLUSION</u>

Because there is no genuine issue of material fact that would preclude judgment in favor of Defendants, Defendants respectfully request that this Court grant their Motion for Summary Judgment and dismiss Plaintiff's Remaining Claims.[11]

---

[11] The United States Supreme Court held, "[t]he question whether a litigant has a 'cause of action' is analytically distinct and prior to the question of what relief, if any, a litigant may be entitled to receive." Franklin v. Gwinnett County Pub. Schs., 503 U.S. 60, 69 (1992) (quoting Davis v. Passman, 442 U.S. 228, 239 (1979)). The Court explained: Federal courts cannot reach out to award remedies when the Constitution or laws of the United States do not support a cause of action. Id. at 74. Not only must the federal statute at issue afford a private right of action, but a plaintiff seeking relief under that statute must also allege facts in his complaint that, if true, would establish a violation of the statute. See Loggins v. Franklin County, 218 Fed. App'x 466, 475-77 (6th Cir. 2007). Thus, if a plaintiff's complaint does not state a valid claim under a statute or common law, that plaintiff is not entitled to seek declaratory relief. United States Wrestling Fed'n v. Wrestling Div. of the AAU, Inc., 711 F. 2d 1060, 1060 (6th Cir. 1983). Here, because Plaintiff's substantive claims fail, so must his claim for declaratory relief.

Respectfully submitted,

*/s/ Amanda T. Quan*
John Gerak, OH #0075431
Rebecca J. Bennett, OH #0069566
Amanda T. Quan, OH #0086623
Ogletree, Deakins, Nash, Smoak & Stewart, P.C.
Key Tower
127 Public Square, Suite 4100
Cleveland, OH 44114
216.241.6100
216.357.4733 (FAX)
Email: john.gerak@ogletreedeakins.com
        rebecca.bennett@ogletreedeakins.com
        amanda.quan@ogletreedeakins.com

*Attorneys for Defendants Case Western Reserve
University, Barbara R. Snyder, Lou Stark, G.
Dean Patterson, Jr., George O'Connell, and
Shannon J. Greybar Milliken*

**CERTIFICATION OF COMPLIANCE WITH LOCAL CIVIL RULES**

Pursuant to Local Civil Rule 7.1(f), counsel for Defendants Case Western Reserve University, Barbara R. Snyder, Lou Stark, G. Dean Patterson, Jr., George O'Connell, and Shannon J. Greybar Milliken hereby certifies that the Court assigned this matter to a Standard Track, and the Memorandum in Support of this Motion complies with the twenty (20) page limitation outlined in Local Civil Rule 7.1(f).

*/s/ Amanda T. Quan*
*One of the Attorneys for Defendants Case Western*
*Reserve University, Barbara R. Snyder, Lou Stark,*
*G. Dean Patterson, Jr., George O'Connell, and*
*Shannon J. Greybar Milliken.*

## CERTIFICATE OF SERVICE

I hereby certify that on October 29, 2018, a copy of the foregoing was electronically filed with the Clerk of Court using the CM/ECF system. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

*/s/ Amanda T. Quan*
*One of the Attorneys for Defendants Case Western Reserve University, Barbara R. Snyder, Lou Stark, G. Dean Patterson, Jr., George O'Connell, and Shannon J. Greybar Milliken*

36092343.8