IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| JOHN DOE, | ) CASE NO. 1:17 CV 414 |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) JUDGE DONALD C. NUGENT |
| | ) |
| CASE WESTERN RESERVE | ) MEMORANDUM OPINION |
| UNIVERSITY, *et al.*, | ) |
| | ) |
| Defendants. | ) |

This matter is before the Court on the Motion of Defendants Case Western Reserve

University ("CWRU"), Barbara R. Snyder, Lou Stark, G. Dean Patterson, Jr., George O'Connell,

and Shannon J. Greybar Milliken for Summary Judgment. (ECF #59) For the reasons that follow,

Defendants' Motion for Summary Judgment is granted.

## PROCEDURAL HISTORY

Plaintiff John Doe filed this action on March 1, 2017, regarding the actions taken and

procedures employed by the Defendants concerning the investigation of a sexual misconduct

complaint made by a student, Jane Doe, against Plaintiff which resulted in serious sanctions being

imposed on Plaintiff, including a multi-year suspension from CWRU. All of the events at issue

occurred during the school year 2014-2015 while Plaintiff was a student at CWRU.  Defendant

CWRU and the individual Defendants, who were employees of CWRU, Barbara J. Snyder,

president of CWRU, Lou Stark, Vice President for Student Affairs of CWRU, G. Dean Patterson,

Jr., Associate Vice President for Student Affairs of CWRU, George O'Connell, Director of

Student Conduct and Community Standards of CWRU, and Shannon J. Greybar Milliken,

Associate Dean of Students and Deputy Title IX Coordinator at CWRU moved to dismiss the

Complaint. Defendant Lauren Tompkins, an outside investigator hired by CWRU to investigate

the complaint by Jane Doe, filed a separate motion to dismiss. The Court granted Defendant

Tompkins' motion to dismiss and granted in part and denied in part the CWRU Defendants'

motion to dismiss. The claims that remain are: Count 1–Violation of Title IX-erroneous outcome

against CWRU; Count 3–Breach of Contract against Defendant CWRU; Count 5–Negligence

limited to duties arising from Title IX directives against all Defendants; and Count 6–Promissory

Estoppel against CWRU. (ECF #41) Defendants now move for summary judgment on the

remaining claims. Plaintiff has filed a brief in opposition and Defendants have filed a reply brief

in support. The matter is now fully briefed and ready for decision.

## FACTS[1]

Plaintiff met Jane Doe during freshman orientation activities held in August 2014. At that

time Jane was a freshman and Plaintiff was a sophomore orientation team member. Thereafter,

Plaintiff and Jane Doe developed some sort of relationship which included some sexual contact.

The incident at issue occurred on the night of September 13, 2014. On November 23, 2014, Jane

Doe sent an email to Defendant Shannon Greybar Milliken, who was the Title IX Sexual

Misconduct Investigator and Assistant Director and Deputy Title IX Coordinator at CWRU at the

---

[1]

      Except as otherwise cited, the factual summary is based on the Complaint and the parties' statements of fact. Those material facts which are controverted and supported by deposition testimony, affidavit, or other evidence are stated in the light most favorable to the non-moving party.

time to make an appointment regarding a sexual assault incident. (Milliken Aff. ¶¶ 2, 4) Dr.

Milliken met with Jane Doe on November 25, 2014. Dr. Milliken typed notes of her conversation

with Jane Doe which Jane Doe reviewed and signed to verify that the notes accurately reflected

what Jane Doe had shared with Dr. Milliken during the meeting. (Id. ¶5)

According to Dr. Milliken's notes from her November 25 meeting with Jane Doe, Jane

Doe stated that she and John Doe had spent a lot of time together during the first three weeks of

school and John Doe had told her he liked her, but she was not sure if she liked him. On the

afternoon of the incident, Jane Doe told John Doe that she did not like him and he was upset. That

evening Jane Doe went to some parties with friends and consumed shots and other alcoholic

beverages. Later that night John Doe texted Jane Doe to meet him outside her dorm. She said that

he came over because he heard that she was really messed up. John and Jane walked to the FIJI

house and went to the basement and began making out on the couch. Jane Doe states that she was

under the influence at the time and did not have very good control or process of my surroundings

and would just comply or wouldn't do anything and then realize a minute later that she did not

want to do this. She states that John Doe took off her pants and underwear and penetrated her

with his finger. Eventually, Jane Doe said that John Doe put his penis inside of her and she was

not okay with it. She said she did not want to do this and John Doe stopped and said they should

do oral sex, she didn't say anything and he put it in her face, she started and after a minute

stopped and said she didn't want to do this. She started crying and wanted to leave and he insisted

on driving her back. (Milliken Aff., Milliken Ex. 2)

Dr. Milliken confirmed with Jane Doe that she felt safe but that Jane Doe did not want to

be near John Doe. Dr. Milliken asked if Jane Doe would like to request any academic

-3-

accommodations. Jane Doe mentioned that she did before, but it was kind of okay now because she did fail a class but was withdrawing from it. (Id.)

The next day, on November 26, 2014, Dr. Milliken's assistant, Trina M. Jones, sent an email to John Doe stating that Dr. Milliken, Title IX Sexual Misconduct Investigator, asked her to contact you to set up a time for you to meet next week. Ms. Jones suggested a meeting on December 1 at 2:45 p.m. (Milliken Aff., Ex. 3) Eventually Ms. Jones scheduled a meeting between Dr. Milliken and John Doe for December 11, 2014 at 10:30 a.m. On December 9, 2014, John Doe accepted the calendar appointment for the December 11, 2014 meeting. (Milliken Aff. ¶6, Milliken Ex. 4)

Later that night on December 9, 2014, Jane Doe emailed Dr. Milliken to check on the status of the investigation and to tell her that John Doe had contacted her and showed up at her dorm wanting to talk about the incident. Dr. Milliken replied that she was out of the office the previous week and had been unable to meet with John Doe but that an appointment had just been set up that day with John Doe to meet on Thursday, December 11. Dr. Milliken told her that she would do a No Contact directive the next day.(Milliken Aff., Milliken Ex. 5)

On December 10, 2014, Dr. Milliken emailed a No Contact directive to Plaintiff. The No Contact directive stated that the University Office of Student Conduct & Community Standards is currently in the process of investigating allegations made regarding the sexual misconduct policy and gave official notice that Plaintiff was to have no contact with Jane Doe for the duration of the investigation. The No Contact directive was signed by Dr. Milliken and stated her title as Title IX Investigator, Assistant Director, and Deputy Title IX Coordinator. (Id. ¶8, Milliken Ex. 6)

John Doe met with Dr Milliken the next day as previously scheduled to discuss the

allegations made against him by Jane Doe. (Id. ¶ 9) As she did with her initial meeting with Jane

Doe, Dr. Milliken prepared contemporaneous notes of her discussion with John Doe, which John

Doe reviewed, made changes to and signed to verify that the notes accurately reflected what he

disclosed during the meeting. (Id. ¶ 9, Milliken Ex. 7) During his initial interview with Dr.

Milliken, John Doe stated that on the night of the incident, he went to Jane Doe's dorm to talk to

her. He convinced her to spend the night at his fraternity house. He stated that they were both

under the influence of alcohol and noted that she would not have come to the fraternity house

with him had she been sober. He took her to the basement of the fraternity house because he knew

no one lived down there and they could get privacy. John Doe said he watched Jane Doe fall

asleep and then kissed and undressed her and himself. He said he did not remember everything he

did but that he sobered up when she pushed him off her and started to cry. Although John Doe

said the night was a blur, he said he kissed her and fingered her and performed oral sex on Jane

Doe but did not know if they had anal or vaginal intercourse. He said what happened in the

basement was not the result of physical force or abuse "but it was without her consent. She was

not, by definition, capable of giving consent. What happened was my fault." (Id. Milliken Ex. 7)

　　Dr. Milliken asked John Doe if he felt safe and if there were any academic

accommodations that he would like to request and if there was anyone else he thought Dr.

Milliken should speak to about the matter. She also went through the next steps of the

investigative process as described in the Sexual Misconduct Policy. (Plaintiff's Dep. 102-103;

Milliken Ex. 7) When asked if there was anything else that Dr. Milliken should know, Plaintiff

stated that the reason he went to see Jane Doe on December 9 was because of the call that he got

from Trina, Dr. Milliken's assistant, to set up the December 11 meeting.[2] He did not know what

the meeting was about and googled Dr. Milliken's name and then knew what this was about. He

felt he needed to talk to Jane Doe because he was concerned about the impact her allegations may

have on his fraternity. Finally, Dr. Milliken asked John Doe what he would like to see happen

with the sexual misconduct investigation and explained the available support services. (Id.)

Moving on with the sexual misconduct investigation, Dr. Milliken interviewed John Doe

and Jane Doe again, separately, on February 6, 2015 and February 10, 2015, respectively. As with

the initial meetings, Dr. Milliken typed the witness responses to her interview outlines

contemporaneously and both John and Jane Doe signed the interview notes, verifying their

accuracy. (Milliken Aff. ¶ 10) During the second interviews Dr. Milliken reviewed the Sexual

Misconduct Policy and further discussed the incident, each person's sobriety level at the time and

tried to establish a time line of events. Dr. Milliken asked both parties what type of hearing they

would like to be used and both John Doe and Jane Doe said they would like the sole administrator

hearing with no witnesses. Dr. Milliken asked each person when they were available for a hearing

and explained the option for providing a written statement and an option for an impact statement.

(Milliken Exs. 8 and 9).

On February 18, 2015, Dr. Milliken sent separate emails to John Doe and Jane Doe to

notify them about the administrative hearing scheduled on February 25, 2015, and to provide

---

2

In his deposition, John Doe states that after discussing the No Contact Order with Dr.
Milliken in the December 11 meeting, he went right from that meeting to Jane Doe's
dorm to talk to her–to ask her why she was doing this. (Plaintiff Dep. 118-120) John Doe
also texted Jane Doe on December 23, 2014, again in violation of the No Contact Order.
(Id. 123)

information about the process. She attached a copy of CWRU's Sexual Misconduct Policy to both emails, although CWRU's Sexual Misconduct Policy was publicly available on CWRU's website during the 2014-2015 academic year. (Milliken Aff. ¶ 11; Darnell Parker Aff. ¶ 4) Dr. Milliken's November 18 emails informed both John Doe and Jane Doe that they could submit both an impact statement and a written statement to her by noon Monday, February 23, 2015 by email. Dr. Milliken's email noted that the written statement is your account of the events in your own words and the impact statement should include what the desired sanction for John Doe would be. Dr. Milliken stressed that submission of both statements was optional. The email stated that the hearing file would be complete and ready for review starting Monday, February 23 at noon until Tuesday, Feb.24, 2015. The parties were to schedule a meeting time in advance to review the investigative file in order to avoid the parties having any contact. (Milliken Aff. ¶ 11, Exs. 10, 12)

CWRU also retained an outside law firm to assist with its Title IX investigation of Jane Doe's Complaint. To that end, one of the law firm's associates, Lauren Tompkins, acting as an investigator not an attorney, assisted Dr. Milliken by interviewing witnesses, other than John Doe and Jane Doe, using the interview form provided by CWRU. (Tompkins Dep. 38-42) Ms. Tompkins interviewed the witnesses using the CWRU interview form, typed the witness's responses during the interview and had the witness review the statement for accuracy and then sign the statement. (Id. 38-39).

When Dr. Milliken had not heard from John Doe regarding whether he intended to submit a statement or impact statement prior to the Hearing or intended to review the file before the Hearing, she emailed Plaintiff on Monday, February 23, 2015. John Doe responded by email stating that he had been out of town and asked to review the file on February 24, 2015 at 2:30.

Shortly before his scheduled review period on the 24th, Plaintiff emailed Dr. Milliken that he forgot he had a meeting at 2:30 and requested to see the file at 4:15. When John Doe arrived at Dr. Milliken's office she was in a meeting and could not see John Doe. Dr. Milliken emailed John Doe that he could come in to speak with her and review the file on February 25, 2015, the day of the Hearing, at 8:30 or from 12-1:45. (Milliken Aff. Ex. 12) Plaintiff went to the office on February 25, 2015 and spent 20 minutes reviewing the file prior to the Administrative Hearing. (Plaintiff's Dep. 154-163)

On February 25, 2019, Plaintiff met with George O'Connell who conducted the administrative hearing. During the hearing Plaintiff pointed out the inconsistencies he found in Jane Doe's statements and opined that Mr. O'Connell was unfamiliar with the case because he was unaware of the alleged inconsistencies in Jane Doe's statements that had been noted by Plaintiff. (Plaintiff Dep. 166-168.) While Mr. O'Connell did not specifically recall this case, he said his practice when he was acting as a hearing administrator was to meet with each student individually, ask them questions, review the information available to him and assess each student as he met with them. (O'Connell Dep. 117, 135-36.) On February 27, 2015, Mr. O'Connell met with Plaintiff to review his decision. (Plaintiff Dep. 179). In the written decision, Mr. O'Connell wrote: "[b]ased on my review of all provided information, my discussion with you and my discussion with Jane Doe, I have found you responsible for non-consensual sexual intercourse under the university sexual misconduct policy." (Plaintiff's Dep. Ex. 21) Disciplinary sanctions of separation from the university through May 15, 2017, persona non grata status, continuation of the No Contact Order with Jane Doe through her graduation and exclusion from university housing after readmission to the university were imposed. (Id.) Plaintiff was advised that he had

-8-

the right to appeal the decision within three business days of March 4, 2015. (Id.)

Plaintiff filed an appeal but did not take issue with the finding of responsibility but rather the illogical sentence, *i.e.*, why he was separated for two years rather than three years when Jane Doe will have graduated. Plaintiff sought a reduction of the separation from two years to the end of the May 2015 term or the end of the May 2016 term. He also stated that he would "rather have the sentence increased to the May 2018 term than live with the current sentence, for increasing the sentence gives me a clearer vision on how to proceed with my life." (Plaintiff's Dep. Ex. 22)

On March 17, 2015, the Chair of the Appeals Board notified Plaintiff that the Appeals Board reviewed Plaintiff's Appeal and considered the stated ground for appeal to be that the sanctions are substantially disproportionate to the severity of the violation. (Plaintiff's Dep. Ex. 24) After reviewing the case file, the Appeals Board determined that the sanctions initially imposed were disproportionate to the severity of the violation and modified the sanctions to include separation from the university through May 21, 2018 to allow Jane Doe to finish her degree without John Doe on campus. The persona non gratis status was extended as well and the original No Contact Order and exclusion from university housing were maintained. (Id.)[3]

Plaintiff filed this action almost two years later on March 1, 2017.

## STANDARD OF REVIEW

Summary judgment is appropriate when the court is satisfied "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of

---

[3]

Plaintiff stated that he did not consult an attorney or his parents at any point during this investigatory process or hearing or appeal because he thought he could figure it out on his own. (Plaintiff's Dep. 178)

law." Fed. R. Civ. P. 56(a). The burden of showing the absence of any such "genuine issue" rests with the moving party:

> [A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any,' which it believes demonstrates the absence of a genuine issue of material fact.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (citations omitted). A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Determination of whether a factual issue is "genuine" requires consideration of the applicable evidentiary standards. The court will view the summary judgment motion in the light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Summary judgment should be granted if a party who bears the burden of proof at trial does not establish an essential element of their case. *Tolton v. American Biodyne, Inc.*, 48 F.3d 937, 941 (6th Cir. 1995) (citing *Celotex*, 477 U.S. at 322). Accordingly, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. 1995) (citing *Anderson*, 477 U.S. at 252). Moreover, if the evidence presented is "merely colorable" and not "significantly probative," the court may decide the legal issue and grant summary judgment. *Anderson*, 477 U.S. at 249-50 (citations omitted). In most civil cases involving summary judgment, the court must decide "whether reasonable jurors could find by a preponderance of the evidence that the [non-moving party] is entitled to a verdict." *Id.* at

-10-

252. However, if the non-moving party faces a heightened burden of proof, such as clear and convincing evidence, it must show that it can produce evidence which, if believed, will meet the higher standard. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989).

Once the moving party has satisfied its burden of proof, the burden then shifts to the non-mover. The non-moving party may not simply rely on its pleadings, but must "produce evidence that results in a conflict of material fact to be solved by a jury." *Cox v. Kentucky Dep't of Transp.*, 53 F.3d 146, 149 (6th Cir. 1995). Evidence may be presented by citing to particular parts of the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials. Fed. R. Civ. P. 56(c). In lieu of presenting evidence, Fed. R. Civ. P. 56(c) also allows that a party may show that the opposing party's evidence does "not establish the presence of a genuine dispute" or that the adverse party "cannot produce admissible evidence to support the fact."

According to Fed. R. Civ. P. 56(e),

[i]f a party fails to properly support an assertion of fact, or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may:

(1) give an opportunity to properly support or address the fact;

(2) consider the fact undisputed for purposes of the motion;

(3) grant summary judgment if the motion and supporting materials – including the facts considered undisputed – show that the movant is entitled to it; or

(4) issue any other appropriate order

In sum, proper summary judgment analysis entails "the threshold inquiry of determining whether there is the need for a trial--whether, in other words, there are any genuine factual issues

-11-

that properly can be resolved only by a finder of fact because they may reasonably be resolved in

favor of either party." *Anderson*, 477 U.S. at 250.

## DISCUSSION

Defendants move for summary judgment on all remaining claims–breach of contract

against CWRU, promissory estoppel against CWRU and negligence limited to duties arising from

Title IX directives against all Defendants.

### I. Breach of Contract

Both Plaintiffs and Defendants agree that there is contract between the University and

Plaintiff. This understanding coincides with Ohio law which provides that the relationship

between a university and its students is contractual in nature. *Al-Dabagh v. Case Western Reserve*

*Univ.*, 777 F.3d 355, 359 (6th Cir. 2015), *cert denied*, 135 S.Ct. 2817 (2015) *citing Behrend v.*

*State*, 55 Ohio App.2d 135, 379 N.E.2d 617, 620 (1977). *See also, Tate v. Owens State Cmty.*

*College*, 2011-Ohio-3452, ¶ 21 (Ohio App. 10 Dist.) ("It is well-settled that there is a contract

established when a student enrolls, pays tuition, and attends classes at a school. This contract is

typically found in a handbook, catalogue, or other guideline." *Smith v. Ohio State Univ.* (1990),

53 Ohio Misc.2d 11, 13, 557 N.E.2d 857; *Elliot v. Univ. of Cincinnati* (1999), 134 Ohio App.3d

203, 730 N.E.2d 996.) In this case, CWRU's sexual misconduct policy supplies the contract

terms. When reviewing whether a university has breached its handbook or policies, courts must

defer to the decisions of the school unless the court finds "such a substantial departure from

accepted academic norms as to demonstrate that the person or committee responsible did not

actually exercise professional judgment." *Tate, supra, citing Bleicher v. Univ. of Cincinnati*

*College of Med.* (1992), 78 Ohio App.3d 302, 308, 604 N.E.2d 783; *quoting Regents of the Univ.*

-12-

*of Mich. v. Ewing* (1985), 474 U.S. 214, 225, 106 S.Ct. 507, 88 L.Ed.2d 523; accord *Al-Dabagh*,

777 F.3d at 359.  Further, Sixth Circuit precedent "does not require strict adherence to

administrative procedures, rather, courts must consider whether the university abused its

discretion in applying the disciplinary grievance procedure." *Faparusi v. Case W. Reserve Univ.*,

No. 1:16CV1586, 2017 WL 759024, at *2 (N.D. Ohio Feb. 28, 2017), *aff'd* 711 F. App'x 269 (6th

Cir. 2017), *reh'g denied* (Oct. 18, 2017), *cert. denied*, 138 S. Ct. 1445, 200 L. Ed. 2d 719 (2018).

Plaintiff asserts that CWRU "substantially and unreasonably departed from its own

procedures" as follows:

-- The Sexual Misconduct Policy (the "Policy") requires that a student accused of sexual

misconduct be provided with support services and academic accommodations and Plaintiff was

not provided with support services or informed about academic accommodations until the middle

of his final exams week. The record in this matter clearly reflects that Dr. Milliken discussed

support services and academic accommodations with Plaintiff during their first meeting on

December 11, 2014, which apparently fell within Plaintiff's exam week. There is no evidence that

Plaintiff requested support services or academic accommodation during his first meeting with Dr.

Milliken. The Policy does not state that such services must be provided if not requested by the

affected parties. Plaintiff also argues that Dr. Milliken violated the Policy when she failed to stop

the initial meeting when provided with information regarding Plaintiff's mental health and

disabilities. However, as noted above, Dr. Milliken did discuss the availability of support services

and academic accommodations with Plaintiff at that meeting. Plaintiff did not ask for any

accommodation or request additional information regarding support services.

-- Plaintiff asserts that he was not notified of the sexual misconduct investigation or his

-13-

right to bring a support person prior to his first meeting with Dr. Milliken. Neither party here points to any provision in the Policy stating that the school must provide an accused person with advance notice of the specific allegations made against him or inform him of the right to bring a support person prior to his first meeting with the investigator. While Plaintiff alleges that he was blindsided with the sexual misconduct complaint when he met with Dr. Milliken, it is clear that Plaintiff was aware that Dr. Milliken was the Title IX Sexual Misconduct Investigator, as noted in Trina Jone's email to Plaintiff setting up the meeting and that Plaintiff had connected that to his incident with Jane Doe, as evidenced by his visit to Ms. Doe on December 9, 2014, the date he confirmed his meeting with Dr. Milliken. Finally, Plaintiff received the No Contact directive on December 10, 2014, prior to his initial meeting with Dr. Milliken, informing him that he was the subject of a sexual misconduct complaint and advising him not to contact Jane Doe.

Plaintiff notes that he was not provided a copy of the Policy at his initial meeting with Dr. Milliken and was only emailed a copy on February 23, 2015, two days prior to the administrative hearing. Despite the fact that Plaintiff was not given a copy of the Policy in his meetings with Dr. Milliken, they did discuss the Policy and the two types of processes for resolving Title IX complaints at both of the meetings. Moreover, the Policy was publicly available on the University's website during the entire 2014-2015 academic year.

Plaintiff also complains that he was not permitted to meaningfully review the witness statements or to provide responses to them prior to the hearing. Plaintiff also notes that he only reviewed the investigation report for twenty minutes prior to the administrative hearing and that even one to two days of review would have been insufficient. Further, Plaintiff contends that CWRU violated the Policy by not including the statements submitted by the parties to the

-14-

Administrative Hearing Report. None of these complaints demonstrates non-compliance with the Policy. Plaintiff chose the informal resolution process which does not provide for a complainant or respondent to review or respond to the Investigation Report and witness statements. Moreover, Plaintiff was given the opportunity to review the Investigation Report and witness statements beginning two days before the administrative hearing but Plaintiff apparently declined to take advantage of that and was not able to schedule a review time until the day of the Administrative Hearing. There is no evidence regarding why Plaintiff decided to only spend 20 minutes reviewing the file on the day of the hearing.

With respect to the statement submitted by Plaintiff after the date that it was due, CWRU contends that the statement submitted by Plaintiff was an impact statement, not a written statement, and as such was only relevant to the sanction phase of the process. The statement submitted by Plaintiff appears to be a copy of a long text message he sent to Jane Doe on December 23, 2014, in violation of the No Contact Directive, which was not a statement describing his version of what happened. (See Plaintiff Dep. Ex. 12) In the statement, Plaintiff states that "I think re-summarizing what I know and don't know are details that don't convey the humanity of our story, so I would like to share this text message that I sent Jane Doe on December 23, 2014." (Id.) The text message is a long rambling statement theorizing why Jane Doe may have made the complaint, his contemplation of what he could lose and whether suicide was the answer and his wish that he could talk it out with Jane Doe. In any event, the statement submitted by Plaintiff was not what the Policy described as a written statement which is the complainant's account of the events in your own words. As such, failure to add the statement to the Investigative Report did not violate the Policy and, given the content of the writing, its

-15-

absence was not in any way prejudicial to Plaintiff.

Finally, Plaintiff argues that CWRU violated the Policy because it failed to complete the investigation within 60 days. Plaintiff is correct in that the investigation in this case took longer than 60 days and fell over the University's winter break. The Policy, however, does not require an investigation to be completed in 60 days, it merely provides that "[t]he University generally attempts to resolve complaints from the filing of a complaint to a determination within sixty (60) days." (Policy, p. 15)

These alleged contract breaches asserted by Plaintiff are either non-existent or at most, minor. It is clear that CWRU has substantially followed its sexual misconduct policy. As the Plaintiff acknowledges, courts must give deference to the decisions of a university unless there is "such a substantial departure from accepted academic norms as to demonstrate that the ... committee responsible did not actually exercise professional judgment." (ECF # 72 p. 2-3) *quoting Al-Dabagh v. Case W. Reserve Univ.*, 777 F.3d 355, 359 (6th Cir. 2015). Here, there has been no "substantial departure" because CWRU reasonably complied with its sexual misconduct policy. As such, CWRU is entitled to summary judgment on Plaintiff's breach of contract claim.

### 2. Promissory Estoppel

The parties agree that there is a contract between Plaintiff and CWRU. Further, in part one above, the Court has already recognized that contract and determined that CWRU was not in material breach of that contract and that consequently, Plaintiff's breach of contract claim fails. Plaintiff's promissory estoppel claim relies on the same allegations as his breach of contract claim, i.e., promises set forth in the University's sexual misconduct policy. Ohio law bars a promissory estoppel claim when there is an express contract between the parties. *Doe v. College of Wooster*, 243 F.Supp.3d 875, 888 (N.D. Ohio 2017)(dismissing promissory estoppel claim

where such claim "rest[ed] on promises' set forth in the Student Handbook and the disciplinary process set forth therein, and relies on the same allegations as [a] contract claim.") Accordingly, CWRU is entitled to summary judgment on Plaintiff's promissory estoppel claim.

### 3. Title IX

In Count One of his Complaint Plaintiff asserts a claim of violation of Title IX–Erroneous Outcome against CWRU. While the Complaint notes that "Title IX claims arising from disciplinary hearings are analyzed under one or more of the following four standards: erroneous outcome, selective enforcement, deliberate indifference, or archaic assumptions," the rest of Plaintiff's claim focuses solely on the erroneous outcome theory. (ECF #1, ¶ 174, 175-199). Now, in response to Defendants' Motion for Summary Judgment, Plaintiff raises the additional theory of selective enforcement. The Court will address these theories in order.

### A. Erroneous Outcome

An erroneous outcome claim requires the plaintiff to show that the "outcome of [the] University's disciplinary proceeding was erroneous because of sex bias." *Mallory v. Ohio Univ.*, 76 F. App'x 634, 639 (6th Cir. 2003) To do this, a plaintiff must establish:

> (1) facts sufficient "to cast some articulable doubt on the accuracy
> of the outcome of the disciplinary proceeding," and
>
> (2) a "particularized . . . causal connection between the flawed
> outcome and gender bias."

*Doe v. Cummins*, 662 F. App'x 437, 452 (6th Cir. 2016) (*quoting Yusuf v. Vassar College*, 35 F.3d 709, 715 (2d Cir. 1994).

With respect to the first element, Plaintiff argues that the decision finding him responsible was erroneous because the University did not provide him an opportunity for cross-examination

even though credibility was at stake. However, courts have determined that "the right of cross-examination and confrontation as it exists in criminal settings is not a requirement of due process in school disciplinary proceedings." *Pacheco v. St. Mary's Univ.*, 2017 WL 2670758, *17 (W.D. Tex. June 20, 2017)(granting summary judgment to university on erroneous outcome claim finding "there is no evidence raising a genuine issue of material fact that the lack of cross-examination was a procedural flaw casting doubt on the accuracy of the proceeding.") Further, as noted above, Plaintiff chose the informal proceeding that does not permit the complainant or respondent to submit questions to the panel for cross examination. A respondent's choice of the informal procedure cannot be used to create doubt as to the accuracy of the proceeding as the parties knew before the fact that cross examination would not be allowed. As explained in part one, CWRU substantially followed its procedures set out in the Policy negating Plaintiff's assertion that the process was flawed, thus purportedly resulting in an erroneous outcome.

However, even if the Plaintiff could show some genuine question of material fact regarding whether the outcome was erroneous, Plaintiff must still demonstrate a genuine issue of material fact as to whether CWRU's actions were motivated by gender bias, *i.e.*, that there is a causal connection between the flawed outcome and gender bias. To show a causal connection, Plaintiff must provide evidence that "gender [was] a motivating factor in the decision to discipline." *Doe v. Colgate University*, 2017 WL 4990629, *11 (N.D. New York Oct. 31, 2017), *aff'd Doe v. Colgate University*, 2019 WL 190515 (2d Cir. Jan. 15, 2019) (*quoting Yusuf v. Vassar College*, 35 F.3d 709, 715 (2d Cir. 1994). In *Yusuf*, the court found that "statements by members of the disciplinary tribunal, statements by pertinent university officials, or patterns of decision-making that also tend to show the influence of gender" may create an inference of

-18-

gender bias. *Yusuf*, 35 F.3d at 715. However, evidence of bias against the accused in sexual misconduct hearings does not equate to bias against men. *Doe v. Colgate University*, 2017 WL 4990629 at *11, *Haley v. Va. Commonwealth Univ.*, 948 F. Supp. 573, 579 (E.D. Va. 1996)("[B]ias against people accused of sexual harassment and in favor of victims ... indicate[s] nothing about gender discrimination.")

As evidence of gender bias, Plaintiff alleges that Dr. Milliken was biased against college age men in favor of college age women and that her alleged bias "infected every aspect of the investigation against Doe." (ECF #72, p.10) Plaintiff's only evidence of this alleged bias however, is Dr. Milliken's dissertation entitled "The Dangerous Reality: Sexual Risk Taking Among College Age Women." Plaintiff provides several quotes from Dr. Milliken's dissertation including the following:

> --"We have an epidemic in higher education regarding the sexual risk taking of college students, in particular women.."

> --"Overall, the purpose of the research presented here is to assess current sexual risk-taking practices by Caucasian women to see what we (as a society, as higher education administrators, as parents and families of girls and women) can do to care more for them."

> --This research "present[s] a call to action to care for the mental health of girls and women and to increase disease prevention contraception device use in sexual relationships among young people."

> --"the men [depressed females] are frequently engaging in casual sex with are the most confident, which could be seen as them taking advantage of women."

(ECF #72 pp 11-12) While Plaintiff's allegations regarding Dr. Milliken's dissertation, the influence she exercised over the record and the evidence presented to the decision maker, taken as true and with all inferences credited to Plaintiff, were sufficient to survive a motion to dismiss, at the summary judgment phase, Plaintiff must link Dr. Milliken's dissertation with evidence that would support that those comments about sexual risk taking on the part of college students caused gender bias to infect his disciplinary process. *See Doe v. Colgate*, 2017 WL 4990629, at *13 (rejecting plaintiff's contention that article written by former university president that touted a "Yes Means Yes" seminar focused on 'female sexual power' and a 'world without rape' served as evidence of gender-biased pressure because plaintiff failed to explain the seminar's content, whether it was critical of the university's hearing process, and whether the seminar impacted the university to a degree that it could support an inference that it pressured administrators.) Any alleged bias must be evident from the record and not based on inference and speculation. *Nash v. Auburn Univ.*, 812 F.2d 655, 665 (11th Cir. 1987); *Doe v. Trustees of Boston College*, 892 F.3d 67, 91 (1st Cir. 2018)(Plaintiff "cannot merely rest on superficial assertions of discrimination, but must establish that 'particular circumstances suggest[] that gender bias was a motivating factor.'")

Plaintiff asserts that the record reflects Dr. Milliken's alleged bias in the way that she favored the complainant as follows:

–Dr. Milliken summoned Plaintiff to her office on December 11, 2014 while she permitted Jane Doe to pick a date and time for their initial meeting and emailed Jane Doe a list of support services immediately after their initial meeting.

–Dr. Milliken asked Plaintiff a number of leading questions displaying a presumption of guilt and did not advise Plaintiff of his rights guaranteed by the Policy.

-20-

–Dr. Milliken did not advise Plaintiff prior to his first interview that a sexual misconduct complaint had been filed against him and did not advise him of his right to have a support person with him, or to refrain from making statements, or provide access to support services such as counseling for mental health issues or email him a list of support services following their initial meeting even though Plaintiff broke down in the meeting.

–the number of on campus forcible sex offenses doubled from seven in 2013 to 14 in 2014, which was Dr. Milliken's only full year at CWRU and the reporting of sexual misconduct allegations spiked in 2014, which Plaintiff attributes to Dr. Milliken's training of large numbers of students.

–Dr. Milliken was applying for other jobs during this investigation.

In addressing these points, as described in Part 1 above, CWRU and Dr. Milliken substantially complied with the Policy throughout the investigation, including in setting up her meetings with the students involved in this process. The interview outlines used by Dr. Milliken for both John and Jane Doe were virtually identical and she followed the same procedure where she typed up the student's responses to the questions during the interview, allowed the student to read their responses, edit them and sign them at the meeting. The interview notes of Plaintiff's initial meeting with Dr. Milliken reflect that she reviewed the Policy, and discussed the availability of accommodations and support services. John Doe refused accommodations. While Plaintiff feels that Dr. Milliken asked him leading questions which he believes shows that she presumed his guilt, Plaintiff's subjective beliefs do not support a finding that Plaintiff was treated differently than Jane Doe on the basis of sex. Plaintiff also feels that Dr. Milliken should have essentially advised him of Miranda type rights such as not to make a statement. The Policy does

not require the giving of Miranda type warnings. While Dr. Milliken trained students on the sexual misconduct policy as part of her job, she, and the University, had no control over the number of forcible sexual assaults that occurred on campus or on the number of sexual misconduct complaints filed. Finally, Plaintiff theory that Dr. Milliken's job search may have prevented her from having time to provide Plaintiff with a fair, prompt or thorough investigation, is mere speculation. As noted above, the fact that this investigation took 90 days rather than 60 days does not violate the Policy. Further, the investigation was thorough–in addition to John Doe and Jane Doe, 14 witnesses were interviewed and their witness statements were recorded and signed. While Plaintiff believes that there could have been follow up on one of the witnesses to get his journal, there is no evidence beyond Plaintiff's speculation that Dr. Milliken's job search affected this investigation. Most importantly, the job search provides no support for Plaintiff's theory that Dr. Milliken was biased against him in particular or college age men in general. The record does not support Plaintiff's allegation of bias against college age men or plaintiff in particular.

It is up to Plaintiff to show that CWRU's actions were motivated by gender bias. Even if the record supported a finding of bias by Dr. Milliken, Dr. Milliken did not make the findings determination in this case. With no evidence of gender bias on the part of the actual decision makers, Plaintiff generally argues that Dr. Milliken's alleged bias infected the entire investigation because she was well regarded by her department and her immediate supervisor, George O'Connell, stated that Dr. Milliken did not require much supervision. Further, because Dr. Milliken and Mr. O'Connell would briefly discuss on-going cases in the course of their work, Plaintiff claims that O'Connell was biased against him before they met. Courts have rejected

-22-

these kinds of claims based on dual roles or supervisory oversight. School disciplinary boards, or in this case the single hearing office, are entitled to a presumption of honesty and impartiality absent a showing of actual bias. *Atria v. Vanderbilt Univ.*, 142 Fed. Appx. 246, 256 (6th Cir. 2005); *Plummer v. Univ. of Houston*, 860 F.3d 767, 776-77 (5th Cir. 2017)(affirming summary judgment of Title IX claims where the plaintiff asserted a conflict of interest existed due to a key fact witness serving in dual roles) *citing Baran v. Port of Beaumont Nav. Dist. of Jefferson Cty.*, 57 F.3d 436, 446 (5th Cir. 1995)("[Where a]llegations of bias based on the prejudgment of the facts or outcome of a dispute generally stem from the fact that an administrative body or hearing officer has dual roles of investigating and adjudicating disputes and complaints...the honesty and integrity of those serving as adjudicators is presumed.") The fact that Dr. Milliken worked with the decision makers here is not unusual and does not support a finding that CWRU's decision in this case was motivated by gender discrimination.

Plaintiff argues that the investigative report assembled by Dr. Milliken  made a credibility decision about Plaintiff because it noted his "controlling" behavior and that Mr. O'Connell, who was supposed to make the credibility decisions, relied on Dr. Milliken's assessment. Plaintiff also suggests that the fact that Mr. O'Connell and Gia Adeen, who acted as the Appeal administrator, emailed their Outcome Letter and Appeal Decision Letter, respectively, to Dr. Milliken for comment before they were issued shows that Milliken's alleged bias was able to influence both the administrative hearing and appeal. There is no evidence in the record, however, indicating that Dr. Milliken actually suggested or made any changes or additions to the Outcome Letter or Appeal Decision. Further, it is clear that Mr. O'Connell and Ms. Adeen drafted the Outcome Letter and Appeal Decision, respectively. Moreover, Mr. O'Connell made his own credibility

-23-

decisions as reflected in his Outcome Letter which reviewed what Plaintiff had discussed with Mr. O'Connell at the hearing, noted that he had spoken with Jane Doe, and explained why he decided that John Doe had violated the Policy.

Finally, there is no significant evidence submitted by Plaintiff to suggest "patterns of decision-making" on the part of CWRU that tend to show the influence of gender. Plaintiff submits a chart regarding sexual misconduct complaints where Dr. Milliken was an investigator. (ECF # 72, Ex. 8) Review of the chart shows that 24 of the complaints went through the process to decision, with findings of either responsible or not responsible. Of those cases all but two of the cases were filed by female complainants. Of the 22 cases filed by female complainants, 4 male respondents were found not responsible and 18 were found responsible. In the two cases filed by male complainants, one female respondent was found not responsible and one was found responsible. 56 complaints had a finding of N/A which was not explained. In many of those cases the complaint went inactive due to lack of information or cooperation. One noted that parties admitted consensual sex. Finally, there were 3 complaints where a finding was pending, one complaint that was determined to not be a Title IX complaint, one case had no finding and another did not have enough information. The fact that there were many more female complainants than male complainants is not unusual and cannot be used to infer that males are treated unfairly or that the University's disciplinary system is influenced by gender. *See Doe v. Regents of the Univ. Of Cal.*, No. 2:15CV2478, 2016 WL 5515711, *5 (C.D. Cal. July 25, 2016(finding that a court "cannot plausibly infer ...that a higher rate of sexual assaults committed by men against women, or filed by women against men, indicates discriminatory treatment of males accused of sexual assault in the consequent proceedings") The chart offers no evidence that

-24-

CWRU treated women more favorably then men.

Careful review of record evidence shows that there is no genuine issue of material fact related to Plaintiff's Title IX claim. There is no evidence that the University's sexual misconduct policy itself is discriminatory to males or that Dr. Milliken in particular, or any other University employee applied the Policy against Plaintiff in a biased or discriminatory way. Finally, no evidence submitted by Plaintiff supports his claim that the finding of responsibility against him by Mr. O'Connell was motivated by gender bias. As such, CWRU is entitled to summary judgment on Plaintiff's Title IX claim Erroneous Outcome Claim.

### B. Selective Enforcement

Plaintiff raises a selective enforcement claim in response to Defendants' Motion for Summary Judgment. Plaintiff's response to Defendants' Motion to Dismiss, as well as his Complaint clearly reflect that his only claim under Title IX was for erroneous outcome, which this Court recognized in the opinion granting in part and denying in part Defendants' Motion to Dismiss. (ECF #41 p. 10) A plaintiff may not raise a new legal claim for the first time in response to a motion for summary judgment. *Zebari v. CVS Caremark Corp.*, No. 16-2612, 2017 WL 7734059, at *3 (6th Cir. Nov. 15, 2017), *cert. denied*, 138 S. Ct. 2608, 201 L. Ed. 2d 1004 (2018) *citing Tucker v. Union of Needletrades, Indus. & Textile Emps.*, 407 F.3d 784, 788 (6th Cir. 2005). *See also, Doe v. Miami University*, 882 F.3d 579, 594-595 (6th Cir. 2018) (Plaintiff forfeits Title IX selective enforcement claim when it was not raised in complaint or in opposition to motion to dismiss.) Accordingly, Plaintiff's newly asserted selective enforcement claim is dismissed.

However, even if Plaintiff's selective enforcement claim was properly before the Court, it

would fail as a matter of law. "To prevail on a 'selective enforcement' claim, the plaintiff must show that a similarly-situated member of the opposite sex was treated more favorably than the plaintiff due to his or her gender." *Doe v. Cummins*, 662 F. App'x 437, 452 (6th Cir. 2016). To make this showing, a plaintiff must "identif[y] ... a comparator of the opposite sex who was treated more favorably by the educational institution when facing similar disciplinary charges." *Id.* In the case before the Court, Plaintiff does not identify why Jane Doe is an appropriate comparator. John Doe merely argues that he was intoxicated , and under *Doe v. Miami Univ.*, 882 F.3d 579 (6th Cir. 2018), CWRU's failure to pursue a similar charge against Jane Doe constituted gender bias. However, as another court reviewing a selective enforcement claim following the *Miami* decision found, "to be clear, in *Miami University*, the Court of Appeals held that, for the purposes of a deliberate-indifference claim, a complaint need not necessarily have been made against a female accuser. *Miami Univ.*, 882 F.3d at 591. That Court did not address selective enforcement claims, for which the similarly-situated comparator requirement remains in place. *Ohio State Univ. II*, 323 F.Supp.3d at 967-68." *Z.J. v. Vanderbilt Univ.*, 355 F. Supp. 3d 646, 677 (M.D. Tenn. 2018) (finding that male plaintiff was not similarly situated to female complainant merely by virtue of having been intoxicated. There was no allegation of any charge against the female complainant that would have required investigation and thus no reason to infer gender bias.) Similarly, in *Doe v. Ohio State University*, 323 F.Supp.3d 962, 967-968 (2018) the district court refused to reconsider dismissal of Plaintiff's selective enforcement claim following the *Miami University* decision finding that the controlling law regarding selective enforcement claims has not changed because the Sixth Circuit did not analyze a selective enforcement claim in *Miami*.

-26-

In this case Plaintiff has failed to identify a similarly situated female who was treated more favorably by CWRU when facing similar charges. Until Plaintiff can make that showing, an inference of gender bias does not arise. Jane Doe is clearly not similarly situated. The only alleged similarity is that both students were intoxicated, but it is clear that all of the alleged sexual acts were initiated and performed by Plaintiff. There is no allegation by Plaintiff that Jane Doe performed any sexual act on him with or without consent that could have led to a similar charge of non-consensual sexual intercourse. As such, no inference of gender bias can be drawn and any selective enforcement claim fails.

### 4. Negligence

Following earlier motion practice, the negligence claim against Defendants was limited to any duty arising out of the OCR directives. Defendants move for summary judgment on this claim because Title IX and its implementing regulations cannot serve as the basis for a negligence *per se* claim. *Gebser v. Lago Vista Independent School Dist.*, 524 U.S. 274 (1998). Plaintiff failed to address this argument in his opposition and has abandoned this claim. *See Halker v. Bob Evans Farms, Inc.*, No. 2:13 CV 893, 2014 WL 4472651, *3 (S.D. Ohio, Sept. 11, 2014). Accordingly, this claim is dismissed.

### CONCLUSION

For the reasons set forth above, there is no genuine issue of material fact that would preclude judgment in favor of Defendants on Plaintiff's remaining claims[4]. Accordingly,

---

[4]

　　Because Plaintiff's substantive claims have failed, he is not entitled to declaratory relief, thus his request for declaratory relief is dismissed. *See United States Wrestling Fed'n v. Wrestling Div. Of the AAU, Inc.*, 711 F.2d 1060, 1060 (6th Cir. 1983).

Defendants' Motion for Summary Judgment (ECF #59) is granted.

IT IS SO ORDERED.

DONALD C. NUGENT
UNITED STATES DISTRICT JUDGE

DATED: May 1, 2019

-28-